1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
2

3      ****************************************************************

4    UNITED STATES OF AMERICA
                                   CRIMINAL DOCKET NO. 07-28
5    V.                            NEW ORLEANS, LOUISIANA
                                   APRIL 8, 2009, 9:00 A.M.
6    JACQUELINE CLEGGETT

7      ****************************************************************

8

                        TRANSCRIPT OF COMPETENCY HEARING
9          HEARD BEFORE THE HONORABLE KURT ENGELHARDT
                    UNITED STATES DISTRICT JUDGE
10

11

12   APPEARANCES:

13

14   FOR THE PLAINTIFF:       FEDERAL PUBLIC DEFENDER (NEW ORLEANS)
                              BY:  GEORGE CHANEY, JR., ESQUIRE
15                            BY:  CYNTHIA M. CIMINO, ESQUIRE
                              HALE BOGGS FEDERAL BUILDING
16                            500 POYDRAS STREET, ROOM 318
                              NEW ORLEANS, LA  70130
17

18   FOR THE DEFENDANT:       U.S. ATTORNEY'S OFFICE
                              BY:  THEODORE R. CARTER, III, ESQUIRE
19                            500 POYDRAS STREET, ROOM 210
                              NEW ORLEANS, LA  70130
20

21

22   OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                 500 POYDRAS STREET, ROOM B406
23                               NEW ORLEANS LA  70130
                                 (504) 589-7779
24

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
25   PRODUCED BY COMPUTER.

1                    **I N D E X**

2

3  <u>Examinations</u>                                    <u>Page</u>

4  **DR. SUSAN R. ANDREWS**...................................   8

5  VOIR DIRE EXAMINATION BY MR. CHANEY...................   8

6  DIRECT EXAMINATION BY MR. CHANEY......................  10

7  CROSS-EXAMINATION BY MR. CARTER.......................  26

8  REDIRECT EXAMINATION BY MR. CHANEY....................  32

9  **LORI BORRUANO**........................................  36

10 DIRECT EXAMINATION BY MR. CHANEY......................  36

11 CROSS-EXAMINATION BY MR. CARTER.......................  42

12 **DR. JOHN W. THOMPSON, JR.**............................  46

13 DIRECT EXAMINATION BY MR. CARTER......................  46

14 CROSS-EXAMINATION BY MR. CHANEY.......................  61

15 REDIRECT EXAMINATION BY MR. CARTER....................  80

16 **DR. KEVIN JOSEPH BIANCHINI**...........................  86

17 DIRECT EXAMINATION BY MR. CARTER......................  86

18 CROSS-EXAMINATION BY MR. CHANEY.......................  99

19 REDIRECT EXAMINATION BY MR. CARTER.................... 118

20

21                    **E X H I B I T S**

22 <u>Description</u>                                     <u>Page</u>

23 Exhibit A............................................. 134

24 Exhibit B............................................. 134

25 Exhibit C............................................. 134

1          **P-R-O-C-E-E-D-I-N-G-S**

2          M O R N I N G   S E S S I O N

3              APRIL 8, 2009

4          (COURT CALLED TO ORDER)

5

6

7          THE COURT:  Good morning.  You may be seated.

8          THE DEPUTY CLERK:  Criminal Action #07-28, *United States*

9   *of America versus Jacqueline Cleggett.*

10         THE COURT:  Counsel, if you would make your appearances

11  for the record.

12         MR. CARTER:  Good morning, Your Honor.  Theodore Carter

13  on behalf of the United States.

14         THE COURT:  Good morning.

15         MR. CHANEY:  Good morning, Your Honor.  George Chaney,

16  along with Cindy Cimino on behalf of Dr. Jacqueline Cleggett.

17             My understanding is Dr. Cleggett is en route,

18  Your Honor.  My investigator is at the front of the courthouse

19  waiting for her to be delivered.  She was being transported from

20  the facility by an operation called Transplus.  I called and

21  spoke with the driver, who said they were about 15 minutes out

22  from the courthouse he was describing, but that was more than

23  15 minutes ago, so I don't know if they ran into traffic in the

24  stretch as they got closer towards New Orleans.

25         THE COURT:  Can we try to get an update as to how -- I

1   mean, if it's a question of a few minutes, then that's fine;

2   otherwise, I would prefer to proceed, if it's going to be a

3   substantial delay.

4          MR. CHANEY:  Certainly, I can try to make another call,

5   Your Honor.

6          THE COURT:  All right.  Well, we're going to take about

7   a five-minutes recess.  If you would, please advise the courtroom

8   deputy once you have received any word.  I hope maybe she'll

9   arrive during the recess, which would be great.

10         MR. CHANEY:  I will do that.

11         THE DEPUTY CLERK:  All rise.

12         (WHEREUPON, at this point in the proceedings, a brief

13         recess was taken.)

14         THE DEPUTY CLERK:  All rise.

15         THE COURT:  You may be seated.  George, what's the

16  latest?

17         MR. CHANEY:  The latest that I got from my office was

18  that she was outside.  I got a report that she was outside the

19  courthouse.  She has some mobility issues.  She can walk.  She's

20  improved to the point where she can walk, but she walks very

21  slowly, with a limp.  I think most of the time she's using a

22  wheelchair or a cane to assist her.  I don't think she brought

23  either of those devices with her this morning to assist in her

24  movement.  So my investigator is -- they have to lend assistance

25  to her.

1          THE COURT:  Do we know that she is here now?

2          MR. CHANEY:  We know that she has arrived at the

3     courthouse.

4          THE COURT:  Well, let's wait for her to come in.  I'm

5     going to ask you all to be very efficient because we're now

6     25 minutes behind.

7          MR. CHANEY:  I understand, Your Honor.

8          THE COURT:  All right.  Counsel, for the record, the

9     defendant has just arrived and is going to be seated at counsel's

10    table with Mr. Chaney.  Why don't we go ahead and begin since

11    we're already delayed.  We're going to have to do a better job of

12    getting started on time.  I understand there is travel

13    arrangements involved, but when we have things for 9 o'clock,

14    we've got to start at 9 o'clock.  It's now 9:33.  So let's go

15    ahead and begin.

16         MR. CHANEY:  Your Honor, I apologize to the Court with

17    respect to -- that is a part of the problem relating to just

18    going forward in this process, is that Dr. Cleggett has some

19    serious injuries and impairments that impact her mobility and

20    that sort of stuff.  We have tried to coordinate and do all that

21    we can to make sure that she is here when she's supposed to be.

22    One of the things that we may have to do is, we discussed with

23    the Court the possibility of -- with respect to the further

24    things, if we can move in the direction of Baton Rouge, I would

25    make the motion that the Court is inclined to have that happen,

1   assuming that we have hearings past this day.

2          But I will do everything I can throughout the

3   process to accommodate.

4          THE COURT:  Okay.  We'll go ahead.  Let's go ahead and

5   proceed.

6          Mr. Chaney, do you want to call your first witness?

7          MR. CHANEY:  Your Honor, I think it's the government

8   that calls the first witness.

9          MR. CARTER:  At this point, Your Honor, it's his motion,

10  and --

11         THE COURT:  That's why I suggested, since the defendant

12  filed the motion and raised the issue, and I have looked at some

13  of the jurisprudence relative to burden of proof.  Ironically

14  enough in the briefs, both sides claim the burden of proof, and I

15  don't think they do so in terms -- incorrectly so, based on the

16  jurisprudence that each side has cited.  However, I think under

17  the most recent -- I should say the Fifth Circuit jurisprudence

18  that exists, it would seem as though the government would have

19  the burden, but it is the defendant's motion raising the issue.

20         So I would prefer that the defendant would go

21  forward at this time, ultimately, as I said, as I appreciate the

22  law right now, I think it's more prudent to put the burden on the

23  government.  But since it's the defendant's motion, I understand

24  you're going to call Dr. Andrews at this point.

25         MR. CHANEY:  That was my intention, Your Honor.

1       THE COURT:  Let's go ahead and get started.  Regardless

2  of who goes first, it would be the government's burden by a

3  preponderance of the evidence, as I understand it.

4       MR. CARTER:  Yes.

5       THE COURT:  Okay.

6       MR. CHANEY:  The defense calls Dr. Susan Andrews,

7  Your Honor.

8       THE COURT:  Dr. Andrews, if you would come up.  Please

9  remain standing until you take the oath.

10          Did you all want to -- while she's making her way

11  up, did you all want to stipulate into evidence the reports?

12       MR. CARTER:  Yes, Your Honor.

13       MR. CHANEY:  Yes.

14       MR. CARTER:  The government will stipulate to

15  Dr. Andrews' report which was prepared after an examination of

16  Dr. Cleggett in this matter.

17       THE COURT:  For the record, the report will be the

18  May 28, 2008, report prepared by Dr. Andrews along with relevant

19  attachments which were transmitted to me by cover letter from

20  Mr. Chaney on March 30th of 2009.

21          Now, with regard to the other reports, Mr. Chaney,

22  are you prepared to stipulate into evidence the reports that I

23  received from Mr. Carter also under cover letter dated March 30,

24  2009?

25       MR. CHANEY:  Your Honor, those reports are reports from

1  Dr. Thompson at Tulane University dated October 3rd, 2008, a

2  report prepared by Dr. Kevin Bianchini that was prepared on

3  January 21st, 2009.  We would stipulate to those reports.

4          THE COURT:  Let's go ahead.  Those will all be in

5  evidence, then.

6          THE DEPUTY CLERK:  Would you please raise your right

7  hand.  Do you solemnly swear that the testimony which you are

8  about to give will be the truth, the whole truth and nothing but

9  the truth, so help you God?

10         THE WITNESS:  I do.

11                      **DR. SUSAN R. ANDREWS**

12 was called as a witness and, after being first duly sworn by the

13 Clerk, was examined and testified on her oath as follows:

14                    VOIR DIRE EXAMINATION

15 BY MR. CHANEY:

16 Q.   Good morning, Dr. Andrews.

17 A.   Good morning.

18 Q.   I would like you to begin just explaining to the Court your

19 experience, your area of expertise.

20 A.   I am a clinical neuropsychologist.  I hold a Ph.D. in

21 psychology from Tulane University in developmental psychology.  I

22 went back to school some years later and did a postdoctorate at

23 the University of Southern Mississippi in clinical psychology and

24 an internship at the New Orleans VA Medical Center.  I'm licensed

25 by the State of Louisiana in clinical neuropsychology.

1    Q.    How long have you been licensed by the State?

2    A.    Since the '70s.

3    Q.    And with respect to the practice of neuropsychology, how

4    long have you been involved in that practice?

5    A.    I've been involved in neuropsychology for about 20 years.

6    Q.    In connection with your practice, do you see patients and

7    treat patients, or what -- is your practice more focused on

8    academic pursuits?

9    A.    No, I see patients, I treat patients.  I do a variety of

10   different things.

11   Q.    And do you belong to any associations or organizations which

12   have that focus on psychology?

13   A.    Yes.  I do the American Psychological Association, of

14   course, and the National Academy of Neuropsychology, just to

15   mention two.

16   Q.    In connection with your work as a neuropsychologist, have

17   you been qualified as an expert in court?

18   A.    Yes.

19   Q.    How many times?

20   A.    I don't have an exact number, Mr. Chaney, but it's certainly

21   in excess of 50.

22   Q.    And with respect to your areas in neuropsychology, did you

23   bring those experiences, that knowledge to bear with respect to

24   the evaluation that you did of Dr. Jacqueline Cleggett Lucas?

25   A.    Yes, sir.

Q.   I would like to focus on the report -- well, actually, the
process you used to determine in evaluating Dr. Cleggett.

        THE COURT:  Before we do that, Mr. Chaney, have we a
stipulation that this witness is an expert in the field of
clinical neuropsychology?

        MR. CARTER:  I will stipulate to that.

        THE COURT:  And I take it based on her testimony, that
that's what she's being offered as?

        MR. CHANEY:  That's what we're offering her as, yes.

        THE COURT:  While we're at it, do we also have a
stipulation with regard to the expertise of the two doctors the
government has called?

        MR. CHANEY:  The defense will stipulate that both
doctors -- that Dr. Thompson, I think, is neuropsychiatry.  I
think Dr. Bianchini is neuropsychology.

        THE COURT:  Right.  The Court will go ahead and accept
both Dr. Andrews as well as the other two doctors who are going
to testify today as experts in the stated fields.

                You can go ahead and proceed.

                        DIRECT EXAMINATION

BY MR. CHANEY:

Q.   Doctor, if you could, could you describe for the Court the
processes you used in your evaluation of Dr. Cleggett?

A.   I went down to the nursing home where she actually is
residing on two different occasions.  Arrangements had been made

1  ahead of time for me to meet with her, and a room was set aside

2  for us to meet in.

3         I did that twice.

4  Q.   And prior to meeting with her, were you provided with copies

5  of some medical records relating to the injuries she suffered on

6  September 23rd --

7  A.   Yes.

8  Q.   -- 2006?

9  A.   Yes.

10 Q.   Did you review those?

11 A.   Yes, I did.

12 Q.   What, if anything, was significant about what you saw in the

13 medical records relating to that injury?

14 A.   Well, the primary thing, of course, was the fact that she

15 had suffered a fairly severe head injury, and that had been only

16 about 20 months prior to my evaluation.

17 Q.   What areas of the brain were impacted or affected as a

18 result of the injury, based on your review of the records?

19 A.   She had impact in several areas, but the frontal lobes

20 bilaterally, frontotemporal were both damaged as well as the

21 right parietal area, and she still has some left hemiparesis,

22 which is a result of the accident.

23 Q.   When you say "hemiparesis," what --

24 A.   She still has restricted movement on the left side of the

25 body.

1  Q.   So injury to the right side of the brain will impact the

2  left side movement of the body?

3  A.   If it's in the right place, yes.

4  Q.   Now, you described that she has frontal damage.  What is the

5  importance of the frontal area, the frontal lobes of the brain?

6  A.   The frontal lobes are basically responsible for your ability

7  to organize your behavior or your ability to inhibit

8  inappropriate behaviors, to plan, to initiate, to shift your

9  behavior, if it's not working, to something else that might work.

10 It's the problem-solving executive part of the brain, if you

11 will.  It's not the part of the brain that does IQ.  It is the

12 part of the brain that does logic.

13 Q.   With respect to the frontal lobes, do they have any role to

14 play in memory, either episodic memory or other types of memory

15 that we need?

16 A.   They have to do with the logical organization of memory,

17 particularly verbal memory.  They also have to do with working

18 memory, which is a lot like attention, if you will.

19         And, of course, they do have some to do with visual

20 memory as well, but not as much as the posterior areas of the

21 brain.

22 Q.   Okay.  And are there some tests or measures that you use in

23 evaluating people to try to see the extent of damage or to help

24 you to confirm that there is damage to areas of the brain?

25 A.   Well, certainly in this case, the imaging results were very

clear.  I mean, it was not a question of whether or not this lady

had damaged areas of her brain.  I mean, clearly she does.  But

the neuropsychological testing is also done to show the extent,

if you will, and how the damage has harmed someone functionally.

Q.   Now, you talk a little bit about intelligence.  Can you

describe for me what you mean -- you were making a distinction, I

take it, between, like, executive brain function or organizing

things and intelligence.  With brain damage to the frontal lobes,

does it wipe out -- does it take a person from being a genius to

an imbecile?  I mean, what's the impact of brain damage on

intelligence?

A.   Well, it depends on where in the brain the person has been

damaged, but if the damage is strictly to the frontal area of the

brain, usually there is no real impact on intelligence.  The

impact is on your ability to use what you have, to use the

intelligence that you have.

Q.   Okay.  And when you're talking about using the intelligence

again, we were -- you were describing, for example, being able to

recall a memory, being able to relate that in a specific way.  Is

that impacted by that frontal cortex damage?

A.   Not so much that as it is the ability to stay, let's say, on

a particular topic, to stay focused on something and to logically

organize the sequence of thoughts so that it answers whatever

question or stays on whatever topic you're supposed to be on.

Q.   In your evaluation of Dr. Cleggett, did you see impairment

1  in those areas?

2  A.   Yes, she does have impairment in those areas, as well as

3  impairment in the areas of her ability to inhibit emotional

4  outbursts.  That's another area of impact, if you will, of the

5  frontal lobes, is to be inhibited versus disinhibited.  In her

6  case, she can be quite disinhibited.

7  Q.   What's the importance or significance of this disin- -- did

8  you see that demonstrated or did you see what you saw to be

9  disinhibition on the part of Dr. Cleggett through the

10  interactions you had with her?

11  A.   A number of times, yes.

12  Q.   Can you describe for the Court what it was you saw and the

13  significance of it?

14  A.   One of the examples of disinhibition was when she indicated

15  on our second meeting that if -- that she had been told that if

16  she did badly on the testing that she would not have to go to

17  trial.  She didn't seem to recognize that that was an

18  inappropriate thing, for example, to say.  It occurred to her, it

19  came out of her mouth, and that's an example of disinhibition.

20  Q.   And with respect to her -- the damage to her brain, did it

21  impact her ability to understand time, process time, I mean,

22  relate time in time?

23  A.   That's primarily the posterior -- right posterior area of

24  the brain that has been impacted.  She has almost no sense of

25  time, time passing.  She, for example, would say that she was

1  going to take a short five-minute break to go to the restroom and
2  she would be gone for an hour and a half.
3  Q.   Were the issues with respect to her, for example, knowing
4  that you would be there at a specific time and then --
5  A.   She wasn't aware that she was overdue.  She didn't think
6  that she had been a particularly long time.  She just didn't have
7  a sense of that time passing.  She's also consistently not
8  oriented to time.
9  Q.   And did you see that noted somewhere other than from your
10 observations?
11 A.   I also noted it in Dr. Bianchini's report that she was
12 consistently not oriented to time.
13 Q.   And in connection with your preparation for the testimony,
14 your testimony here today, did you review the report of Dr. Kevin
15 Bianchini?
16 A.   Yes.
17 Q.   And did you review the report of Dr. John Thompson?
18 A.   Yes, I did.
19 Q.   With respect to Dr. Bianchini's report, was there anything
20 of significance that you noted relating to beyond the issue of
21 time orientation that you thought that was significant to this
22 respective evaluation of Dr. Cleggett?
23 A.   There were a couple of things that I think would be
24 important.  One is that Dr. Bianchini noted that she was often
25 confabulating.  Confabulation is a term that neuropsychology uses

for -- it's not lying, it's actually where the person believes they are telling the truth.  They have taken a memory that's potentially a real memory from another event and connected it with another memory and put the two things together and not really realizing that those two things really didn't go together in the first place.  She does do that.  And he noted that, as well.

I also noted in my report, as did he, that she gave inconsistent effort at times on things.  But generally speaking, the thing that was most interesting to me when you compared the results of the two reports was that I noted in my report that the only area that I felt like she really had not done her best in was verbal memory.  And when you compare my scores with Dr. Bianchini's scores, basically they are pretty much the same except for the area of verbal memory where she has done significantly better.  I don't know if she could have done as well as that when I tested her because I think she's actually improved in the period of time between the time I saw her and the time that Dr. Bianchini saw her.  She was still within that window, if you will, of recovery from an acute brain injury.

Q.   What is the significance of verbal memory and how that might impact her in a process like this?

A.   Well, she surely does understand and is capable of conversing with people.  She uses a good vocabulary.  She's well-educated, obviously.  And the verbal memory is more of the

1  left side of the brain.  It's not the area that was as badly
2  damaged in her situation.
3  Q.   So the fact that she has good word choice, good word use, or
4  good vocabulary doesn't necessarily indicate that she can then
5  put that to use in the course of a trial to help defend herself?
6  A.   Well, that's the problem with the front lobes.  It's two
7  different sets of problems.
8  Q.   Now, that confabulation issue, there was also a term
9  perseverative?
10 A.   Perseveration.
11 Q.   Perseveration.  What is that?
12 A.   Perseveration is where the person will continue to give the
13 same response that was appropriate, let's say for a previous
14 question, and they might give it another several times.
15 Q.   Does that reflect anything to you when the person keeps
16 giving the same answer to a different question?
17 A.   Well, it's basically a very big marker, if you will, for
18 people that have severe brain damage.  It doesn't necessarily
19 affect her so much in this particular question, which is the
20 question of whether or not she would be able to assist in her own
21 defense, as I understood it.
22 Q.   Okay.  And just to focus again on this issue of
23 confabulation, if a person is confabulating, are they consciously
24 trying to deceive or are they trying to lead someone wrong?
25 A.   No.  The confabulation is actually not conscious.  It's not

1  a lie.  It's not a conscious effort on the part of the individual

2  to dissimilate.  They are not even aware of it.

3  Q.   So with respect to information that somebody brings forward,

4  is it easy the tell if it's a confabulated memory or if it's

5  something that actually happened?

6  A.   Well, it depends on how well you know the situation.  If

7  you -- you personally know the situation, then you would be able

8  to tell the difference.  Sometimes the two memories that are put

9  together are so odd that it would be obvious to anybody that

10  those two things couldn't have happened together, but a lot of

11  the times you wouldn't know unless you had very good

12  understanding yourself of the circumstances.

13  Q.   Now, with respect to the injury to the brain and the ability

14  to -- episodic memory, can you explain to the Court what that is?

15  A.   Well, episodic memory is understanding or a memory of the

16  episodes, if you will, the things that have happened to you

17  within a logical chain of time.

18  Q.   For example, if you practice as a doctor, you have patients

19  that you treated, that information regarding those patients,

20  their names, their faces, that sort of stuff, would that be a

21  part of what episodic memory is involved in?

22  A.   It could be called that, yes.

23  Q.   And with respect to brain injury, if that -- if there is

24  brain injury to the frontal lobes and to the right side, has

25  there been a link established between damage to that area and a

1  person's ability to use episodic memory?

2  A.   Well, I would say that probably that -- that could be

3  impacted, but in Dr. Cleggett's case, that's not the -- as I

4  appreciate it, that wouldn't be the biggest problem.  The biggest

5  problem is that she wouldn't know, neither would you, whether you

6  could reliably trust the information that she was giving you

7  because you don't know when it's confabulated and when it's not.

8  Q.   Also, you are familiar with the trial process where an

9  individual would have to, for example, take the stand to testify

10  on their behalf, where they are subject to a direct examination,

11  as I'm doing with you, and then you're subject to a

12  cross-examination regarding the information that you've given

13  during your direct exam.

14        How does the injury to Dr. Cleggett's brain impact her

15  ability to withstand or to participate in testifying in the

16  trial?

17  A.   Well, one of the main things that is going to be potentially

18  an impact is that her attention span comes and goes, and it

19  clicks in and out.  If she's attending to the information, then

20  very likely she's going to remember what was said, but she also

21  goes off on tangents all the time, and that could cause her not

22  to pay attention to some of the things that were said or for her

23  to not necessarily recall what she said, or when that happens,

24  then she's not going to be able to answer the question in the way

25  that would be appropriate.

1  Q.   Okay.  And also, in connection with your evaluation of

2  Dr. Cleggett's records, you saw that she is prescribed a number

3  of medications that she takes on a daily basis; correct?

4  A.   Yes.

5  Q.   Including Oxycontin, including Xanax, including a number of

6  antiseizure medications.  What impact, if any, could those

7  medications have on her ability to withstand, for example, the

8  pressure, the natural pressure of attention associated with a

9  trial?

10 A.   Well, she's been taking those medications for a long period

11 of time, and I would probably not be the best person to answer

12 that question.  I think a medical doctor would be in a better

13 position.

14 Q.   I understand.  Now, with respect to her brain injuries and

15 her ability, for example, to control anger, can you alert the

16 Court, I mean, what you observed and what you know about those

17 things?

18 A.   Well, the frontal lobes, of course, as I said, are the ones

19 that are responsible for helping us inhibit inappropriate

20 behavior, inappropriate emotional reaction.  As I appreciate the

21 records, Dr. Cleggett had more trouble with that earlier in her

22 -- right after her brain injury, but she still continues to have

23 some difficulties with that.

24       So flares of anger could be expected when she becomes

25 particularly angry.  She's not going to be real good at

1  inhibiting that display.

2  Q.   Now, A part of what you addressed in your report and that

3  was expressed in the reports prepared by the two other evaluators

4  was the concept of malingering.

5       I would like for you to describe for the Court what

6  your concerns were and what you observed with respect to

7  Dr. Cleggett's performance throughout the course of the time you

8  tested her.

9  A.   She made that statement on the second visit, beginning of

10 the second visit, and then I felt that there were times during

11 the verbal memory testing, for example, where she really wasn't

12 giving as good an effort as she could.  However, she has such

13 deficits with respect to visuospatial perceptual kind of

14 abilities that she really gave everything she could and it upset

15 her greatly that she couldn't do any better on this particular

16 types of tasks.  At the end, she felt like she had done a really

17 good job.  In fact, she even said to me, "I guess I'm going to

18 trial, huh?"

19      So it was her perception that she had not really

20 malingered.  She probably didn't really remember those episodes

21 of the verbal memory tests that she, I felt, didn't give a full

22 effort on.

23      If you look at my scores and compare them with

24 Dr. Bianchini's scores several months later, again, I point out

25 that you can't get scores that close if someone is not giving an

1  honest effort.

2  Q.   With respect to the issue of malingering, when you're

3  looking at that, when a person malingers, is it something that

4  you'll see across the board with all of the tests administered,

5  they just trash it or dump it or can a person malinger on one

6  point, I mean, from your experience?

7  A.   That's a good point.  Certainly when people are malingering,

8  particularly if they are naively malingering, which she was, most

9  of the time what you'll see is kind of -- I call it a flat line,

10 but that -- basically what I mean by that is that they do badly

11 on everything.  They do very badly on everything.

12 Q.   Was that the case with Dr. Cleggett?  Did she do badly on

13 everything?

14 A.   No, no.  It's definitely not the case with Dr. Cleggett.

15 She -- you know, as we've said several times now, her verbal IQ

16 and her verbal memory, for example, is still very much at

17 functional levels.  They may not be as high as they were, but

18 they are certainly still functional.

19 Q.   What is the impact or could you gauge in any way the impact

20 of fatigue, for example, on her performance throughout the course

21 of the time that you were testing her?

22 A.   Well, she did fatigue, and when she began to fatigue, on

23 both days, what happened was that she stopped with so much of the

24 extraneous.  In a sense that kind of helped us move forward, if

25 you will, because she wasn't going off on so many tangents and

having to be redirected to whatever the task was, but she also

very much runs down after several hours.

Q.   What impact, if any, might pain, if she's in some type --

she takes Oxycontin, she takes a number of medications that help

her to try to maintain pain.  If pain is reasserting, would that

impact her ability to perform on psychological testing?

A.   Well, you know, I can only speak generally.  I didn't see

that happening.  I can just say that in general, when people are

in pain, it tends to take their attention away from what's going

on around them and focus more inside.

Q.   Okay.  During the course of your testing, do you recall if

Dr. Cleggett had any complaints about pain or being in pain?

A.   I don't think I remember her doing that, no.  But of course,

we were in the nursing home where she had access to all of her

medications.

Q.   Okay.  And during the course of the time that you were

testing her, did she have to actually break or have instances

where medications were administered to her?

A.   She did break several times obviously for meals and for

bathroom breaks and the like.  I don't recall anybody ever coming

to the room to chase her down to give her something, but she

passes the -- passed the nursing station every time she would

take a break, so I don't know what happened.

Q.   Okay.  Finally, with respect to the issue of emotion and

memory, is there some link that's significant that would impact

Dr. Cleggett with respect to her ability to assist in her

defense?

A.    That's an interesting question.  I don't -- nothing comes to

mind that would be particularly relevant.

Q.    Okay.  With respect to your report, you made -- you rendered

an opinion regarding her ability to assist in her defense, and I

would like for you to detail those areas that you believe the

Court ought to focus on with respect to her ability to assist

counsel at trial.

A.    Okay.  I felt as if -- let me just give a general statement

about that first.  I felt as if, at the time that I saw her, that

she was not able to assist in her defense.  There was no question

about whether or not she was competent in the sense of knowing

what was -- she was being accused of or anything of that nature.

And the reason I felt that was because I felt that if given time,

she could recover more from her brain injury.  She may be

actually better able to assist in her defense at that point.

        But there are several key issues.  One of them is the

fact that she has the problem with confabulation and she doesn't

know.  Another key issue is her complete lack of time sense.

We're talking about a situation where she has to go back and

recall events as early as before 2002, as I appreciate the

situation.  She really doesn't have a very good understanding of

where she is in space and time, let alone being able to go back

without confabulation and put those events together in some kind

of logical sequential manner, which is the problem because that's
-- the frontal lobe damage is the logical sequential information.

So those things I thought were important.  She's also
very easily distracted by anything that's going on around her and
anything -- any thought that comes to her head and she's off on a
tangent and she's constantly having to be redirected, not to
mention the fact that it takes a very long time to get anything
done with Dr. Cleggett because of the lack of time sense.
Q.    And does she understand, for example -- or would she be able
to understand when her responses are, for example, hurting her in
a situation where she's called to the stand?  Would she have
enough self-awareness to be able to understand how an emotional
outburst might impact people that are evaluating her?
A.    Obviously not.  I mean, she certainly has difficulty in
inhibiting inappropriate responses as I've already mentioned.
Q.    And with respect to deductive reasoning, during our meeting
we talked about the need of an individual, for example, in the
context of a trial, to be able to understand, follow, track and
bring pieces together.  Did you see evidence of impairment with
respect to Dr. Cleggett's ability to do that?
A.    She has significant impairment in that -- in the area of
deductive reasoning, significant impairment.  She just doesn't
think that way.
Q.    Finally, with respect to -- you made some comments on Page 6
with respect to short-term memory and information integrating

thoughts.  How might that impact?

A.  She does lose her train of thought frequently because she gets off on a sidetrack and doesn't remember what she was talking about.  This is more a problem of attention than it is a problem of memory.

MR. CHANEY:  If I could have a second, Your Honor.

No further questions with respect to this witness, Your Honor.

THE COURT:  All right.  Thank you.

MR. CHANEY:  Thank you, Doctor.

THE COURT:  Cross, Mr. Carter?

CROSS-EXAMINATION

BY MR. CARTER:

Q.  You said there was no question regarding her competency as it relates to her knowing what's going on here, what she's being charged with, the basic judicial process, the consequences of the trial; is that correct?

A.  That's correct.

Q.  So she does understand the seriousness of these charges?

A.  I believe so, yes.

Q.  And I believe you stated in the report, she also understood the importance of the evaluation that you were performing?

A.  I believe so, yes.

Q.  And what was at stake in her responses?

A.  I believe so.

Q.   So when you said something just recently about her understanding what was in her own best interest, she understood what was in her own best interest, didn't she?

A.   I think so, yes.

Q.   She understood that it was in her own best interest to, as you wrote, fake bad on the test?

A.   I think she actually had that thought, yes.

Q.   Well, you think or did she tell you that?

A.   She said that, yes.  I mean, I think she understood -- I mean, she said it.  I believe she understood it.

Q.   You had no reason to doubt that, did you?

A.   No.  I've already made that statement.

Q.   I thought so.

        Now, she was oriented to person and place; is that correct?

A.   Yes.  We were in her nursing home and she certainly is oriented to person.

Q.   And place?

A.   Yes.

Q.   Your issue is her orientation regarding time?

A.   Correct.

Q.   And help me out here, Doctor, do you have a copy of your report with you?

A.   In front of me.

Q.   Could you point me to where it refers to confabulation?

1  A.    I don't think I referred to confabulation in my report.

2  That was from Dr. Bianchini's report.  I don't think I stated

3  that.

4  Q.    Thank you.  You didn't put that in your report?

5  A.    No, I didn't.

6  Q.    In fact, you list six primary deficits on Page 6 of your

7  report, and confabulation is not there?

8  A.    Correct.

9  Q.    And time orientation is not there?

10 A.    Correct.

11 Q.    Now, you talked about verbal memory, memory being important.

12 Given this type of injury, wouldn't there be an anterior grade

13 memory loss as opposed to -- by that, I mean, memory loss of

14 incidents that happened at or after the time of the accident as

15 opposed to before the time of the accident?

16 A.    Well, what you're referring to is something that we talk

17 about around the trauma event.  There may have been some anterior

18 grade loss.  I don't recall reading exactly how long, but that

19 usually shrinks over time as the patient recovers, and I don't

20 believe that she actually has that problem currently.

21 Q.    Okay.  And memory tests, memory tests are important, aren't

22 they?

23 A.    Well, I think that they are important to a certain extent.

24 We're not talking about her ability to learn any new information,

25 which is what memory test basically is testing.  So the real

question, as I appreciate it, was not whether or not she could
learn new information at this point but how well she could
reconstruct what her own behavior and her own history was.
Apparently that's more a concern.  We have no tests really that
we can measure that with.

Q.    I'm sorry.  You have no tests?

A.    We have no tests to measure someone's ability to remember
their own past history.  I mean, not really, not at that level of
detail.

Q.    So you don't know what her ability is to remember her own
past actions?

A.    Exactly.

Q.    Because you have no test for that?

A.    Exactly.

Q.    And the tests you do perform, she did not provide a full
effort?

A.    Well, that's true on the verbal memory part.  I think she
did provide full effort on almost everything else.

Q.    I think you referred, on Pages 3, 4 and 5 of your report, to
her not providing full effort, to her faking bad and wanting to
fail the test; is that correct?

A.    Yes.

Q.    Now, you mentioned malingering just now.  Did she malinger
or did she not malinger?

A.    I think she did episodically malinger, yes.

Q.   You mentioned naively malingering.  Do you believe that Dr. Jacqueline Cleggett is naive?

A.   In her tests to malinger with me, she definitely was.

Q.   She was honest with you, wasn't she?

A.   She was disinhibitively honest with me, yes.

Q.   But she knew you were hired by her attorney, didn't she?

A.   I don't think that mattered.

Q.   You don't think.  But you know that she knows you were hired by her attorney?

        MR. CHANEY:  Objection; asked and answer, Your Honor.

        THE COURT:  No, I'm going to overrule.  I'll let her answer.

A.   I'm sure that's probably true.

                        EXAMINATION

BY MR. CARTER:

Q.   And she knew that the purpose of -- well, if she failed the test, if she was found to be incompetent, she wouldn't have to go to trial; she knew that?

A.   She did.

Q.   And would it surprise you that she did not make these same statements to Dr. Thompson?

A.   Well, I don't know that Dr. Thompson spent as much time with her as I did, number one; number two, he wasn't doing the same kind of evaluation.  The kind of evaluation I was doing was asking questions to which she had to give an effort to answer.

1   But it wouldn't surprise me, no, because I think that what came

2   out of her mouth is kind of a disinhibited statement.

3   Q.   She was acting a little differently with you than with the

4   prosecution's expert?

5          MR. CHANEY:  Objection, it calls for speculation.

6          THE COURT:  Yeah.  Unless there is grounds to indicate

7   that this witness was there or had reason to know other than the

8   other expert's report, I'll sustain the objection.

9          MR. CARTER:  I'll move along, Your Honor.

10                          EXAMINATION

11  BY MR. CARTER:

12  Q.   Would it surprise you that she never made statements such as

13  this to Dr. Bianchini?

14  A.   No, it wouldn't.

15  Q.   You said that she loses her train of thought rather easily,

16  and that's on Page 5 of your report.  She can be redirected to

17  the area that's being discussed, can't she?

18  A.   Yes.

19  Q.   And she can read her own medical records, can't she?

20  A.   Yes.

21  Q.   She even told you that, didn't she?

22  A.   Yes.

23  Q.   In reading those records, she can understand those records,

24  can't she?

25  A.   I believe.  I haven't tested that, but I would think that

1  that's true.

2  Q.  Didn't she tell you at Page 5, I believe you mention that

3  she said she can read her own records and be able to tell exactly

4  what happened?

5  A.  Yes, I said that.  What I said, though, was I don't know if

6  it's true.

7  Q.  You doubt that?

8  A.  I don't know.  I mean, I said that she said that.  I don't

9  know that that's a true factor.

10  Q.  Well, but do you doubt that that is true?  You've performed

11  an examination on this doctor.  Do you doubt that her statement

12  is true?

13  A.  I don't know.

14  Q.  You don't know.  And in reading and understanding those

15  records, she does have the ability to discuss those records with

16  her defense counsel, doesn't she?

17  A.  I would think so, yes.

18         MR. CARTER:  Nothing further, Your Honor.

19         THE COURT:  Thank you.  Any redirect?

20                    REDIRECT EXAMINATION

21  BY MR. CHANEY:

22  Q.  The ability of her to read her records, does that

23  necessarily mean that she can have recall regarding the specific

24  events relating to specific record entries, for example?

25  A.  Well, no, she indicated that she might not remember them,

1  but that she could read what she's written, yeah.

2  Q.   But with respect to her, what she would basically be doing

3  is saying what the record says?

4  A.   Yes.

5  Q.   And do you have any indication or knowledge regarding

6  whether she might be able to, for example, if a patient said, "On

7  our meeting on March 30th, 2001, I told Dr. Cleggett that I

8  really don't need these pain meds, I just get them so I can sell

9  them on the street," would she, for example, have recall?  I

10  mean, could she refute that based on what you know about how her

11  brain is working now?

12  A.   No.  What I said earlier is that I don't -- none of our

13  memory tests really give us that kind of information.

14  Q.   Okay.  But with respect to if there is damage in her ability

15  to recall an episode, then that would not be available to her?

16  A.   My problem with that is that she confabulates memory and it

17  wouldn't be reliable.  She may tell you something, but you don't

18  know for sure that it would be exactly the right thing.

19  Q.   Now, the question was asked about naivete.  When you were

20  referring to naivete, you weren't suggesting that she was a

21  simple person who could be manipulated, were you?

22  A.   No.  I said her attempts to malinger were naive.

23  Q.   And that's significant to you for what reason?

24  A.   Well, because it was just so obvious when she was doing it

25  that it wasn't even a good attempt, if you will.

1  Q.  Now, there was a question regarding anterior grade memory

2  loss, and that would not impact -- that anterior grade memory

3  loss does not relate to, for example, her ability to go back in

4  time and say, "In 1999 or in 2000, I did this or I did this

5  within my practice or instituted these practices within my

6  practice"?  Anterior grade memory loss would not impact that

7  necessarily?

8  A.  No.  Anterior grade memory loss is memory going forward, so

9  it would be your inability to learn the information or to keep

10  track of the events as they occur.

11  Q.  So it would be post, and we would be looking -- to look at

12  historical stuff, we have to look at the episodic memory or the

13  things prior to what -- the injuries that she suffered.  Are

14  there any measures, as you call them, memory tests or measures

15  which can effectively measure a person's ability to do those

16  things?

17  A.  We're talking about their past history and details of their

18  past history.  That's specific to each individual.  And, of

19  course, we don't have any tests to do that.

20  Q.  I mean, for example, if she is saying something happened on

21  a specific date and you have information from an individual who

22  was there at the scene observe the event, that could be some type

23  of test or verification that what's she's saying happened or did

24  not happen?

25  A.  Exactly.

1 Q.  But in connection with what she said, you didn't do any of
2 that?
3 A.  No.  That would require finding people, I guess, that would
4 say that they actually did know about this or that event.
5 Q.  And that issue of her ability to recall and reconstruct her
6 own behavior, is it your -- her ability to recall and
7 reconstruct -- I mean, from memories -- her behavior at some
8 prior time?  Do you have any idea how well Dr. Cleggett can do
9 that based on the evaluations that were performed either by you
10 or Dr. Bianchini?
11 A.  How well she could recall and reconstruct her own past
12 history, is that what you're asking?
13 Q.  Yes.
14 A.  Well, my feeling is that she's going to have difficulty with
15 that because of her lack of logical organization, because of the
16 fact that she confabulates memories, because of the fact that
17 she's inconsistently oriented in time and space, and I'm not sure
18 that you could trust what it is that she was putting together,
19 even though it may actually be something of relevance, but it
20 might not match what she's being asked.
21 Q.  In his questioning, Mr. Carter talked about her orientation
22 to time and place and kind of get short stripped to the timing
23 issue.  Is that a serious matter, orientation toward time, being
24 able to move and understand the arc of time and what's going on?
25 A.  It's actually a very serious matter.  In fact, it's one of

1  the primary issues that we look at when someone is becoming what

2  we call demented, as they begin to lose their sense of time and

3  space, that's a major factor.

4          MR. CHANEY:  Nothing further with respect to this

5  witness, Your Honor.

6          THE COURT:  All right.  Thank you, Mr. Chaney.  You may

7  step down, Dr. Andrews.  Thank you very much.

8          THE WITNESS:  Thank you.

9          THE COURT:  Mr. Chaney, next witness.

10         MR. CHANEY:  We call Lori Borruano.

11         THE DEPUTY CLERK:  Would you please raise your right

12 hand.  Do you solemnly swear that the testimony which you are

13 about to give will be the truth, the whole truth and nothing but

14 the truth, so help you God?

15         THE WITNESS:  I do.

16                         **LORI BORRUANO**

17 was called as a witness and, after being first duly sworn by the

18 Clerk, was examined and testified on her oath as follows:

19

20                      DIRECT EXAMINATION

21 BY MR. CHANEY:

22 Q.    Sorry.  It's Borruano?

23 A.    Borruano.

24 Q.    Ms. Borruano, where you are employed?

25 A.    Plaquemine Caring.

1  Q.   What is that facility?

2  A.   A long-term care facility.

3  Q.   And when you say "long-term care," are the people in the

4  facility able to care for themselves?

5  A.   No.

6  Q.   And in connection with that facility, what are your

7  responsibilities there?

8  A.   I'm the social services director.

9  Q.   Describe, if you can, your own experience and education.

10  A.   I have a four-year degree in social work.  I'm a licensed

11  nursing facility administrator, and I've been working in

12  long-term care for 18 years.

13  Q.   In connection with your responsibilities at Plaquemine

14  Caring, do you have the occasion to interact with Dr.

15  Jacqueline Cleggett Lucas?

16  A.   Every day.

17  Q.   And how long has Dr. Lucas been in your facility?

18  A.   It should be about two years, maybe a little more.

19  Q.   And do you know the deficits that she suffers under, in

20  terms of --

21  A.   Yes.

22  Q.   Can you describe for the Court what areas she needs help or

23  assistance in from your facility?

24  A.   Her biggest problem on a daily basis would be her reaction

25  to situations.  She does really well in our environment.  We are

1  very structured.

2  Q.   Describe, like, her day, the course of a day for her in your

3  facility.

4  A.   Well, the whole point in long-term care is to make it as

5  close to home as possible so the residents at the facility are at

6  home.  They can get up and eat and do what they want when they

7  want, but there is a definite structure.  Breakfast is served

8  between, you know, 6:45, 7:15.  Lunch is served at noon.

9  Activities are scheduled.  Medication passes are scheduled.

10  Q.   I want to stop a little bit on medication.  If an individual

11  has a specific need for medication, are those medications

12  administered by people on your staff?

13  A.   Yes.

14  Q.   Now, with respect to Dr. Cleggett, are you familiar with the

15  medications she takes and the schedule that's -- the schedule on

16  which those medications are being given?

17  A.   I am not.  I'm not.

18  Q.   For example, do you know if she takes pain medications and

19  Oxycodone?

20  A.   I know because we've talked about it in conversation, not

21  because --

22  Q.   You don't have any specific knowledge from your review of

23  her records?

24  A.   No.

25  Q.   With respect to the issue of medications, are her

1  medications given to her for her to take them at specific
2  intervals at the facility?
3  A.   No.  None of our residents at this time give themselves
4  their own medicine.
5  Q.   With respect to Dr. Cleggett, she's a physician, or was
6  trained as a physician.  She's not presently operating.  Why
7  wouldn't you just give her a medication and let her take them at
8  the intervals that she's needs to?
9  A.   Residents in long-term care have a right to take their own
10 medicine if it was approved by our care plan team, which is a
11 representative, basically, from every department there.  And due
12 to mostly her memory, it's not safe.
13 Q.   And have you had experiences with respect to dealing with
14 Dr. Cleggett regarding memory issues that impact her medication
15 schedule or how she deals with it?
16 A.   Yes.
17 Q.   Could you describe for the Court what you can recall?
18 A.   Some time back, she was having a lot of problems and a lot
19 of complaints about the nurse not giving her her meds.  She said,
20 "You know, I went to the nurse and I told her, 'You didn't give
21 me my medicine,' and she said, 'Yes, I did,' and I don't believe
22 her."
23        And I can't remember now how long she's been doing it,
24 but Ms. Jackie started keeping a notebook and she writes down
25 every time the nurse gives her medicine and she writes down what

1  medicine.  And that has really, really helped.

2  Q.  Had that adaptation or accommodation helped in terms of --

3  A.  Absolutely.  Absolutely.

4  Q.  Now, with respect to her level or her ability to care for

5  herself, what assistance does she need from your facility?

6  A.  She receives assistance with -- of course, we serve her all

7  her meals.  We do all the housekeeping.  We wash all the clothes.

8  She gets some assistance with showers.  She can't do her own

9  hair.  So she gets a lot of assistance.

10  Q.  Now, I want to focus on issues of anger.  Were there issues

11  that came up with Dr. Cleggett in terms of anger outbursts or

12  problems with the staff since she's been at your facility?

13  A.  Many.

14  Q.  And I mean, is it something that happens on a daily basis,

15  weekly basis?

16  A.  No.  No.  It happens periodically, but it happens regular.

17  It's not daily, it's not weekly.  It just depends on what kind of

18  day she's having.  Sometimes she is the most pleasant person and

19  other days it's just nobody really goes around her because she's

20  in a bad mood.

21  Q.  Have you been able to track that to any issues relating to

22  pain or her being under any type of specific pressure or stress?

23  A.  Yeah.  I mean, you know, to me, what I see every day is it's

24  how she reacts to pretty much anything.  If she's upset about a

25  little thing, she explodes.  If she's depressed, you can't talk

1  to her.  To me, that's her coping mechanism, is her anger and
2  hostility.
3  Q.    Have there been episodes where she's been at somebody and
4  then not have any recall regarding the blowup of that sort of
5  problem?
6  A.    No, I've never had to go to her and talk to her about an
7  incident and have her tell me "I have no memory about it at all."
8  Usually she will -- she will remember it and after she calms
9  down, she will -- you know, we'll talk about it and she'll talk
10 it out and we'll talk about why it wasn't appropriate behavior,
11 and we can pretty much go from there.  But, no, normally she
12 would remember if an incident occurred.
13 Q.    And during the course of the time, you said roughly
14 two years, you've had some action or interaction with
15 Dr. Cleggett?
16 A.    Uh-huh (affirmative response).
17 Q.    Have you ever had the occasion to have her talk about her
18 medical practice or the treatment of patients when she was a
19 physician?
20 A.    Not the treatment of patients.  She told me about her
21 medical practice.  I think we were talking about -- it was around
22 the time our facility just got a new security system with
23 cameras, and she said, "Oh, I had some of these in my office,"
24 and, you know, vague things like that.  Nothing specific at all.
25 Q.    And with respect to Dr. Cleggett, during the time that she's

1  been in your facility, has there been improvement, for example,

2  in her ability to ambulate?

3  A.   Yes.  Yes.

4  Q.   And have there been improvements in her ability, for

5  example, to use her arms or her hands?

6  A.   Yes.

7  Q.   In connection with the rehabilitation that's been done, have

8  there been specific efforts to address memory deficits or are

9  there any things available at your facility to help her to try to

10 rebuild, reconstruct or improve memory?

11 A.   No.

12        MR. CHANEY:  I have no further questions with respect to

13 this witness, Your Honor.

14        THE COURT:  Thank you.

15        MR. CHANEY:  If I could just have a second.  I just want

16 to look at my notes.

17            Thank you, Your Honor.

18        THE COURT:  All right.  Mr. Cater?

19                    CROSS-EXAMINATION

20 BY MR. CARTER:

21 Q.   I'm sorry, ma'am.  What's your name again?

22 A.   Lori Borruano.

23 Q.   Ms. Borruano, if I understand you correctly, the assistance

24 that you provide Ms. Cleggett is primarily physical assistance?

25 A.   Yes.

1  Q.   Did you know Dr. Cleggett or Ms. Jacqueline Cleggett before

2  her accident?

3  A.   No, sir.

4  Q.   She is a relatively young woman; is that correct?

5  A.   Yes.

6  Q.   And from what you know was a relatively vibrant woman?

7  A.   Yes.

8  Q.   Wouldn't it be normal for her to be angry about her current

9  situation needing such assistance?

10  A.   It is a common response.

11  Q.   Now, in terms of memory loss, you've referred to it in

12  taking -- you're concerned about her taking her medicine.  That's

13  a short-term memory loss you're concerned about?

14  A.   Yes.

15  Q.   But she remembers you from day to day; right?

16  A.   Yes, sir.

17  Q.   Did you ever walk into her room and she not know who you

18  were?

19  A.   (Witness shakes head negatively.)

20  Q.   And you said that --

21       THE COURT:  Answer verbally.  Your answer is no?

22       THE WITNESS:  No.

23                          EXAMINATION

24  BY MR. CARTER:

25  Q.   And you said she can remember incidents that occurred?

1  A.    Yes.

2  Q.    And you guys talked them out, you talked them through?

3  A.    Yes.

4  Q.    And you come to some type of resolution in talking through

5  and understanding?

6  A.    Usually we can.

7  Q.    And sometimes you don't?

8  A.    Sometimes we don't.

9  Q.    But you never -- do you ever get a sense that she doesn't

10 understand what you're talking about?

11 A.    Some days, some days.

12 Q.    Tell me about that.

13 A.    Well, it's like I said, it depends on which day of the week

14 and what kind of day she's having.

15 Q.    Give me an example of what you're talking about.

16 A.    I mean, I can remember her having an altercation with -- and

17 I mean verbal, you know, there is no physical abuse.  But I can

18 remember her yelling and screaming at a nurse about she wanted

19 medicine and the nurse said, "Well, I'll called the doctor.  We

20 don't do anything without a doctor's order."  And the nurse was

21 trying to explain to her that she had called the doctor and she

22 was waiting for a response, that we couldn't do anything without

23 the doctor's order.

24         And she was very upset and she -- I could not calm her

25 down.  And, you know, she does get in her head sometimes that,

1  you know, "Oh, she just doesn't like me and that's why she's not

2  doing it."  And you know, that's why she comes to me, because I

3  can kind of be that go-between and I can go and I can talk to

4  that nurse.  Because Ms. Jackie will sometimes get to a point

5  with my coworkers that it's -- that's it.  They can't communicate

6  with each other anymore, she gets that angry.

7  Q.    So if I understand you correctly, she has or has had

8  problems with coworkers, your coworkers?

9  A.    With my coworkers, yes.

10  Q.    And she has been unable to resolve them?

11  A.    Some.

12  Q.    And she has come to you for assistance in resolving those?

13  A.    Yes.

14  Q.    And sometimes you can resolve them?

15  A.    Sometimes I can to her satisfaction, and sometimes I can't

16  to her satisfaction.

17           MR. CARTER:  Thank you.  Nothing.

18           THE COURT:  Any redirect?

19           MR. CHANEY:  No, no further questions with respect to

20  Ms. Borruano, Your Honor.

21           THE COURT:  Thank you, Ms. Borruano.  You can step down.

22              Mr. Chaney, any other witnesses on the defendant's

23  side?

24           MR. CHANEY:  No witnesses from the defense, Your Honor,

25  no other further witnesses from the defense.

1  THE COURT:  Mr. Carter, would you like to call a witness

2  on behalf of the government?

3  MR. CARTER:  Yes, Your Honor.  The government calls

4  Dr. John Thompson.

5  THE COURT:  Dr. Thompson, would you come forward and

6  remain standing once you get here so you can take the oath.

7  THE DEPUTY CLERK:  Would you please raise your right

8  hand.  Do you solemnly swear that the testimony which you are

9  about to give will be the truth, the whole truth and nothing but

10  the truth, so help you God?

11  THE WITNESS:  I do.

12  **DR. JOHN W. THOMPSON, JR.**

13  was called as a witness and, after being first duly sworn by the

14  Clerk, was examined and testified on his oath as follows:

15

16  DIRECT EXAMINATION

17  BY MR. CARTER:

18  Q.   What type of medical doctor?

19  A.   I practice psychiatry, forensic psychiatry and addiction

20  psychiatry.

21  Q.   And how long have you been practicing?

22  A.   Since 1990.

23  Q.   1990.  It has been stipulated that you're an expert in this

24  matter.  So I won't spend a lot of time or frankly any more time

25  on your education or your background.

1        Let's talk about your evaluation of Dr. Cleggett.  When
2   did you evaluate Dr. Cleggett?
3   A.    September 19th of 2008.
4   Q.    And please tell me how you went about that evaluation.
5   A.    Well, I actually went to the nursing home to see her there.
6   Prior to going, I reviewed some records.
7   Q.    What records did you review?
8   A.    Dr. Andrews' report and also the records from her
9   psychiatric hospitalization at Our Lady of the Lake Hospital, the
10  regional medical center because I wanted to get an idea of, you
11  know, what type of injury she had had and the kinds of -- and
12  types of evaluations I might want to do for her.
13  Q.    And were any of your conclusions based upon these medical
14  records different from what you heard Dr. Andrews state as being
15  her conclusions from these medical records?
16  A.    From the medical records themselves, no.  It appeared that
17  she had had a severe brain injury and that she was in the process
18  of recovering from the brain injury at the nursing home or at the
19  center.
20  Q.    And after reviewing these records, you met with
21  Dr. Cleggett?
22  A.    Yes.
23  Q.    What happened at that meeting?
24  A.    Basically, I went through my standard evaluation that I
25  normally do for someone for competency to stand trial that

involves discussing with them the issues that occurred around the
alleged charges, whether's they, you know, understand those
issues, what they've been charged with.  I talk with them about
whether or not they have an attorney, whether their attorney met
with them.  Talk to them about their case, those kinds of issues.
I'll go through whether or not they were arrested and were in
jail and spent any time in jail.  I'll go through their past
psychiatric history, their past medical history, family history,
various kinds of medications they might be taking.

       And then I'll do what's called a Georgia Court
Competency Test, which is a standardized evaluation of
competency.  And then I'll ask follow-up questions along those
lines.

       I'll do what we call a mental status examination, which
is more of a screening exam to -- obviously Dr. Bianchini's exam
and Dr. Andrews' exam is a much more expanded version of a mental
status exam, but it gives me an idea of how they are functioning
that day.

       And then I put those things together with the medical
records to come to an assessment or a diagnosis and then also
address the question that's before the Court, and the question
before the Court being, does she understand the Court process and
can she relate to her attorney with a reasonable degree of
rational understanding.

       So that's my standard competency evaluation assessment.

1  Q.    Fast forwarding to the end of this result, what was your
2  conclusion after all of your tests?
3  A.    That she did understand the Court process and that she could
4  relate to her attorney with a reasonable degree of rational
5  understanding and I felt that she could go through the Court
6  process given her history and how she was functioning at the time
7  I evaluated her.
8  Q.    Would that mean that she was competent to stand trial?
9  A.    That's really a decision for the judge, but in my opinion
10  from performing probably a thousand of these, I felt that she was
11  capable of understanding the Court process and relating to her
12  attorney.  The ultimate decision of competency or capacity is
13  really up to the judge.
14  Q.    I understand.  Let's walk through some of your processes
15  here.  You talked about conversation with Dr. Cleggett and
16  performing certain -- would it be appropriate to call them
17  standardized tests, the Georgia Competency Test?
18  A.    There is all different types of testing in what we have been
19  talking about the various tests.  Some are open-ended questions
20  type where you just ask a certain number of questions.  Others
21  are just specific tests where you get the person to answer yes
22  and no to a specific kind of test.  So we have been talking about
23  all kinds of tests.
24        The Georgia is sort of a semi-structured test meaning
25  that it goes through the various aspects that are relevant to the

Court system based on what I refer to as sort of historical
operationalizing the two arms of *Dusky*.

So you have, do they understand the Court process.  So
there will be questions like where does the judge sit in the
courtroom.  All right?  So that would give you an idea of where
-- how she would -- I'll show her a picture of the courtroom.
Visuospatially, she'll have to identify it's a courtroom, where
will the judge be.  That's sort of a right-sided brain function.
Where would people sit?  Where will she sit with her attorney?
Where does the audience sit?  Those kinds of things.

And the next area of questioning with the Georgia would
be, well, what do those people do?  What's their role?  And so --
you know, what would the judge do?  And she would answer what she
thought the judge's job was and how the judge functions.  You
know, what's your attorney do for you?  Do you think your
attorney is doing a good job?  She discusses whether or not she
thought he was doing a good job, how often he contacted her, how
that was different from other attorneys she had had for other
kinds of civil matters and those kinds of things.  So we
discussed the different components of the courtroom.

You ask a question about do they know what their
charges are.  It was clear that she knew what her charges were.
She knew how many charges she had.  She knew that she could serve
a lot of time.  In fact, she had calculated time and told me what
she thought her maximum time was.

Q.   Do you remember what she said?

A.   704 years, 37 times the maximum of 20.  So she said it was a
lot of time that she could possibly face if she got the maximum
time on every single one of the counts.  She told he me that
there was 37 counts or roughly that number and that there were a
lot of years.

     So more to whether that was specifically correct or not
is not as important as she understands this is a serious
situation that she could spend a long time in the correctional
system for.

     So you ask questions along those lines.  And then you
may -- you also ask them about, you know, what happened back at
the time you were charged, what was actually going on.  And that
really, I thought, was something -- I wasn't expecting her to
give me the answers that she gave me and that she had a very
logical explanation of she was practicing medicine.

Q.   Let me stop you there.  Are we still talking about the
Georgia Competency Test?

A.   Yes.

Q.   And as part of that test, you asked her about what happened?

A.   Right.  That's one of the parts of the test is, tell me what
happened.  Tell me your version of the story.

Q.   What was her response?

A.   Basically she told me that she had been practicing medicine,
she had graduated in med-peds, which is a combination of internal

medicine and pediatrics, that she had been practicing in a pain
clinic that was Jacqueline Cleggett, M.D., her clinic.  She was a
sole proprietor, sole practitioner.  And within that clinic, she
had hired nurse practitioners, that she saw patients there and
that during the -- while seeing the patients, they primarily came
for various pain-related issues, and that she would prescribe
them pain medications.  She described it was a cash-only
business.  The amount that she would charge.  How she would do
evaluations prior to the patients coming in.  She felt that she
had done appropriate evaluations prior to them coming in, that
she used a standardized way of evaluating them.  That she took
histories to find out their physical problems and whether they
were in pain, and that she prescribed the medications
appropriately.

You know, I asked her about this because I was
concerned about whether or not she could remember it and with the
severity of the head injury, I thought that was a critical piece
of her discussing with her attorney.  She said that she had
taken -- she had had depositions on issues related to civil
matters in relation to this and had to answer questions about
this, but that she was sure that she had practiced in an
appropriate way and had gone through the steps that she was
supposed to.  She talked about a computerized assessment
instrument that they used when they were evaluating the patients.

So her description of what happened around the charges

was really quite detailed and we discussed various aspects of

that.

So that's part of the Georgia, too, you can give them a

score on that, a score from two to eight, how they described what

happened around the time of the events.

Q.   What was her score on that part?

A.   On that part, I gave her -- I didn't give her the top score.

I think I gave her a six.

Q.   Why not the top score?

A.   It was, you know, benefit of the doubt.  I didn't have every

-- I didn't have the actual medical records before me to compare

with whether or not she had actually done those things and

followed all of the things she was supposed to.  But the way she

described it in detail, at least she understood her version of

the events, which is really more critical than the exact version.

Does that person have a version?  Do they understand how they are

planning on, you know, discussing that with their attorney in

order to defend themselves against whatever charges?  And that

seemed to me to be a rational and appropriate way of defending

yourself, saying "I did a good job.  I know I did a good job, and

I did this thing appropriately.  Instead they are saying I didn't

do it appropriately, I'm saying I did do it appropriately."

Q.   So she was saying she did it appropriately?

A.   Right.

Q.   And she was defending herself to you?

1  A.    Yes.

2        So that's basically the Georgia.  You look at these

3  different aspects and then add the scores up and you come to a

4  final score.

5        The Georgia, itself, is not a test that you sort of

6  hand somebody and say, "Here, take this test" and you score it

7  and all of a sudden, yes, you're pronounced competent.  It

8  basically allows us to go look at the different areas that you

9  want to look at in those two arms of the *Dusky* standard of the --

10 do they understand the court process and do they also understand

11 relating to their attorney, can they relate to their attorney?

12       She said she thought her attorney was a good attorney

13 and that, you know, he contacted her weekly, so they had -- they

14 had made contact on a regular basis.  I oftentimes hear people

15 complain about their attorney's ability or to either contact them

16 or deal with them.  She didn't really have any of those

17 complaints.

18       So for the most part, on the Georgia, she scored a 90

19 out of a hundred.  Those scores --

20 Q.    Is that pretty good?

21 A.    The scores above 70 are considered in the passing range.  So

22 depending on the person's presentation, a 90 can be good.  I

23 thought for her, a 90 was good because I expected her to have

24 some deficits in areas that she didn't have them in.

25 Q.    Dr. Andrews questioned Ms. Cleggett's ability to recall and

reconstruct. Did your experience, during your conversations with
Ms. Cleggett, support that, that concern about her ability to
recall and reconstruct?

A. No. I was -- after reading Dr. Andrews' report and then
discussing it with her, I was surprised that the amount of
information she relayed and her knowledge not only of, you know,
her practice at the time but also her knowledge of just general
practices related to pain management. She was able to discuss
issues related to what's appropriate pain management treatment,
you know, what was considered inappropriate pain management
treatment. She related that actually to herself, so she said,
"Well, like right now, I have to go to the nurses' station to get
my pain medicine every four hours. They really should prescribe
that to me twice a day in a higher dose with a more powerful
medication because that's not the right way to prescribe pain
medication."

So she knew -- she was prescribing it appropriately in
the past and she also related it to one of her own events. So it
gave me an idea that she was able to manipulate data from before,
data from now with herself and be reasonable about it.

Q. Dr. Andrews also mentioned or used the term "confabulation."
Are you familiar with that term?

A. Yes.

Q. What's your understanding of that term?

A. Confabulation, in my experience, occurs -- the most common

1    time we see it is with people who have chronic alcohol problems.

2    They drink a long time.  They lose their short-term memory, so

3    they sort of make up short-term memory as they go, they make it

4    up on the fly.  That's the most severe case of -- that you would

5    see of confabulation.

6            Basically it's making up information to fill in gaps

7    when they can't remember.  Sometimes patients will do that --

8    dementia patients will do that as they get older, as sort of a

9    face-saving thing.  They may have a standard way of dealing with

10   that.  You know, they can't remember what goes on, so they'll say

11   something like, "When was the last time I saw you?  Oh, yeah, I

12   remember.  What did we talk about?"  And then they'll start

13   filling it in, okay, even though they don't necessarily remember

14   that event.

15           So there are different versus of it, but basically it's

16   filling in information when you really don't have the memory of

17   the information.

18   Q.   Did you notice this in Dr. Cleggett during your examination

19   of her?

20   A.   I didn't see it regularly during the examination.  You know,

21   there are occasional times where she would what I call be

22   circumstantial, in that she would start on -- go on a tangent and

23   then she would come back to the topic.  Maybe once or twice I had

24   to bring her back to the topic.

25   Q.   Is that confabulation?

A.   That's not really confabulation.  I didn't see outright

confabulation on my examination of her.

Q.   If I understand you correctly, Doctor, in your experience,

confabulation involves short-term memory loss?

A.   Yes.

Q.   Did you perform any other tests on Dr. Cleggett?

A.   Just a standard mental status examination which would ask

her, you know, if she was awake, alert and oriented, you know,

questions along that, maybe some brief memory questions, but I

didn't go into great detail with my mental status, because she

had had fairly sophisticated psychological testing before, and by

the time I got to that part of the examination, since there were

differences in what I saw and what I saw in Dr. Andrews' reports,

I was planning on getting more sophisticated neuropsychological

testing or at least requesting that you get somebody to do that

so we can see, you know, how those compare.

Q.   And you did that?  You recommended that?

A.   Yes, I did.

Q.   And who did you recommend?

A.   I have done -- I've worked with almost all the

neuropsychologists in Louisiana at one time or another, but

Dr. Bianchini and his group, he has a group of

neuropsychologists, and I find that they do an excellent job and

shoot straight and down the middle, so I recommended --

          MR. CHANEY:  Objection.  The question was who did he

1  get, Your Honor.  This is some type of bolstering.

2          MR. CARTER:  That's okay.  That's not where I was going.

3  A.  I'm sorry, Dr. Bianchini.

4          MR. CARTER:  That's fine.  We can strike that.

5                          EXAMINATION

6  BY MR. CARTER:

7  Q.  You mentioned the *Dusky* standard.  What is your

8  understanding of the *Dusky* standard?

9  A.  Well, basically, it's a standard of how the Court looks at

10  competency to stand trial or capacity to stand trial.  Prior to

11  that particular case, I believe it was in 1960 or so, the

12  individual courts made determinations, and as competency evolved,

13  they were looking for a standardized definition of "What is

14  competency to stand trial."  Both evaluators and courts wanted a

15  standard sort of definition so they'd have something to go by.

16          So *Dusky* basically is, does the person have the present

17  ability, meaning, you know, at the present time or in the near

18  present, to be able to relate to their attorney with a reasonable

19  degree of rational understanding and have a rational as well as

20  factual understanding of the proceedings against them.  That's

21  sort of the direct quote from the case.  So I don't know what

22  else you need from that.

23  Q.  Well, after your evaluation of Ms. Cleggett, does she meet

24  those standards?

25  A.  Yes.  I don't think that she has, you know, a perfect degree

1  of absolute understanding, but I do think she has a reasonable

2  degree of rational understanding.

3  Q.    So under the *Dusky* standard, it would be your conclusion

4  that what?

5  A.    I believe that she would meet the *Dusky* standard if I was

6  asked to do that, but the Court is really asked to do that,

7  again.

8  Q.    But in your opinion, she meets those standards?

9  A.    Yes.

10 Q.    You mentioned that you reviewed Dr. Andrews' report and you

11 talked about the recall and reconstruction which was one

12 experience that was different from what you read in Dr. Andrews'

13 reports.  What else did you find to be different that is referred

14 to in Dr. Andrews' report?

15 A.    I really have to go through it specifically with the court

16 issues, but I just felt like the whole idea that she couldn't

17 relate to her attorney or she couldn't behave during the court

18 process or that her brain functioning would allow her to behave

19 inappropriately in the courtroom.  I really didn't see evidence

20 for that during my evaluation.  I thought she was really quite

21 pleasant during the evaluation.  There were times when we talked

22 about stuff that was upsetting to her.  She looked upset.  There

23 were times when we talked about, you know, issues that were funny

24 and she joked around a little bit, so there was an appropriate

25 range of that.  When I was wheeling her out, she identified that

her pain medicine was due, could I stop her by the nursing

station because she wanted to take her pain medication, her pain

medication was due.

So a lot of things that were in the report were not

consistent with the evaluation that I did in reference to her

sort of inability to be able to, you know, relate to her attorney

and understand the situation and be able to address it in a

reasonable way.

Q.   Did anything in your examination lead you to conclude that

Ms. Cleggett could not read her own medical records?

A.   No, I don't think anyone has testified that she could not

read her own medical records, and that's really quite common in

when -- in medical malpractice cases, when I'm asked to review

those medical records, sometimes the doctors don't remember every

detail about it and they refer to their records and testify from

their records because they don't have necessarily an independent

recollection of every single case, but they know what their

standard and customary practices are and what they did.

Q.   Based on your evaluation, would Ms. Cleggett be able to

understands those records?

A.   Yes.

Q.   And be able to discuss those records with her attorney?

A.   Yes.

MR. CARTER:  Nothing further, Your Honor.

THE COURT:  Mr. Chaney?

1    MR. CHANEY:  Thank you, Your Honor.

2                CROSS-EXAMINATION

3  BY MR. CHANEY:

4  Q.   Dr. Thompson, in your report, you didn't make any reference

5  to any confabulation, did you?

6  A.   No, sir.  I didn't.

7  Q.   You made the referral to Dr. Bianchini?

8  A.   Yes, I did.

9  Q.   And you thought him to be a capable neuropsychologist?

10 A.   Yes.

11 Q.   He noted confabulation.  Do you differ now or do you believe

12 that he was in error with respect to that observation?

13 A.   I think you'll have to ask him about that.

14 Q.   I'm asking you, Doctor, with respect to your belief, based

15 on your knowledge of him.

16 A.   No.

17 Q.   So if he saw what he believed to be evidence of

18 confabulation, you don't have anything, based on your experience,

19 to refute that?

20 A.   Well, I didn't see it.  That would be the only thing I have.

21 I just say I didn't see it.  If he saw it, he saw it.

22 Q.   I understand.  Is it your belief or your experience that he

23 would note in his records something that he didn't see?

24 A.   No.

25 Q.   Now, with respect to her being pleasant, you heard the

testimony of the social worker?

A.   Yes, I did.

Q.   She said that the doctor will have good and bad days?

A.   Yes.

Q.   So did you visit the doctor on the day when she was having a bad day or a good day, based on your observation of your interaction with her?

A.   My observation would be that I visited her on a day when she was having a reasonable day.  I don't know if she was having a good or a bad one.

Q.   With respect to the number of interactions that you had compared to Mr. Borruano, Ms. Borruano obviously has had, over the course of two years, more contact?

A.   Definitely.

Q.   Do you have anything to challenge her representations regarding bad days, where the doctor can't relate at all, can't understand?

     MR. CARTER:  Objection, Your Honor.  There was no testimony that she couldn't relate at all.  That's misstating the testimony of Ms. Borruano.

     THE COURT:  I'm going to sustain the objection, although I think you can rephrase the question to get the information you're seeking.

     MR. CHANEY:  Certainly, Your Honor.  I'll make that attempt.

1    EXAMINATION

2  BY MR. CHANEY:

3  Q.    With respect to the issue of a good or bad day, you follow

4  what Ms. Borruano said; correct?

5  A.    I did.

6  Q.    And did you hear her say that there were days when

7  Dr. Cleggett had verbal altercations with staff members where it

8  was --

9  A.    Yes.

10 Q.    -- seemed that she did not understand?

11 A.    Yes, I did.

12 Q.    Do you have anything to refute that?

13 A.    No.  I would even expect that she would have bad days given

14 the history of her head injury.

15 Q.    Now, I want to go back.  When you were doing your

16 competency, you're looking at a fairly low level of functioning;

17 is that correct?  I mean, she knows her lawyer and what he does?

18 A.    No, I'm not looking at a low level of functioning.  I'm

19 looking at -- when I'm doing a competency assessment, I'm looking

20 at all levels of functioning.  There are parts of the test that

21 are very simple.

22         So the simple parts of the test would be, at least for

23 verbal, if you want to refer to brain dysfunction as left or

24 right-sided, to simplify it, her verbal aspects of being able to

25 identify people and say their names in the courtroom is really

low.  That's also a test of looking visuospatially does she know

where it all is.  She's had some right-sided problems that

everybody has talked about.  And it seems there is an area where

there is identified CT findings and there's identified neuropsych

findings, but she did okay in that area.

So that's just stuff to file way.  That's the easy

part.  Then you have a little more complicated part which is

describe the functions, okay, of what everybody does in the

courtroom.  That takes, from my experience of all the people I've

evaluated, that people can describe that sometimes very well,

other people do it in very simplified terms and you have to kind

of discuss what do they mean by it, you know.  The judge gives

you time -- some people may say, "Well, the judge gives you

time."  "What does that really mean?  Does that mean you're going

to jail or he's going to look at a clock or what?"  You have to

get them to describe that and get them to describe what it is.

And then the relationship with the attorney, the things

that you're talking about are fairly sophisticated and things

that Dr. Andrews brought up and said, "This is an issue."  Okay?

That's a much more sophisticated area of neuropsychological

testing that you have to look at, but you also can get that

information from evaluating the person and see how they do.

So, you know, that's -- the test really gives you all

aspects of that.

Q.   Okay.  But you did none of that neuropsychological testing;

1  correct?

2  A.    The actual paper and pencil testing?  No.  I did other types

3  of testing.  I didn't do that.

4  Q.    So with respect to the neuropsychological testing and

5  results, you would have to refer or defer to the

6  neuropsychologists that did those tests, is that fair to say?

7  A.    I would take their interpretation of those tests into

8  consideration, but I don't defer.

9  Q.    You heard with respect to Dr. Andrews saying that

10  Dr. Cleggett's performance on the test when she took them with

11  her and the performance on the test when she took them with

12  Dr. Bianchini was not significantly different.  There was some

13  measured improvement in verbal memory?

14  A.    That's her testimony, yes, I did hear that.

15  Q.    So with respect to that, if she's performing at a certain

16  level in 2008 and then performing a little bit better in 2009,

17  but consistent in some respects in terms of her performance on

18  psychological evaluators, does that say that she has made

19  significant improvement or measured improvement or --

20  A.    It's basically -- you know, these tests are extremely

21  sensitive.  Okay?  And what you have is, you have a person with a

22  very high level of functioning prior to taking the test.  And

23  those tests are measured against that level of education.  Okay?

24        So compared to how she was functioning before, she

25  definitely has deficits.  I mean, I don't think anyone has

disputed that. It's whether or not the level that she's come

down in those areas that they agreed on -- and you can ask

Dr. Bianchini what they agreed on -- whether that impairs her

ability to the point where she cannot relate to you with a

reasonable degree of rational understanding or that she cannot

testify relevantly. And I don't think -- I don't think it does.

Dr. Andrews must think it does, but I don't think it does.

Q.    With respect to the *Dusky* standards you talked about, the

ability to relate and then rationally and factually assist; is

that correct?

A.    Yes.

Q.    If someone has absolutely no memory of events relating to

patients and a patient, for example, the question is, patient,

Melvin Jones, seen such and such date, specific event occurred

during the course of an examination and evaluation, that sort of

stuff, and Dr. Cleggett has absolutely no recall of that, doesn't

that address the issue of factually being able to relate to the

attorney? Since I have no personal knowledge of what happened,

how do I make cross-examine with respect to those issues?

A.    Let me see if I can address that. First of all, it would

not be uncommon with any doctor who was in this situation,

whether they had a brain damage -- brain injury or not.

Especially a doctor that was seeing 60 or 70 patients a week,

that they would not individually remember a patient that they saw

for a block of time. They may have to go to their records and

refresh themselves about what they did and they would also
explain in the courtroom that "This is my standard and customary
practice."  That's exactly what she did when she sat down with
me.  She said, "I know my standard and customary practice was to
do it this way.  That's the way I did it.  And the medical
records show that I did it that way."  So she's actually seen the
medical records and reviewed them and she thinks all those things
are in place.

        So that's an aspect of it that I think it's clear that
she can handle that and she can deal with that particular issue
herself, but she might not remember the specific details of the
case, just like if I'm a surgeon and I do a thousand knee
surgeries, I might not remember, you know, back five years ago
the specific knee surgery I did on this patient.  But I look at
my records and I say, "Looks like we did this.  In my operative
note, I said 'I did this, this and this.'  This is what occurred.
I don't have a specific or independent recollection of it, but I
know this is how I practice and this is what I did, and that's
within a good standard of practice."

        It seems to me although I don't know all the details of
what the charges are, that that's what she has to be able to do
in this case, and I think she's capable of doing that.

Q.   Now, you understand from your own experience as a doctor
that you may have to testify in a courtroom; correct?

A.   Yes.

1  Q.   In connection with a matter?

2  A.   Yes.

3  Q.   And you understand from your own experience that there may

4  be a challenge, a very aggressive challenge to the information

5  that you're presenting; you understand that?

6  A.   Yes.

7  Q.   Now, at the level of functioning you had, you certainly have

8  the use of all of your mental faculties to be able to thrust and

9  parry with an attorney; correct?

10  A.   Yes.

11  Q.   To be able to understand, relate, refer and recall

12  information that will be helpful in supporting the position that

13  you're advancing; correct?

14  A.   Yes.

15  Q.   Did you understand the testimony regarding Dr. -- from

16  Dr. Andrews regarding her inability to do these executive

17  functions and her lack of disinhibition and the anger, how those

18  things would then bear on her ability to then effectively assist

19  me in telling a story that 12 people can understand, follow,

20  accept, and render a verdict?

21  A.   Yes.  I mean, I realize that that's the area, if there is

22  any area in what we call the operationalized component of

23  competency, there is usually -- there are 13 areas plus or minus

24  a few.  The ability for her the sit in the stand and testify and

25  tell a coherent story, that's the one area that I would be most

1  concerned about and that's why I asked her those questions, you

2  know, about this particular area.

3         So I mean, I think that's an area that she may be have

4  to be given more time with you to go over, that you need to spend

5  more time with her doing that, and however you do that, whether

6  you practice it or talk about it, you have to spend more time in

7  that area, but I don't think she's incapable of doing it.

8  Q.   You understand that cross-examination is done on the fly?

9  There are no lawyer breaks where I can then supplement her memory

10 or her information with the information that I know?  You

11 understand that; correct?

12 A.   I agree.  I agree with that, yes.

13 Q.   So given the brain impairment that's been already described,

14 and nobody is denying it, you said significant brain injury and

15 impairment.

16 A.   Yes.

17 Q.   Dr. Bianchini said significant injury and impairment.

18 A.   Yes.

19 Q.   And Dr. Andrews said significant injury and impairment.

20 A.   Well, I think we've all said she had a significant injury.

21 What level of impairment is there, I think, varies.  So -- and

22 whether that impairment impacts her such that she's not capable

23 of performing the function that you just described, which is the

24 one area that I think I would be concerned about and I was

25 concerned about when I did the evaluation.  It's not how she

1   performs on that particular neuropsychological test, it's when

2   she's sitting up here, can she do in it a reasonable way.  And I

3   think she can do it in a reasonable way, but it may take some

4   more effort on your part or the Court's part to supply her with

5   more information, give her all the information she needs, and to

6   work on it.

7           The important thing I think in that is that she can

8   incorporate new memories, so she can -- you can sit down with her

9   and say, "This is how I want to handle the case.  This is the way

10  I want to go with it," and she can incorporate that.  I don't

11  think she's necessarily going to have an irrational outburst in

12  court.  I mean, I think she's able to handle herself in court, so

13  while on the witness stand, she has to remain calm and testify.

14  These outbursts they described occur periodically over -- you

15  know, with big spaces of time in between them.

16          So that's my opinion.  I'm sure you have a different

17  one and Dr. Andrews has a different one, but my opinion --

18  Q.   I don't have an opinion about future events.  Are you saying

19  today that you believe that during the course of a trial, that

20  there -- that there will be no outbursts?  You're saying you have

21  some basis for that?

22  A.   I'm saying that I think that she can control, during the

23  course of the trial, her emotions to the extent that she can go

24  through the trial, yes.

25  Q.   With respect to that, in connection with the Georgia

1  Competency Test that you talked about, do you go through
2  something like a mock cross-examination where in effect, you put
3  her under the pressure that she might face as a part of the
4  cross-examination in the courtroom?
5  A.   No.  Routinely, I don't do that during my examination.  I
6  ask her questions about that, and I observe her during the course
7  of the evaluation.

8       Now, I will see individuals that when I start to ask
9  them questions about things related to court, they immediately
10 have an emotional response to that and they have a difficult time
11 controlling their emotions related to that.  She talked about the
12 emotional aspects of that, but she didn't lose control when we
13 were discussing it.  I didn't --
14 Q.   Could that be explained by the fact that she was having a
15 good day or a reasonable day, as you described it?
16 A.   It may be, but it also may be that she has the capacity to
17 be able to take in those emotions, know that she is going to have
18 to deal with this issue and not get upset about it.  And so
19 that's part of what I have to take into consideration when
20 evaluating her.
21 Q.   How do you know or how does any doctor know if a person is
22 confabulating?
23 A.   It has to do with -- usually, when you do those kinds of
24 tests, when you definitively say someone is confabulating, you're
25 asking them questions where you know the answer to the question.

1  Q.   For example, if someone has paralysis in their left arm, and

2  you tell them to raise their left arm, and instead of them

3  raising their left arm, they said their arm is tired?

4  A.   Well, I don't know that that's necessarily -- a more easy

5  example of confabulation is when you're asking for memory,

6  testing, and you say, "Hi, I'm Dr. Thompson.  I'm going to ask

7  you my name again in a minute.  I work here.  I do this.  I do

8  whatever."  You distract them a little bit.  "What's my name?"

9  "Oh, you're Dr. Stewart."  "Are you sure I'm Dr. Stewart?"

10  "Yeah, you're Dr. Stewart," and they sort of fill in.  So it's

11  more simple things.  It's hard to get, as Dr. Andrews said, more

12  complex examples of confabulation, so you'll have to ask

13  Dr. Bianchini whether or not -- you know, whether he did the

14  testing or someone else did the testing where that came from.

15  But I didn't see that during my evaluation.

16  Q.   The Georgia Competency Test does not have as a function or

17  focus of it trying to determine if somebody might confabulate

18  during the course of their testimony; correct?

19  A.   Well, they knew all the different components of the court at

20  one point, and then later you would ask them about it and they

21  kept filling in, you might say they were confabulating, but it

22  really doesn't have a specific confabulation test, and I don't

23  know that there is a confabulation test.

24  Q.   With respect to confabulation, in effect, you have to know

25  the right answer to know whether someone is confabulating;

1   correct?

2   A.   Yes.

3   Q.   So the question is asked and I don't know, we're relying on

4   that witness, and you don't know, then there is no way for us to

5   know how reliable the information that the witness is bringing

6   forward is; is that fair to say?

7   A.   Well, you know, in any of these evaluations, I don't think

8   you can know all the information.  So that's true to a certain

9   extent.  I mean, you have to take the information that you have

10  available and try to apply it to that information.

11  Q.   Now, with respect to Dr. Cleggett's level of functioning,

12  your opinion, in large part, is based on the fact that you think

13  intellectually she has a pretty good understanding or has pretty

14  good intelligence.

15  A.   Yeah.  Based on the testing, she certainly has, you know,

16  reasonable intelligence to be able to do the kinds of things that

17  she needs to do in court.

18  Q.   But do you understand that testifying in court involves more

19  than simply intelligence and recall, it involves making

20  evaluation, it involves knowing what's good for me, what's

21  detrimental to me, and all those sorts of things?  And you heard

22  what Dr. Andrews said regarding the impairment to her brain and

23  how that impacts her ability to do that?

24  A.   I heard Dr. Andrews' opinion about how she thought it

25  impacted, and we disagree.

1 Q.  But she did the neuropsychological testing of Dr. Cleggett

2 and based her opinion on the results of the neurosurgeon testing

3 and her understanding of what those measures mean; correct?

4 A.  It depends on what example you're talking about.  The

5 example that you were talking about was based on a conversation

6 that she had, not necessarily the neuropsychological testing, so

7 -- that she revealed information to Dr. Andrews that maybe

8 Dr. Andrews thought she shouldn't have revealed to her, which

9 was --

10 Q.  The disinhibition?

11 A.  Well, she called it disinhibition.  I don't call it

12 disinhibition.  She basically said, "You know, if I don't do well

13 on these tests, I might not have to go to court."  So she was

14 aware of that.  Dr. Andrews thought that that was an example of

15 disinhibition or an example of her saying something that she

16 shouldn't necessarily have said.

17           And during the course of the evaluation, that happens

18 all the time where people -- you know, people will -- after you

19 spend time with them, they reveal stuff to you that they may or

20 may not -- shouldn't reveal to you.  It happens in almost every

21 evaluation that I do.  People say something to me and I just go,

22 okay.  You know, I just file it.  But I don't know that I would

23 necessarily say that that particular example came from

24 neuropsychological testing.  It came from just a conversation

25 with her.

1  Q.   It's a difference when a person you're talking about has no

2  psychological organic brain damage and the person has organic

3  brain damage.  There is a difference, or can be a difference; is

4  that what you're saying?

5  A.   There can be, and I think that's what -- you know, in

6  essence, what I heard the testimony is, is that that can affect

7  it.  What I'm saying is what I saw, it didn't affect it when I

8  evaluated her.  It can affect it, but does it affect it?

9  Q.   So it's a difference of opinion?

10 A.   Certainly it's a difference of opinion.

11 Q.   And the opinion that Dr. Andrews was rendering was based on

12 neuropsychological testing and training and based on her

13 knowledge regarding the organic brain injury that Dr. Cleggett

14 suffered; correct?

15 A.   Yes, but no testing on competency to stand trial or capacity

16 to stand trial.  So she didn't give her a test at all on that.

17 Q.   Now, with respect to medications, medications can impact

18 people's ability to understand or remember; correct?

19 A.   Yes, they can.

20 Q.   And in connection with your evaluation of Dr. Cleggett, you

21 were able to find out what medication she took?

22 A.   Yes.

23 Q.   There were a number of medications that she took to deal

24 with pain, anxiety, and those sorts of things?

25 A.   Yes.

Q.   And a number of those medications had, as side effects or
contraindications, impact on memory?

A.   Yes.

Q.   And those medications are, to go through them, you have, I
guess, them detailed at Page 5, a listing of medications she
took?

A.   Yes.

Q.   Effexor?

A.   Yes.

Q.   That medication is an antidepressant?

A.   Antidepressant medication.

Q.   And one of the contraindications or one of the side effects
of that is short-term memory problems?

A.   Effexor has lots of effects on various parts of the brain,
obviously because it treats depression, so there are some people
who can have a side effect of being -- being more fuzzy in their
memory or having more difficulty with their memory or having
sedation from the medication.  But after you take it for a while,
it actually treats depression and treats irritability.  So one of
the things you're concerned about, is she going to be irritable
and have outbursts?  That medication actually helps that
situation.

Q.   Elavil?

A.   Yes.

Q.   That is a pain medication for headaches?

1    A.    It's actually an older antidepressant, but it's commonly

2    used for headaches and for sleep because it tends to help people

3    sleep at night and it sedates them and helps them sleep, but it's

4    an adjunct for pain.

5    Q.    When you're adding the Effexor and the Elavil, any

6    contraindications that heighten or increase the likelihood of

7    certain types of problems?

8    A.    Certainly can.

9    Q.    Xanax?

10   A.    Yes.

11   Q.    That is for anxiety?

12   A.    Antianxiety medication.

13   Q.    Restoril?

14   A.    Is a sleeping medicine, but it's the same class as the

15   Xanax.  It's called a benzodiazepine.  It's another type of

16   sleeping medication.

17   Q.    Hydrocodone?

18   A.    That's the pain medication she was taking every four hours

19   when she was meeting with me.

20   Q.    With respect to a person suffering pain, does pain affect

21   your ability to concentrate, your ability to fulfill a task or

22   carry out a task?

23   A.    It can.

24   Q.    And with respect to the interactions or when you mix a

25   number of different drugs like this, can it increase the memory

1  issues that result?

2  A.    Yes, it can.

3  Q.    Soma?

4  A.    Soma is more like a muscle relaxant.  It also can have

5  sedative effects if that's the issue you're asking about.

6  Q.    So, with respect to those medications and how they play out

7  during the course of a trial, have there been any long-term

8  longitudinal studies that talk about how individuals who might

9  take those medications, how it might affect them during the

10 course of a trial, the stresses of a trial?

11 A.    I've not seen a study on just that particular issue about

12 whether medications -- it's been my experience as a person in

13 charge of restoring people to competency in the state of

14 Louisiana, treating patients to get them ready to go to trial,

15 that the majority of the time, medications are beneficial to how

16 the patient or the client does within the trial process rather

17 than detrimental.

18 Q.    That's the hope or the expectation?

19 A.    No, it's not a hope.  It actually happens all the time.

20 They use the medications so that the person will be in better

21 shape.  In fact, I would recommend at times that antidepressant

22 medicine, some of the medicines she's taking be prescribed in

23 order to help them.  Antianxiety medication so she doesn't feel

24 so anxious when she's trying to sort these kinds of things out.

25 When she's been on these medicines for a while, the sedative

effects wear off and you have less and less sedation the longer

you are on the medications.  It can happen.  But she's been on

them for a while, and the day I saw her, she was taking them.  So

I'm evaluating her at the time she was taking them.  So I'm

looking at her then.  She wasn't falling asleep during my

evaluation.  She wasn't unable to relate to me.  She's on the

same medications that I have on my report.  She may be on

different ones now.  But this medication -- she was handling

those medications well and was taking them at the time.

Q.   And she's in a place that she's familiar with?

A.   She is.

Q.   And she's in a room that she's comfortable in?

A.   It was a room, yeah.

Q.   Her room.

A.   No, it wasn't her room.  It was a room that was separate

that they put apart for us to evaluate in, so it was another

patient room.

Q.   But you did not evaluate her at any time where you thought

she was under any stressors or any pressures that you could see?

A.   I haven't evaluated her when she's in the court as she is

today, but I evaluated her at her facility, yes.

Q.   Have you seen her -- have you evaluated her testifying in a

deposition or any other type of --

A.   I haven't done that.

Q.   Do you have any specific knowledge about how she was able to

comport herself during the course of -- for example, of those

depositions?

A.    She said -- I do, as a matter of fact.  She said that when

she was -- when she would go back and read the depositions, she

didn't -- she would look at them and say, "Well, you know, how

could I have said that?  I don't really -- that's not how I

wanted to answer that question."  So I took that into

consideration, as well, but she -- when she would go back and

read depositions.  Now, when I go back and read my own

depositions, sometimes I think, how could I have said that?  But

she had concerns about that.

Q.    Did you review the depositions to see if there were, for

example, any outbursts with inappropriate language?

A.    No, I did not.

Q.    Do you have any knowledge regarding how many times a

deposition might have to be recessed to give her an opportunity

to recompose herself because she had lost her composure?

A.    No.  But I think that's something that the Court might want

to take into consideration here.

        MR. CHANEY:  No further questions with respect to this

witness, Your Honor.

        THE COURT:  Thank you.  Redirect?

        MR. CARTER:  Yes, sir.

                    REDIRECT EXAMINATION

BY MR. CARTER:

1  Q.   These depositions, did you know when they occurred?

2  A.   I didn't get the exact dates from her as to when they

3  occurred.

4  Q.   You don't know if they were before the accident or after the

5  accident?

6  A.   No.

7  Q.   Based upon her conversations with you about those

8  depositions, what was your understanding about her ability to

9  function during those depositions?

10 A.   She said that, you know, she was able to answer the

11 questions and do whatever.  When she went back and read them, she

12 said to herself, "You know, I don't know if I -- that made sense

13 or that made as much sense as I thought it did when I was saying

14 it."

15 Q.   And you said you've had a similar experience reading your

16 own depositions?

17 A.   I have.  I think everyone has that's read their depositions.

18 Q.   Do those comments by Ms. Cleggett indicate in any way that

19 she's not competent to stand trial?

20 A.   No, they do not.

21 Q.   Dr. Thompson, you've read the report of Dr. Andrews and

22 Dr. Bianchini?

23 A.   Yes.

24 Q.   And you've heard the testimony today of Mr. Borruano and

25 Dr. Andrews?

1  A.    Yes.

2  Q.    Have you heard anything today or upon reviewing those

3  documents see anything -- has anything happened to make you

4  change your mind, change your opinion about Dr. Cleggett's

5  competency to stand trial?

6  A.    No.

7  Q.    You were asked by Mr. Chaney a hypothetical question

8  assuming that Ms. Cleggett had absolutely no memory about Joe

9  Blow or whoever was testifying.  Was there anything in your

10 evaluation of Dr. Cleggett which indicated to you that she had

11 absolutely no memory of past clients?

12 A.    No.  And I think I should clarify, I mean, Dr. Bianchini can

13 address this as well, that would not be -- that would not be

14 common in a brain injury case for someone to lose their long-term

15 memory.  I mean, you know, short-term memory is always the most

16 vulnerable memory.  The memory around the time of the actual

17 trauma is most vulnerable and then you get a decrease in loss of

18 memory the farther away you get from the actual trauma, itself.

19 Once they're structured in the brain, then damaged, it is

20 incapable of them forming new memories, and we've heard today

21 that that's not the case.

22        So she described to me her childhood, the important

23 things that happened in her childhood, things that happened to

24 her that were traumatic in her adolescence, remembering the

25 adolescence, and then remembering things that occurred to

1   individuals that had caused her trauma in adolescence and what
2   had occurred to them and the consequences of it.  In every aspect
3   of long-term memory or past history, she really had a very
4   logical chronological way of describing that to me.

5           So again, that was the part that was -- that I saw that
6   was different from what we've heard in previous testimony.
7   Q.   So she both recalled and reconstructed that information?
8   A.   Yes.
9   Q.   You were asked about her medications.  Do her medications
10  render her incompetent to stand trial?
11  A.   No.
12  Q.   Finally, you were asked about her ability to testify and you
13  seemed to indicate some concern about her ability to testify.  I
14  would like to clarify that for the Court.  What is your concern
15  about her ability to testify?
16  A.   Well, I think that given the history that she's had, that if
17  she's on the stand for a long time, she may need to take more
18  frequent breaks, and I think that because of the nature of the
19  head injury, that her attorney may want to spend more time with
20  her when he's preparing her to go to trial.
21  Q.   What do you mean by spend more time with her?  For what
22  purpose?
23  A.   For, you know, if she's -- if she has areas that she says
24  she can't remember, refreshing those with the medical records,
25  making sure those are consistent with the way they present their

case, they are going to do that in a consistent way.  I think if
she sticks to her version of what she told me, that's a
reasonable testimony that she -- she did things in a certain way,
she evaluated people in a certain way, she did the standardized
way of doing it and she described her medication based on that
standardized way of doing it, that's very reasonable.

Q.   So based on your examination in terms of testifying on the
witness stand, she would be able to understand questions that
were asked of her?

A.   Yes.

      MR. CHANEY:  Objection, Your Honor.  That calls for
speculation.

      THE COURT:  Go ahead.

      MR. CHANEY:  There have been some representations about
her ability to understand or verbal memory.  He's saying that
will she understand.  There has been disputed information
regarding that, and I think it calls for speculation unless there
is some specific thing that Mr. Carter is talking about being
able to understand.

      MR. CARTER:  We're talking about her -- this entire
hearing is about these doctors' opinions on her competency.

      THE COURT:  This is expert testimony.  The question that
was asked was, "So based on your examination in terms of
testifying on the witness stand, she would be able to understand
questions that were asked of her."  And I think that's a fair

1   question within the parameters of the expert opinion of this

2   witness as well as the other experts that we have called and will

3   hear from today.  So I'll overrule the objection.

4                               EXAMINATION

5   BY MR. CARTER:

6   Q.   Can you answer that question?

7   A.   Yes, she would be able to understand the questions posed to

8   her.

9   Q.   Both on direct and cross?

10  A.   Yes.

11  Q.   Would she be able to answer truthfully, in your opinion?

12  A.   Yes.

13  Q.   On both direct and cross?

14  A.   Yes.

15          MR. CARTER:  Nothing further.

16          THE COURT:  You may step down, Doctor.  Thank you.

17               Okay.  We have one more witness.  Mr. Carter; is

18  that correct?

19          MR. CARTER:  Yes.

20          THE COURT:  Why don't we take about a five-minute break

21  and we'll come back and finish with Dr. Bianchini.

22          THE DEPUTY CLERK:  All rise.

23          (WHEREUPON, at this point in the proceedings, a brief

24          recess was taken.)

25          THE DEPUTY CLERK:  All rise.

1    THE COURT:  Let's go ahead and swear the witness.

2    THE DEPUTY CLERK:  Would you please raise your right

3 hand.  Do you solemnly swear that the testimony which you are

4 about to give will be the truth, the whole truth and nothing but

5 the truth, so help you God?

6    THE WITNESS:  I do.

7              **DR. KEVIN JOSEPH BIANCHINI**

8 was called as a witness and, after being first duly sworn by the

9 Clerk, was examined and testified on his oath as follows:

10                   DIRECT EXAMINATION

11 BY MR. CARTER:

12 Q.   Dr. Bianchini, your expertise has been stipulated to, but I

13 would like for you to briefly tell the Court what type of

14 medicine you practice.

15 A.   I'm a clinical psychologist and a neuropsychologist.  I have

16 the license -- the same license as Dr. Andrews mentioned.  I have

17 a license in clinical psych and in neuropsychology.  I'm board

18 certified in neuropsychology also.

19 Q.   How does your practice differ from Dr. Thompson's?

20 A.   Well, Dr. Thompson is a psychiatrist, deals with medical

21 aspects of mental problems and impairments, including behavioral

22 impairments and practices forensic psychiatry, both as a

23 testifying expert and also treating patients in a forensic

24 setting.  I'm a neuropsychologist.  I deal more with brain damage

25 explicitly.  I'm involved in the treatment and rehabilitation of

patients with brain injuries and have for many years evaluated

patients with brain injury to understand their cognitive

problems, neurobehavioral problems, emotional and psychological

problems, as they are related to neurological or brain

dysfunction.  I also deal somewhat with clinical psychological

problems like depression and those things as well, but I have a

specialty in neuropsychology as well.

Q.    Now, when you evaluated Dr. Cleggett, she had already been

evaluated by Dr. Thompson?

A.    By Dr. Thompson and Dr. Andrews.

Q.    What was the purpose of your evaluation?

A.    Because Dr. Cleggett had the history of traumatic brain

injury, my understanding is that Dr. Thompson wanted a

measurement, an examination of the impact of the traumatic brain

injury on the question of competency.

Q.    And how did you go about to make this evaluation?

A.    I conducted a neuropsychological evaluation in the standard

way that we do that which involves me first meeting with

Dr. Cleggett, and she was brought to my office, and then after

she was brought to my office where I interviewed her, we had

technicians go and do testing at the facility where she lived and

they administered the neuropsychological tests, and these are

tests of various mental faculties.  Many was things we've heard

discussed today like attention, concentration, memory, reasoning

abilities, visual perceptual abilities.  It's a comprehensive

assessment of someone's mental faculties which is designed to
survey the person's brain function.

Q.   Over how many -- over the course of how many days did these
tests occur?

A.   We stopped testing when patients report that they are too
fatigued to keep going, so it took a number of days.  It took, it
looks like -- I should be able to count this quicker.

Q.   Take your time.

A.   Looks like six, seven days.

Q.   This fatigue, did this fatigue in any way render, in your
opinion, Dr. Cleggett incompetent to stand trial?

A.   No.

Q.   Why not?

A.   Well, it was apparent -- fatigue, in itself, first of all,
is not a mental impairment.  It's something else.  It's a sort of
property of the person's capacity to remain awake, stamina, as it
were.  And so, you know, you have to understand their cognitive
functioning within the parameters of their capacity to be
examined.

Q.   You reviewed her medical records?

A.   Yes.

Q.   What did you conclude from reviewing her medical records?

A.   Well, when it comes to brain injuries, we understand brain
injuries, in terms of the acute neurological characteristics of
the injury, and the reason we understand them that way is because

1  the literature, scientific literature on brain injury is

2  organized according to these categories.  Typically it's mild,

3  moderate and severe, although there are sometimes some

4  subcategories, but mild, moderate and severe.  And then you have

5  an understanding of what to expect both in terms of

6  neuropsychological problems, vocational impairments, a variety of

7  different things in terms of longitudinal progress have been

8  studied according to those acute parameters as the important

9  points of comparison.  And so I wanted to make sure I looked at

10 the earliest records to understand how severe or what type of

11 injury that she had, and she had a severely traumatic brain

12 injury.

13 Q.   And what would you expect to find as a result of that

14 traumatic -- that severe traumatic brain injury?

15 A.   Neurocognitive impairments, meaning impairments in mental

16 functioning like memory and concentration, for example, and also,

17 you know, neurobehavioral impairments meaning alterations in mood

18 that can result as a primary symptom of brain impairment, also

19 some psychological adjustment difficulties and psychological --

20 or psychiatric mood problems that can accompany the brain

21 damage-related effects.  So those are the kind of things that I

22 would expect to see.  With a severe traumatic brain injury, there

23 is a high rate of permanent impairments for those kind of things.

24 So that's why I think she does have permanent neurocognitive

25 impairments and that's why I said so in my report.

1  Q.   Now, you just mentioned what you would expect to find.  Did

2  you, in fact, find those things after you examined Dr. Cleggett?

3  A.   Yes.  She has residual, and in my view, likely permanent

4  neurocognitive impairments from her severe traumatic brain

5  injury.

6  Q.   Now, for my benefit and for no one else in the courtroom's,

7  what do you mean by "neurocognitive"?

8  A.   Neurocognitive is essentially the same as cognitive.  It's

9  just you attach the word "neuro" to it to imply more fully that

10  the brain is involved.  But it refers to mental faculties,

11  concentrating abilities, remembering, speaking, thinking,

12  understanding, reasoning, dealing with visual information.  So

13  all of these various mental faculties are covered under the term

14  "neurocognitive."

15  Q.   And she does have the impairments?

16  A.   Yes.

17  Q.   And I believe all of the other doctors agree on that?

18  A.   Everybody agrees on that, yes.

19  Q.   Let's talk about the level of those occurrences.

20       Let's first focus on your interview, if that's an

21  appropriate term to use, with Ms. Cleggett.  How long did you

22  meet with Ms. Cleggett?

23  A.   About an hour and 20 minutes.

24  Q.   And what was the purpose of your meeting with her?

25  A.   To ask her about her history and her symptoms.

1  Q.   And how did that meeting go?

2  A.   It went fine.  She reported a number of symptoms to me, and

3  she relayed a history of what happened and also a history of

4  her -- you know, medical history and somewhat of a psychosocial

5  history and things like that.

6  Q.   Did she have any problems, as far as you could tell,

7  recalling that history?

8  A.   She didn't seem to to me.

9  Q.   Did she have any problems, as far as you could tell,

10 reconstructing that and telling it to you?

11 A.   She didn't seem to.  Of course, I don't have, you know,

12 information about her early family life to check against, but she

13 didn't seem to have difficulty relaying that history to me.

14 Q.   When you say you don't have information to check against,

15 you couldn't tell whether or not what she was saying was

16 accurate?

17 A.   I didn't have, you know, a collateral that was in the house

18 with her where she was raised or -- you know, or other

19 information that reflect documented facts of that time period.

20 Q.   At least as far as you could tell, there was no problem

21 reconstructing it?

22 A.   Right.  That's correct.

23 Q.   Let's talk about the tests you performed.  What tests did

24 you perform?

25 A.   There is a whole bunch of tests and they are all listed on

the front there on the report.

Q.   Let me stop you.  Rather than going through a litany of
tests in the interest of time, what was the result of those tests
in terms of competency?

A.   There is a number of different results.  I think that Ms.
Cleggett Lucas has some residual neurocognitive impairments and I
said that.  She also is exaggerating neurocognitive impairments,
as Dr. Andrews testified, and I testified about that.

Q.   So she exaggerated your tests also?

A.   Yes.

Q.   By "exaggerated," you mean what?

A.   Intentionally exaggerated.

Q.   Intentionally attempting to fail or do better?

A.   Intentionally attempting to do worse on the neuropsychology
testing than is her capability.

Q.   What was your conclusion based on your test?

A.   You know, that she has -- you know, she had some impairment.
I think there is a pretty broad agreement, however, that she
understands the nature of the proceedings against her and the
consequences and elements of that aspect of the competency
question.  And then I thought that she had many of the capacities
that would be required to assist counsel, she might need some,
you know, help at times or some things.  She does have residual
cognitive impairments as I mentioned that could impact her
capacity to do that at times.  But I thought that she had the

1  capacity to assist her counsel and to interact with her counsel.

2  Q.   What are you referring to when you say she might need help

3  at times?

4  A.   Well, she does have -- there is a couple of different areas

5  where she has, you know, clear-cut problems.

6  Q.   Such as?

7  A.   She has a problem with attention and concentration.  It's

8  one of the most common problems I see in patients with brain

9  injury.  So that means that at times, she will lose track of, you

10 know, questions asked.  Now, this is not an absolute impairment,

11 so this doesn't mean that she always loses track.  She will lose

12 track more than someone, you know, without this level of -- you

13 know, without a brain injury, particularly someone who has her

14 level of premorbid intelligence who has not had a brain injury.

15 So she will, at times, you know, lose track.  She could be

16 redirected, for example, as a way of helping her.

17 Q.   That was going to be my next question.  When you said --

18 will this be consistent with what Dr. Andrews reported at Page 5

19 where Dr. Andrews concluded that Ms. Cleggett loses her train of

20 thought?

21 A.   It's consistent with that comment, yes.

22 Q.   You just said she can be redirected?

23 A.   Yes.  She also has other -- you know, she tests in areas

24 that demonstrate, you know, capacity, spare capacities.  Because

25 she had -- early on, she was noted to have left hemiparesis, so

what that implies, what that means is that she had damage on the

right side of her brain.  With traumatic brain injury, people

tend to have sort of diffuse damage.  That doesn't mean that's

the only place she had it, it means she had some damage

concentrated in the right -- in the anterior right part of her

brain.  Those patients -- patients with that kind of injury have

been studied and are understood to have certain kind of problems

and she has some of those problems.  Concentration is one of

them.  Difficulty with time is another one.  Show has some of

those things.

Q.   What do you mean by difficulty with time?

A.   Well, if you think of -- if you think of your ability or

other persons' abilities to have a sense of time passing, that's

a -- you could think of that ability I just described as a mental

faculty.  And her ability to do that is likely impaired.  It just

so happens that's one of the things that is seen in patients with

this kind of right hemisphere damage.  However, she has much less

problem -- and this was something that was worth commenting on as

far as Dr. Andrews' testimony.  She has much less problem when it

comes to verbal information.

So if you look at her neuropsychological evaluation,

her verbal intelligence is good.  I think it was 96.  Her verbal

memory, when she's giving full effort, is good.  It was in kind

of low/average range.  Even -- there was some testimony about

verbal -- I mean, about reasoning abilities and her verbal

reasoning abilities, when tested, are in the average range.  So
that means her ability to kind of understand words and connect
meaning to words and that kind of thing, when you actually test
that, is in the average range.

So, you know she has some impairments.  She has some
impairments that are typical for patients with right hemisphere
damage, and she has -- and she has some spared areas on the
testing.

Q.    You just mentioned reasoning.  I'm referring to Page 7 of
your report.  You have listed there the six bullet issues from
Dr. Andrews' report.  I direct you to Number 4 where Dr. Andrews
says, "She..." she being Dr. Cleggett "... has no logical
problem-solving or deductive reasoning."  Do you agree with that
statement?

A.    No, that's not correct.

Q.    Why not?

A.    Well, first of all, she says it in absolute terms, she has
none, and that would be unusual for someone even with very bad
brain injury to have a complete loss of some mental faculty.  It
happens rarely.

And so I don't think it's proper to say she has no
logical problem solving.  I think she has problem solving and
reasoning difficulties particularly when it comes to dealing with
visual material.  Okay.  Like the graph, you know, I think if she
had to look at a graph and understand, make sense of a graph and

1  understand it that way, something that was visually or

2  graphically displayed she would have greater difficulty, but when

3  it comes to words when you actually test her capacity or

4  reasoning and problem solving with words, she does fairly well.

5  Q.    You've listened to Dr. Andrews' testimony here today?

6  A.    Yes.

7  Q.    And you've read the report?

8  A.    Yes.

9  Q.    Anything you heard today or you see in the report cause you

10 to change your opinion about Ms. Cleggett's competency?

11 A.    No.

12 Q.    There has been a lot of discussion and questions about this

13 word "confabulation."  What is confabulation?

14 A.    Confabulation is a compensation for brain damage-related

15 memory impairment.  What happens is when folks have brain

16 damage-related memory impairments -- Dr. Thompson gave you a very

17 good example of alcohol dementia, and that's probably the best,

18 one of the best in the neurobehavioral literature on

19 confabulation, but when people have these kind of memory problems

20 they will sometimes fill in the blanks sort of automatically.

21 And I agree with Dr. Andrews that it happens not with the

22 person's full awareness.  And so they will -- you know, they'll

23 not be able to remember something, their brain just kind of fills

24 something else in.  Whatever they fill in is incorrect, because

25 it's just being filled in.

1          And so that's probably a good definition of

2    confabulation.  It means the brain is kind of making up something

3    to fit, to fill in the difference.

4    Q.    Does Ms. Cleggett suffer from this?

5    A.    I think she did do that at times during our evaluation.  It

6    wasn't a prominent problem, but she did do it some on some memory

7    testing.

8    Q.    Do you recall the other specific example?

9    A.    I don't.  It would take me awhile to find one by looking

10   through the testing.

11   Q.    Did this confabulation relate to long-term or short-term

12   memory?

13   A.    It's a short-term memory phenomenon.  It really doesn't have

14   much to do with long-term memory typically.

15   Q.    And in your experience with Dr. Cleggett, did it relate to

16   long-term or short-term memory?

17   A.    It was on testing of short-term memory.

18   Q.    Would this confabulation affect her ability to review her

19   medical reports?

20   A.    Affect, could it have some impact?  I guess it's a

21   possibility.  I don't think it would -- it's not a prominent

22   problem.  I don't think it would make it not possible for her to

23   remember things from the past certainly as remote memory is

24   something that's commonly spared.  You know, I think it's

25   something that could capably come up about -- particularly about

1  new information.

2  Q.    New information?

3  A.    Not so much about old information.

4  Q.    But in terms of actually reading her medical records, would

5  confabulation affect her ability to read her medical records?

6  A.    No.

7  Q.    Would it affect her ability to understand those records?

8  A.    No.

9  Q.    Would it affect her ability to discuss those records with

10  her attorney?

11  A.    Discuss -- with the attorney who is also looking at the same

12  records and has the records?

13  Q.    Yes.

14  A.    It could come up, but it wouldn't -- it wouldn't, you know,

15  preclude her from being able to talk.

16  Q.    Give me an example of how it could come up.

17  A.    If her attorney was asking her about some factual piece from

18  the record, you know, and she didn't have the record in front of

19  her, she could confabulate.

20  Q.    If she had the record in front of her and the attorney had a

21  copy of the record, this would not be a problem?

22  A.    I think that's correct.

23  Q.    Did you review the medications that Ms. Cleggett was taking?

24  A.    Yes.

25  Q.    Do any of those medications render her incompetent to stand

1  trial?

2  A.   No.

3       MR. CHANEY:  Your Honor, I would like to note for the

4  record that Dr. Cleggett is asleep.

5       THE COURT:  Yes, I've noticed.

6                              EXAMINATION

7  BY MR. CARTER:

8  Q.   You heard the testimony today of Ms. Borruano?

9  A.   Yes.

10 Q.   Anything in her testimony cause you to change your opinion?

11 A.   No.

12 Q.   Finally, Doctor, is there anything in your report, based

13 upon what you've heard today, that you want to correct or change

14 or modify?

15 A.   No.

16       MR. CARTER:  Thank you.

17       THE COURT:  Cross?

18       MR. CHANEY:  Thank you.

19                         CROSS-EXAMINATION

20 BY MR. CHANEY:

21 Q.   Don't you have to be awake and conscious to be able to

22 assist our lawyers?

23 A.   Do we have to be awake?  Yes.

24 Q.   Awake, conscious of what's going on and the testimony that's

25 going on?

1  A.    Yes.

2  Q.    So we can help the lawyer to know that's not the truth, that

3  didn't happen; correct?

4  A.    Yes.

5  Q.    Now, with respect to the issue of confabulation, you noted

6  it in your report and you were, of the doctors who prepared

7  reports, the only one that did -- that noted confabulation?

8  A.    Correct.

9  Q.    And you note it because you thought it would be significant

10  with respect to your evaluation of her; correct?

11  A.    Sure.

12  Q.    Now, with respect to the government asked about her ability

13  to read her medical records, you understand that being able to

14  read medical records and then being able to respond to questions

15  put to you on cross-examination is quite a different task, based

16  on your own experience as a witness; is that correct?

17  A.    Sure.

18  Q.    With respect to the questions that Mr. Carter has asked you

19  and even the questions that I ask you, you have to be able to do

20  what they call executive evaluation or your executive function

21  needs to be good to be able to negotiate this process; is that

22  fair to say?

23  A.    Well, maybe I don't understand the question.

24  Q.    All right.  Let me try to make you understand it.

25  A.    Thank you.

Q.   As a part of his direct examination, Mr. Carter went through
a series of questions with you.

A.   Okay.

Q.   Where he's basically going from your report, which you
prepared at some specific time, asking you questions and asking
you to either affirm or disaffirm those items; correct?

A.   Yes.

Q.   Now, you understand that cross-examination is a different
process; correct?

A.   Cross is different than direct?

Q.   Yes.

A.   Yes.

Q.   What I'm doing now?

A.   Yes.

Q.   I'm referring back to information that may have come forward
during the course of his cross -- I mean, his direct; correct?

A.   Yes.

Q.   I'm also referring to information that may have been in your
report; correct?

A.   Yes.

Q.   And you have to pull those items from your short-term memory
because it happened shortly ago, a short time ago; correct?

A.   Yes.

Q.   And then you have to be able to negotiate those things and
understand what it is I'm asking you and then to be able to

1 respond; correct?

2 A.   I think that's true, yes.

3 Q.   Now, that's executive brain function?

4 A.   There is elements of executive brain function in there.

5 Q.   With respect to Dr. Cleggett, based on the injuries that she

6 suffered, you saw evidence of some problems with executive brain

7 function?

8 A.   Yes.

9 Q.   Now, with respect to Dr. Cleggett and the issue of

10 short-term memory, the measures of short-term memory you gave,

11 some of them were verbal items, you said?

12 A.   Yes.

13 Q.   And then some were of a different nature?

14 A.   Yes.

15 Q.   And she did the best with respect to items relating to

16 verbal issues?

17 A.   She had her best scores on those.  She had bad scores on one

18 of them, I think generally is agreement among Andrews and me that

19 she was probably not doing her best on purpose on those, but it's

20 the belief that if you look at both of them, she has more

21 problems on visual memory and does better on verbal memory.

22 Q.   And with respect to the issue of verbal memory, is that kind

23 of short-term for, like, intelligence or --

24 A.   No.

25 Q.   Not necessarily?

1    A.    No.

2    Q.    I mean, verbal memory relates to your ability to understand

3    the word, to interpret how a word is used in the course of a

4    sentence, to -- or just to recall the word that you've seen

5    previously?

6    A.    Well, verbal memory refers specifically to, you know,

7    encoding, meaning attending properly to understanding

8    sufficiently and being able to repeat back verbal information,

9    typically, you know, either written or spoken.

10   Q.    Peter Piper picked a peck of pickled peppers, say it to you

11   and then you repeat it to me?

12   A.    Uh-huh (affirmative response).  That's one example.

13   Q.    So she can do those types of things?

14   A.    She can do things involving verbal memory.

15   Q.    And fairly high functioning with respect to those things?

16   A.    Yes.  I mean, you know, in the average range.

17   Q.    Now, in the area that you noted that she had the most

18   problem with was what you called attention and concentration?

19   A.    Well, I don't know -- I don't know if you want me to rank

20   them according to worst, but that's one, because I probably would

21   have difficulty doing that.  But that is one of the areas where I

22   think she likely has problems.

23   Q.    Now, when you said you think she likely has problems, you're

24   basically basing your supposition on what you know from studies

25   or are you basing it from things that -- your interaction with

1  Dr. Cleggett?

2  A.   It's not supposition, I don't think.  I mean, you know, it's

3  a combination of knowing literature on brain injury, meeting with

4  Ms. Cleggett Lucas and understanding her medical records to

5  understand what kind of injury and then giving her testing.  So

6  it's a combination of all those -- you know, all those sort of

7  categories of knowledge.

8  Q.   Is there a best -- I mean, people can have injury to the

9  same areas of their brain and then have different brain function;

10 one person is impaired in an area and the other is not impaired.

11 When you look on something regarding organic damage to the brain,

12 it looks to be the same?

13 A.   There is truth in that.

14 Q.   So my question is, with respect to it, how -- did you do,

15 for example, a PET scan or some type of measure to show, for

16 example, if areas of her brain is lighting up at a specific time

17 under some test or stress?

18 A.   No, I didn't do that, but your question seems to be about

19 function.  We do direct measures of function, because we, you

20 know, give tests of functions.  And so I don't exactly need to

21 know what precise body of neurons in the brain is affected, if my

22 question is about the way the brain is functioning, which I think

23 is largely the question for events --

24 Q.   But the measure is a subjective measure?

25 A.   Which measure is a subjective measure?

Q.   Your evaluation regarding brain function is a subjective

measure?

A.   I wouldn't say that.  Do you want me to explain that?

Q.   There are differences in opinions.  Two people can see the

same thing and have different opinions about what's the cause of

it, what's the degree of it?

A.   Well, maybe this -- sounds like there is a couple of

questions on the table right now.

Q.   Break them down as you understand it.

A.   First of all, you're asking is the evaluation sort of

characteristically subjective.  And I think there is -- you know,

because we give tests, and when we can get a good effort, I think

that's a way of objectifying, if you will, or rendering more

objective someone's capacity or capabilities.  That's the

function that that serves.  So I think to that degree, it's not

utterly subjective.

        And then there are categories of impairment, and you

know, you mentioned differences, but there is some agreement

among experts here and there is categories of -- we know that she

had a severe traumatic brain injury.  That has certain

indications.  So there are pieces of it, you know, where there is

objective information that's gathered.  There is also objective

scientific information that you can refer to, and then there can

be some difference in interpretation, as there is in this case.

Q.   So with respect to the issue of attention and concentration,

1  you said that you might -- did I want you to rank them.

2  Attention is the ability to stay, if you will, present; right, to

3  listen, understand, comprehend, and be present?

4  A.   Well, attention, I guess, has parts of that, but it has to

5  do with your capacity to, you know, orient your mind toward a

6  certain stimulus, whether it's -- whether it's, you know, paying

7  attention to what you're thinking yourself or whether it's

8  listening to what someone says or looking at something, the

9  capacity to number one, orient your mind that way.  And then

10 attention also relates to your ability to remain engaged in that

11 way, and then it also relates to the ability to remain engaged in

12 the face of other distraction, like distractibility.

13         So those are various components, some of the components

14 of attention.

15 Q.   In the context of a trial, a basic attention issue would be

16 the ability to stay awake?

17 A.   They are related.  Yeah.

18 Q.   Is it your belief as a psychologist that a client who had

19 difficulty staying awake during the course, say, of a two-week

20 trial, if they were sleeping every day most of the day, that that

21 would be attention?

22 A.   Well, it would be related to attention.  It's not the same

23 as attention.  It's -- actually, we call it arousal, which is

24 different than attention, but it's related.  Of course, you can't

25 attend to something if you're not awake.

1  Q.  Damage to the brain can impact or affect a person's energy

2  level?

3  A.  Damage to the brain can impact?  Yes, it can.

4  Q.  Impact a person's ability to stay awake and stay focused?

5  A.  It can.

6  Q.  Medications administered can affect a person's ability to do

7  those things?

8  A.  Correct.

9  Q.  And so can stress?

10  A.  Well, perhaps through sleep, you know, if stress impacts

11  someone's sleep, it can affect their level of arousal.

12  Q.  Now, the issue of concentration.  Concentration, again,

13  involves being present, but it also has a focus component to it?

14  A.  Correct.

15  Q.  And if a person is asleep, does that bear on their ability

16  to focus?

17  A.  Yes.

18  Q.  On the testimony that somebody might be giving?

19  A.  Sure.

20  Q.  On what's being presented?

21  A.  Yes.

22  Q.  And if that person is asleep and unable to keep themselves

23  awake, is it your opinion that they could effectively assist

24  their lawyer while they are asleep?

25  A.  Certainly someone who is asleep is not assisting their

lawyer or capable during that time of assisting their lawyer.

Q.   We know that the Fifth Circuit has said that a sleeping attorney may not be too much of an impediment, but if I'm relying on her, if I'm relying on her to tell me if somebody is telling the truth, that sort of thing and she's asleep, then that reliance is probably not well-placed?

A.   Clearly if she's not attending to it and not awake to hear it, she can't help you.

Q.   With respect to concentration, distraction has some connection or correlation to concentration; right?

A.   It's a component, right.

Q.   So if a person is easily distracted or loses train of thought, that bears on the issue of concentration; correct?

A.   Yes, it does.

Q.   If you're not concentrating, if you're distracted and important elements are coming forward during the course of a trial, then that's going to impact your ability to tag my coat, to let me know, Mr. Chaney, that's important, and you ought to know this or we need to cover that in the cross of this witness; right?

A.   Yes.  It would impact that, yes.

Q.   And given the impairments that Dr. Cleggett has, including maybe some issues with respect to being able to stay awake or alert, focused and concentrating, that certainly would bear on her defense of herself in the case?

A.   I think it has some impact.

Q.   All right.  Now, you talked about neurocognitive and you said it's neural plus cognitive.  Now, cognitive is brain function at its most basic.  The measures that you gave regarding Dr. Cleggett's brain function, it was pretty consistent with the measures that Dr. Andrews gave or assessments in terms of her function.

A.   The scores were similar.

Q.   But there was a difference in terms of interpretation of those items and possible causes for those items?

A.   Not so much that I think more than implication for this proceeding.  I think there is agreement that she has problems from the injury in question.  So the -- you mentioned the cause. I think there is agreement as far as the cause.

Q.   Now, issues of mood, you addressed.  The damage that she had to her brain could impact her ability, and mood relates to what; how you feel, whether you're agitated, weather you're calm, whether you're on edge?

A.   Emotional feelings and behavior.  So it has to do with, you know, the way you experience emotions like sadness, anger, anxiety, and the way you behave with those feelings.

Q.   All right.  You heard the testimony from the social worker regarding incidents, regular incidents with Dr. Cleggett and staff, and anger and shouting and that.  In your professional opinion, can that be tracked or tied to the brain injury she

1  suffered?

2  A.    I think it's probably related to a couple things.  I think

3  it's probably related to some alteration of her emotional

4  regulation from brain injury and also her, you know,

5  psychological or emotional adjustment to a difficult situation.

6  You know, in terms of her injury, prosecution, you know,

7  various -- I think it's a combination of things.

8  Q.    You heard Dr. Andrews talk about the -- or use the term

9  "disinhibition."  That is a term from neuropsychology?

10 A.    It is.

11 Q.    And disinhibition is basically somebody maybe not having the

12 filters -- that after a brain injury, a person doesn't have the

13 filters that they may have had before a brain injury?

14 A.    Filters is probably one way of saying it.  Another way of

15 saying it is that behavior is organized to some degree, according

16 to kind of go and stop signals, and the stop signals are reduced.

17 But, you know, we're talking about impairments.  I just want to

18 make a point, you know, none of these are absolute impairments

19 and she has some impairments in that area and, you know, that may

20 cause her at times to behave in a way that is disinhibitive.  I

21 heard the social worker saying it wasn't occurring daily, it

22 wasn't occurring weekly.  It was occurring, you know, and

23 stopping.

24 Q.    It may cause her to be frustrated and angry?

25 A.    You mean --

Q.   During the course of a trial when somebody is challenging her on something.

A.   Your question is, could her behavioral problems from her brain injury cause her to be more angry, is that your question, or respond different?

Q.   To respond in an angry way, to use explicatives, to yell at someone, to --

A.   I think she has a greater likelihood of doing that than someone without those problems.  But, you know, from what --

Q.   So the adaptation for that --

        MR. CARTER:  Objection.  Let the witness answer.

        THE COURT:  Let him finish.

A.   But from what we know, it's not -- it's not a -- it's not a sort of dense or it's not an all-encompassing problem.  She has this manifestation sometimes.  She didn't have it when I met with her.  She didn't have it when Dr. Thompson met with her.  Could she -- is she at greater risk of having an emotional event during a period of time than someone without those problems?  Yes, she is.

                    EXAMINATION

BY MR. CHANEY:

Q.   Did you have an opportunity to observe her during the course of depositions or anything like that?

A.   No, I did not.

Q.   How she behaved?

1  A.    I did not.

2  Q.    With respect to how, for example, in the trial, you

3  understand that a jury will be evaluating her for purposes of

4  evaluating her credibility and truth telling?  You understand

5  that?

6  A.    I do.

7  Q.    The issue of confabulation, she could be giving information

8  that she's confabulated and not be aware of it?

9  A.    You mean during testimony, is it possible that she could

10  confabulate some testimony?

11  Q.    Yes.

12  A.    It's possible.

13  Q.    Should the jury be warned about that, that this witness,

14  because of her brain injury, may well make up things not

15  maliciously or an attempt to mislead you, it's just her brain's

16  way of filling in the gaps?

17  A.    I'm not sure I would use the exact warning that you just

18  gave, but I think it would be a fair thing to do, to kind of

19  advise the jury that she has some problems in this area.

20  Q.    To advise the jury that because of injuries to her brain,

21  she may be less inhibited or disinhibited to the point that she

22  may have less ability to control anger or anger response to a

23  presentation or a question put to her?

24  A.    You switched now.  You were previously talking about

25  confabulation.  Now you're talking about disinhibition.

1  Q.    I am.

2  A.    That's okay.

3  Q.    I meant to.

4  A.    So we're talking about both, I should assume?

5  Q.    We're talking about both.  What I'm saying is -- what I

6  understood you to say and understood Dr. Thompson to say is that

7  there are some things that ought to be done given the impairments

8  that she has to make sure that she's treated fairly in the

9  context of a trial.

10 A.    Okay.  And you're asking me about those as they relate both

11 to possible confabulation and possible disinhibition?

12 Q.    Yes.

13 A.    I do think that -- you know, that it would be fair to advise

14 a trier of fact that she has, you know, a history of a

15 significant brain event and that she had some impairments that

16 could reflect her emotional behavior and that she could even be

17 -- occasionally fill in the blanks with something incorrectly.

18 Q.    With respect to issues of fatigue, is it possible -- I mean,

19 with respect to fatigue, should something be done to make sure

20 that she has -- I mean, studies show that the average person has

21 five productive hours in a day where they can really produce and

22 -- optimum production, meaning we can produce past that but we

23 get diminishing returns.  Once a person has a brain injury, is it

24 fair to say that that might be reduced from five hours to

25 three hours, or two hours?

1  A.    Fatigue is a common symptom of brain injury, and so I think

2  there is a likelihood that -- of someone with a brain injury,

3  including Dr. Cleggett, would have reduced time where they would

4  be cognitively present and --

5  Q.    So some adaptation or accommodation may be necessary to

6  ensure that they can effectively and through attention and

7  concentration assist their lawyer?

8  A.    I think that's accurate.

9  Q.    Now, with respect to the testing that was done with

10  Dr. Cleggett, you said it was over the course of maybe six or

11  seven days.

12  A.    Right.

13  Q.    That's unusual, isn't it?

14  A.    It's not that unusual.  It happens -- we probably -- I don't

15  know, we probably see that about only five percent of the time.

16  Q.    And with respect to the test, you're not administering the

17  test.  You have a psychometrics person, you have some other

18  person who is administering the test?

19  A.    Yes.

20  Q.    And then you interpret the test data?

21  A.    Essentially we have technicians that administer the testing.

22  I do and Dr. Andrews does.  It's a standard way of practicing

23  neuropsychology and I have technicians that administer the exam.

24  Q.    How do you ensure that errors are not made during the course

25  of the testing process if you're not administering the test?

1  A.  Well, you know, we train our technicians.  There is, you

2  know, a standardized training process they go through.  They get

3  supervision.  We supervise them.  We have a supervisor that looks

4  over things.  We have multiple levels of checks when it comes to

5  the scoring part.  You know, we also spot -- the doctors, we spot

6  check the scoring, as well, in addition to being scored a number

7  of times.  So, you know, in a neuropsych eval. with 30-something

8  tests like I have, I mean, there's probably -- you know, the

9  chances are -- it's by chance -- there's some scoring problems,

10 but, you know, you can have scoring errors and still not have it

11 meaningfully impact, you know, whether or not someone falls in an

12 impaired range or not.

13 Q.  Statistically insignificant?

14 A.  Essentially like that.  Yeah, that's right.

15 Q.  And with respect to the testing, were you there for any

16 portion of the psychometric testing done?

17 A.  I wasn't.

18 Q.  And with respect to your interaction with Dr. Cleggett, the

19 sum total of time you spent interactively?

20 A.  About an hour and 20 minutes.

21 Q.  Doctor, you understand the cross-examination process; right?

22 A.  Well, I don't know.  I think so.

23 Q.  I mean, you understand that I'm not trying to help you in

24 this process?

25 A.  Okay.

1  Q.   I mean, seriously.  Do you understand that the point of my
2  crossing is to challenge you?
3  A.   I assume there is some element that we all share at trying
4  to get to the truth as all officers of the court, so we have that
5  in common.  But there may be elements of my opinion that you
6  don't like and so you may want to challenge that, I understand.
7  Q.   Not don't like it, but don't agree with it.  But what I'm
8  saying is this:  Throughout this process you've had the full use
9  of your faculties, your abilities, your memory, your executive
10  function to thrust and parry with me and defend your positions;
11  correct?
12  A.   Yes.  Relatively, yes.
13  Q.   And you have the ability to keep in your short-term memory
14  things that may have happened during his questioning of you, and
15  then when I tried to come back, then you can rely on those
16  things; correct?  Your recall of that preservation, keeping
17  focused on that issue and having it available for purposes of
18  explaining your answer, for example?
19  A.   I'm not really sure how I had to do that today, but, you
20  know, I certainly could have done that if I had to.
21  Q.   With respect to someone that has suffered the impairment to
22  her brain, the organic impairment to her brain that Dr. Cleggett
23  has suffered, she functions at a level significantly below you;
24  is that fair to say?
25  A.   Below me?  I don't involve testing me.  I don't mean to be

1  overly picky.

2  Q.   You seem extremely bright to me.

3  A.   I think she has impairments.  She certainly has impairments

4  relative to the way she was before.  So I don't think -- I'm

5  certainly not disputing that she had some impairments.

6  Q.   And so for example, if someone is trying to mislead her and

7  she has no memory of what was said previously, she may be more

8  susceptible to being led in a direction because she does not have

9  a clear memory that she can refer to?

10 A.   I'm thinking about your question.  You know, she has average

11 verbal memory abilities, so it's not like she has no capacity to

12 remember, you know, things that have been said over the course of

13 time, assuming that she was awake and alert.  And so if she said

14 something earlier, you know, like, for example, I think everyone

15 testified today so far has talked about her capacity to kind of

16 recall the charges and the potential -- you know, the potential

17 consequences of that and that kind of thing.  So she may have

18 some, you know, reduced capacity to do that, but it's not that

19 she has none.

20 Q.   So what, from a standpoint of a psychologist, can be done to

21 make sure that that impairment doesn't result in her being

22 unfairly evaluated by the jury?

23 A.   I guess the main thing would be to inform the jury of that

24 possibility and then you, as counsel, would need to be aware of

25 it and, you know, to utilize your, you know, skill and bring out

1  the possibility that could be impacting her testimony.

2      MR. CHANEY:  Nothing further with respect to this

3  witness, Your Honor.

4      THE COURT:  Thank you.  Redirect?

5      MR. CARTER:  Yes, sir.

6                  REDIRECT EXAMINATION

7  BY MR. CARTER:

8  Q.  You were asked, Doctor, about emotional outbursts.  Did you

9  or any of your technicians observe emotional outbursts?

10 A.  No.

11 Q.  You've reviewed the reports of Dr. Thompson and Dr. Andrews.

12 Have they referred to any emotional outbursts?

13 A.  No.

14 Q.  You were asked about explicatives and yelling.  Did you

15 experience that?

16 A.  No.

17 Q.  Did any of your technicians?

18 A.  No.

19 Q.  Did you see that referred to in any of Dr. Andrews' report

20 or Dr. Thompson's report?

21 A.  I did not.

22 Q.  Now, fatigue, however, fatigue is a real problem here, isn't

23 it?

24 A.  Yes.

25 Q.  And that has to be addressed?

1   A.   It's important, I think.

2   Q.   And in your expert opinion, how best can that be addressed?

3   A.   Well, there is probably some medical solutions to that.

4   Dr. Thompson was referring to him being in charge of restoring

5   confidence and there may be medical sort of strategies that are

6   outside of my expertise at this time to do that.  But, you know,

7   I think for one thing, it needs to be taken into account, and

8   there may be -- you know, need to have shorter sessions, things

9   like that.

10  Q.   More frequent breaks?

11  A.   More frequent breaks; correct.

12  Q.   Ms. Cleggett appears to be sleeping.  She's woken now, let

13  the record reflect.  During your meeting with her, did she fall

14  asleep?

15  A.   She didn't during mine, no.

16  Q.   Did any of your technicians report a problem with her having

17  an inability to stay awake, to your recollection?

18  A.   No.

19  Q.   In your review of Dr. Andrews' report, did she report a

20  problem of Dr. Cleggett having the inability to stay awake?

21  A.   I don't remember that in Dr. Andrews' report.

22  Q.   What about Dr. Thompson's report?

23  A.   No.  I didn't see that in Dr. Thompson's report, either.

24  Q.   Is this something that you believed to be a problem prior to

25  coming here today?

1    MR. CHANEY:  Objection, the relevance of him believing

2  it to be a problem.  It's for the Court to evaluate whether or

3  not it's a problem, You Honor.  He's commented he hadn't seen it

4  previously or seen it noted in any of the reports previously.

5    THE COURT:  I'll sustain the objection.

6                          EXAMINATION

7  BY MR. CARTER:

8  Q.   Based upon your review of Dr. Cleggett in your examination,

9  did you believe her inability to stay awake would be a problem?

10  A.   I didn't note it to be a problem prior to this.

11  Q.   Do you believe it's a problem now?

12  A.   She's having difficulty staying awake today.

13  Q.   But exactly.  But that did not appear in any of your tests?

14  A.   No.

15  Q.   Did not appear to appear in any of Dr. Andrews' tests?

16  A.   Correct.

17  Q.   Or in Dr. Thompson's tests?

18  A.   Correct.

19  Q.   Now, you were asked about the ability of an individual to

20  assist an attorney when they are not awake or not conscious.

21  That's true of any individual, isn't it?

22  A.   That's correct.  And -- that's correct.

23  Q.   I'm sorry, you were about to say something else?

24  A.   Well, you know, sometimes people can have trained -- it's

25  hard to generalize these events today to total situation.  I

mean, she may -- I don't know what medication she was given today. I don't know what time she was given them. I know she's on some sedating medication. Sometimes if someone's given medicine at certain points in time, it can impact when they experience the sedation. So, you know, there is a lot of pieces that are missing in terms of understanding how her behavior today in the courtroom would relate to the broader question of her capacity to engage in the whole process.

Q. For example, you don't know what time she went to bed last night, do you?

A. Correct.

Q. Suffice it to say, this is not something that has surfaced as a problem before?

A. Correct.

MR. CHANEY: Objection, Your Honor. This has been asked and answered five times.

THE COURT: I'll overrule, but he's now answered it, so let's move on.

EXAMINATION

BY MR. CARTER:

Q. You mentioned possible confabulation during testimony. I want to understand that. If I understand you correctly, Doctor, confabulation involves short-term memory?

A. Correct.

Q. How might there be a possible confabulation during

1  testimony?

2  A.    Well, right.  If someone was asking her a question about

3  something that happened recently or where her testimony involved

4  recall of something that happened recently, not events in the

5  remote past, there is some chance that she would confabulate in a

6  response, meaning that she would not remember and fill in the

7  blank with a -- you know, with something that wasn't accurate.

8  Q.    Something recent, something post-accident?

9  A.    Yes.

10  Q.    How about pre-accident?

11  A.    I think that's unlikely.  Remote memory is -- in patients

12  with many forms of neurological problems, including acquired

13  brain injury or traumatic brain injury, remote memory is rare,

14  quite rare.

15  Q.    So you would not expect confabulation to be a problem with

16  remote memory?

17  A.    That's correct.

18  Q.    You were asked a lot, defense counsel focused on Ms.

19  Cleggett's ability to withstand withering cross-examination.  And

20  you talked about executive brain functioning.  In your opinion,

21  based upon your examinations, does Dr. Cleggett today have

22  sufficient executive brain function to withstand

23  cross-examination?

24  A.    Yes, I think she has the capability to understand questions,

25  understand the words, to respond to those questions, understand

the meaning of the questions and respond to them.  I think she

has that capability.

Q.    To answer truthfully?

A.    Yes.

Q.    You mentioned with regard to your testimony average verbal

memory?

A.    Yes.

Q.    Now, how does that relate to her remembering what she was

asked on direct and then dealing with that on cross-examination?

A.    Well, it means that her abilities in that area, when we test

them -- and, you know, there is an inference made from a

laboratory type of result like a test to a situation, like you're

asking me, but I mean, when we test it, you know, with a measure,

she's about average.

Q.    She's about average?

A.    Right.

        MR. CARTER:  Thank you.  Nothing further.

        THE COURT:  Thank you.  You can step down.

            Anything further, Mr. Carter?

        MR. CARTER:  No, the government rests.

        MR. CHANEY:  Your Honor, the issue has come up relating

to Dr. Cleggett and the issue of her performance in depositions.

Clifford Milner is the lawyer that assisted her in those civil

matters.  He observed her during the course of depositions and I

observed her with respect to those depositions.  There is

testimony that answers -- that these doctors were not able to
answer the questions.  I would like to call Mr. Milner for
purposes of addressing that.  The government raised the issue for
the purpose of suggesting to the Court that she had no issues
when put under pressure or that sort of stuff.  I think it's
relevant and probative and I would like to call him for purposes
of addressing that.

MR. CARTER:  Objection.

THE COURT:  Wait.  We talked about who would be called
as witnesses.  This is the first I hear of this.  Why am I
hearing about this for the first time now?

MR. CHANEY:  Because it was raised by Mr. Carter during
the course of --

THE COURT:  No, it's the report.  It's in the report.

MR. CARTER:  No, it was not.

THE COURT:  It's in the report.  Her performance as a
deponent is referenced in at least one of the reports.

MR. CARTER:  Your Honor, for the record, I did not raise
that first.  I raised that on redirect in response to him asking
about that on cross-examination.  I did not raise depositions.  I
responded to his raising depositions, and the transcript will so
reflect.

MR. CHANEY:  Your Honor, there's no -- this is an
officer of the court.  His testimony is both relevant and
germane, and it's discrete with respect to it.  There are not a

1   lot of questions, and if it was irrelevant, there would have been
2   no need to plumb it on your redirect.

3           THE COURT:  When were the depositions taken?

4           MR. CHANEY:  I could have him give those dates, Your
5   Honor.

6           THE COURT:  We don't know that now?  I mean, that seems
7   like if you're making a showing that it's necessary, we should
8   know when they were taken before I let him take the stand.

9           MR. CHANEY:  They were taken after I was ordered to
10  represent her.  They were taken while she was at the facility at
11  the River West -- the Plaquemine Caring facility.  I participated
12  in those things and that raised the concerns.  That was a part of
13  the reason for having her evaluated was her performance during
14  the course of those depositions.

15          THE COURT:  All right.  Mr. Carter?

16          MR. CARTER:  Your Honor, it appears that these
17  depositions are something that defense counsel knew of and didn't
18  raise with any of the experts, Dr. Andrews, Dr. Thompson or
19  Dr. Bianchini who all examined her, and based upon their
20  examinations, two have said she's competent.  The one who has
21  said she is incompetent have done so for reasons other than
22  what's stated in Mr. Chaney's motion where he claims her loss of
23  memory is the reason she's incompetent.  Today we've had at least
24  five or six different reasons, a smorgasbord of why she's
25  incompetent.

So we've got a moving target here and that's, in
part, my objection.  We've had this hearing set for a while,
we've had our witnesses listed for a while.  We've had
examinations.  A lot of money and time has been spent on this.
Today we've had five different reasons why she's incompetent and
now we have number six about to walk through the door.  I object.
It's not germane, it is not relevant and it should not be
allowed.

MR. CHANEY:  Your Honor, with respect to that, any
reason why she's incompetent, this Court has to consider.  During
the course of direct, issues are brought up and then they are
plumbed further in the cross-examination of witnesses.  During
the course of this matter, there was reference to her
participating in depositions and reading medical records.  That
gives a specific thing.  I've raised issues relating to -- during
the cross-examination relating to her ability to, under pressure,
respond to questions, keep things in her head and respond.

THE COURT:  Did she give the depositions?  Sat through
the depositions, she was sworn and gave sworn testimony at the
deposition time; is that correct?

MR. CHANEY:  She sat through the depositions.  There
were many breaks that had to be taken during the depositions.
There were outbursts.  The depositions had to be ended and
rescheduled because of issues of fatigue.  Those are all issues
that bear on her ability.

1    THE COURT:  I understand all that.  And I'll accept all
2  of that as fact for purposes of this hearing.  Why do I need to
3  hear from a witness that's going to tell me exactly what you've
4  told me?

5    MR. CHANEY:  Because I'm not a witness, Your Honor.
6  Because I'm not a witness and I can't be a witness in the case,
7  and in terms of making the record complete, I want to have this
8  testimony.  But if the Court will take judicial notice of those
9  things based on representations I've made as an officer of the
10  court, then there is no need for that witness's testimony.

11    THE COURT:  Mr. Carter, do you contest that those events
12  occurred during the course of her sitting and giving deposition
13  testimony?

14    MR. CARTER:  What events?

15    THE COURT:  That frequent breaks were taken and that she
16  had outbursts during the course of the deposition.

17    MR. CARTER:  Is that your representation, that there
18  were outbursts?

19    MR. CHANEY:  That's what I just said.

20    MR. CARTER:  Okay.  Yes, I do, Your Honor.  And
21  furthermore, to the extent that the issues of her ability to read
22  records and remember, that was in my memo in reply to his memo.

23    MR. CHANEY:  I haven't challenged that, Your Honor.

24    MR. CARTER:  You haven't challenged it, but you knew
25  that it was an issue.  And the doctors are all gone.  This is

something the doctors will need to consider.  If this testimony
were, indeed, relevant, we would have to have the doctors listen
to that and see if that changes their opinion.  Now, however, we
have asked the doctors about her ability to take depositions, her
ability to answer questions, what might need to be done.  Fatigue
may be a problem that has to be addressed.  This is the first I'm
hearing about a situation where there were outbursts.  They're
representing there were outbursts at a deposition, fine.  I
cannot stipulate to that.

            THE COURT:  Why don't you -- you have deposition
testimony?

            MR. CHANEY:  I don't have the testimony.

            THE COURT:  Did you give the transcripts to Mr. Carter
prior to today?

            MR. CHANEY:  They were done in a civil proceeding, Your
Honor.

            THE COURT:  I understand that, but you're here offering
them as evidence here today.

            MR. CHANEY:  I'm not offering depositions.  I'm offering
testimony from a witness who observed her demeanor during the
course of a deposition.

            THE COURT:  If there is an outburst during the
deposition, I want to see it on the transcript.  I'm not going to
let somebody come up here and describe it as a matter of fact
testimony.  I would like to see the copy of the transcript where

the outburst occurred.

MR. CHANEY: Certainly, Your Honor. I was not a party, so I didn't order any depositions in connection with this. I participated because in case there were any issues which would bear on the defense of this case, I wanted to be able to be there, to assert her privilege and to protect her rights. In connection with that, I observed things that gave me reason to believe that she would not be able to effectively assist her. I brought that to the Court's attention, I've tried to develop those things. And again, I am not a witness, so --

THE COURT: How many transcripts are we talking about? How many depositions did she sit for?

MR. MILNER: Three.

THE COURT: And in what time frame did she sit for them? Was it within the last year?

MR. MILNER: This summer.

THE COURT: This past summer?

MR. MILNER: Yes, Your Honor.

THE COURT: Summer of 2008. And Mr. Carter, you have not seen these transcripts?

MR. CARTER: Not only have I not seen these, the testimony of Dr. Andrews, Dr. Thompson, and Dr. Bianchini is all -- that she would progress and has progressed and improved over time.

THE COURT: Was her ability to offer testimony in those

1  depositions challenged prior to her sitting for the depositions?

2  Does anybody know that?

3          MR. CHANEY:  I was not a litigant in that way,

4  Your Honor.  As I said, what I was there for was purposes of

5  monitoring that process so that nobody asked questions which I

6  thought bear -- because of sworn testimony, because it would be

7  available during the course of the trial, what I wanted to make

8  sure is that if anybody got into areas that I thought to be

9  protected stuff that -- where privilege could be asserted, that I

10 would be there to assert that, and that is what I was there for.

11 That is how I was able to see and observe those other things.

12         THE COURT:  Well, we could hold the record open to allow

13 Mr. Carter to examine the transcripts and comment on them.  Is

14 that a possible solution?

15         MR. CARTER:  It's a possible solution.

16         THE COURT:  In terms of something that would be helpful

17 to you all to argue the positions that you have here?

18         MR. CARTER:  Your Honor, it may be helpful to the Court.

19 There has already been testimony that she may well have a greater

20 likelihood of making a -- yelling an explicative or saying

21 something like that.  No one has witnessed it.  And there has

22 also been testimony that she has improved over time.  She hasn't

23 done so here today.  So the fact that she may well have done this

24 in the deposition, which was almost a year ago, may not be of any

25 import based upon the testimony, but if it's helpful for the

1  Court for me to review it and submit something on it, I will do

2  that.  But I think that it's -- within the context of what we

3  have heard, it doesn't render her incompetent to stand trial.

4      THE COURT:  I'll willing to accept the representation,

5  although the government challenges it, that in fact she was in

6  need of frequent breaks during the depositions, and further, that

7  she did have outbursts, whether it was motivated by anger or for

8  any other reason.

9      MR. CARTER:  My only hesitation --

10     THE COURT:  I think Dr. Andrews references that, as

11 well, although she did not have that experience with her during

12 the time she was examined by Dr. Andrews.  As a matter of fact,

13 we do have the other witness today.

14     MR. CHANEY:  Ms. Borruano, Lori Borruano.

15     THE COURT:  Ms. Borruano, who testified that she has had

16 angry outbursts during the course of her regular day when she was

17 not sitting for a deposition.  So I just don't know how helpful

18 it is at this point to have a witness come and take the stand to

19 testify about something that seems to me there is a record of,

20 and that the Court can build into its ruling here today.

21     MR. CHANEY:  I understand the Court's concern,

22 Your Honor, but I mean, there is a record that at some point may

23 have to be reviewed and I wanted to make sure the record is

24 complete, but again, the Court accepts the representations or

25 Mr. Carter wants to have the actual depositions produced and

1  submitted into the record, I'm willing to try to get those things

2  produced for his review and then submit them to the --

3  　　　　　MR. CARTER:  I do not want to delay this process.  While

4  I would like to have those documents submitted for my review, I

5  do not believe that they are relevant for the purposes of the

6  Court going forward and making a determination.  I will stipulate

7  that she made outbursts.  My reluctance is, I don't know the

8  nature of those outbursts, I don't know how loudly she yelled,

9  how disruptive they were.  It may have been a comment where the

10  deposition continued or a comment where everybody had to leave

11  the room.  I don't know.  But Ms. Borruano has given us a sense

12  of how this witness functions and what she says and what she does

13  and how she does these outbursts.  The Court can take that into

14  consideration.  Dr. Andrews has testified to how this witness

15  functions.  Dr. Thompson has, Dr. Bianchini has.  I think the

16  Court has its basis for making a determination on competency.  I

17  don't think these outbursts render her incompetent.

18  　　　　　THE COURT:  Mr. Chaney, what else would the depositions

19  or this witness show on this point, that there was a need for

20  frequent breaks and that she made outbursts, inappropriate

21  outburst during the course of the deposition?

22  　　　　　MR. CHANEY:  Those are the primary things.

23  　　　　　THE COURT:  Anything else?

24  　　　　　MR. CHANEY:  No.  Because it was -- I mean -- and I will

25  stipulate that it was shown that she was able to read the record.

1  She was able to read her records.

2        THE COURT:  I think we have a record of that now.

3        MR. CHANEY:  Well, I mean, that's what the rest of it

4  was.  Basically the deposition was -- I don't have any recall,

5  but if it's in my record, that's -- it's in the record.  That's

6  what happened.  I guess that's what happened.

7        THE COURT:  It sounds to me like this would be

8  cumulative, then, of what all we have heard today from the four

9  witnesses.  There is nothing that you've told me that these

10  depositions are going to show that is not already part of this

11  record.  It might tend to further support the fact as found by

12  the Court, but I don't know that those facts are seriously in

13  dispute.  All of the experts have testified that she does have

14  some limited capacity as a result of the accident, that she does

15  suffer from fatigue or, you know, she will need some additional

16  considerations as she probably needed for the depositions.

17        So it sounds to me like this witness that is --

18  first I heard of him is today and these depositions that the

19  copies of which have not been submitted either to the Court as an

20  exhibit or to the government merely go towards something that's

21  already been argued today and has already been made a part of the

22  record.

23        MR. CHANEY:  I understand the Court's position.

24        THE COURT:  I don't know that that adds much more to the

25  Court's consideration that would be determinative.

1    MR. CHANEY:  I understand the Court's position.  I

2  understand that the Court believes it's cumulative.

3    THE COURT:  All right.  These expert reports, I would

4  suggest we put Dr. Andrews as Exhibit A, Dr. Thompson as

5  Exhibit B, and Dr. Bianchini as Exhibit C.

6    Is there a need for these reports to be placed

7  under seal?

8    MR. CHANEY:  Your Honor, it does include medical

9  information, so I think the protocol is to have it under seal.  I

10  would ask that that information be under seal.

11    THE COURT:  We'll seal all three of them, then.

12    MR. CARTER:  No objection.

13    (WHEREUPON, at this point in the proceedings,

14  Exhibits A, B and C were admitted into evidence under seal.)

15    MR. CHANEY:  Your Honor, for the record, Dr. Cleggett is

16  asleep and has been asleep for most of the time that we have been

17  here this day.

18    THE COURT:  I understand.

19    MR. CHANEY:  I would like to have the record reflect

20  that.

21    THE COURT:  Do you all have reports for the record here?

22  You've submitted them to me and I've marked up my copies.

23    MR. CHANEY:  Your Honor, I would have to make a copy of

24  Dr. Andrews'.  The one I have has yellow in it.  But I can make a

25  copy that doesn't have it and submit it to the Court.

1          THE COURT:  That's fine, if you want to go ahead and

2    submit it later today.

3          MR. CHANEY:  I will do that.

4          MR. CARTER:  Your Honor, I have copies of Dr. Thompson's

5    report and Dr. Bianchini's report.  However, I have affixed a

6    government exhibit sicker that might not be consistent with your

7    numbering.  I have Dr. Thompson as Exhibit C, which may be

8    consistent, but I have Dr. -- I'm sorry, Dr. Bianchini as C and

9    Dr. Thompson as Government Exhibit A. You may need to change that

10   to B.

11         THE COURT:  Let's go ahead and change the designation.

12              Anything else we want to cover on the record at

13   this time before the Court rules?

14         MR. CARTER:  Not on behalf of the government,

15   Your Honor.

16         THE COURT:  Mr. Chaney, anything you want to add?

17         MR. CHANEY:  In terms of argument?

18         THE COURT:  Yes.

19         MR. CHANEY:  Just briefly, Your Honor, with respect to

20   the issue of competence, the government has focused on the issue

21   of whether Dr. Cleggett understands the process, whether she

22   understands who I am, who the government is, who the Court or the

23   judge is and what the functions are.  We, from the beginning,

24   have said that that is not an issue of concern.  She understands

25   that.  Your Honor, the standards with respect to this stuff is --

those standards are evolving standards, and what we've seen is as
more information comes relating to how people are able to
function, that those standards need to be adapted, those
standards need to be affected, those standards may well need to
be modified or changed.

With respect to what has been testified here today,
it is undisputed that Dr. Cleggett has brain injury, described as
serious brain impairment, described differently by doctors.  What
I submit to the Court that assisting a lawyer is something more
than sitting next to me and saying that -- sitting next to me in
the courtroom and saying, "Ask this person this question or ask
that person that question."  It is to be able to know, relate,
recall facts that are relevant and probative on issues that
relate to the defense, to be able to remember and recall
instances that occurred so that a witness can be effectively
challenged on cross-examination.  It is being able to understand
what is involved in testifying in a trial, being able to get
through a direct where you listen to the questions that are
asked, that you track in your mind what they are, that you answer
those questions and then get into a cross-examination where you
have to recall what happened in the direct and relate those
things to specifics relating to the case.  Your Honor, because of
the brain impairment, Dr. Andrews says that Dr. Cleggett is
unable to do that, and I would submit to the Court that that
inability is detrimental to her right to a fair trial.  She will

1   not be able to get a fair trial.

2           Now, the doctors have suggested that accommodations

3   can be made.  Accommodations may have to include very short work

4   hours, in terms of getting testimony in where Dr. Cleggett can be

5   awake.  Accommodations will have to be affirmative statements in

6   terms of jury instructions talking about her brain injury, the

7   impact of that injury on her ability to do certain things,

8   including the possibility she may confabulate, which is make

9   something up without knowledge that she's confabulating.  The

10  fact that she may not have a fund of information, may have no

11  memory with respect to things, and so that, in effect, telling

12  the jury that, they can't hold her absence of memory against her.

13  Explaining to the jury significant things with respect to her

14  confusion during a cross-examination should not be interpreted as

15  her attempt to mislead or lie, but that it may well be related to

16  the impairment she suffers in her brain, Your Honor.  If those

17  things -- those things at a minimum would have to be done and I

18  think there are significantly more things that would have to be

19  done.

20          With respect to the depositions that I participated

21  in, we had to travel to that facility to get those things.  We

22  were able to work for very limited hours, sometimes a couple

23  hours a day and then done with it.  There were issues with

24  respect to anger and that sort of stuff, and the instruction to

25  the jury that the outburst that Dr. Cleggett is -- just initiated

1  isn't based on anything related to her being challenged on

2  something relating to truthfulness, but may well be a function of

3  her ability to control angry outbursts.

4          So I think as a practical matter, those things we

5  know going in, but there are some things that are likely or that

6  may occur during the course of the trial that we don't know

7  because of -- and all of them relate to the injuries that she

8  suffered to her brain.

9          The arc of this case, Your Honor, was not one she

10  chose.  These events, the surrender of her license happened in

11  2002.  The government waited until the last week and the last

12  month of the last year to initiate their prosecution and

13  initiated not necessarily with the knowledge that she has

14  suffered a significant brain injury, but that was a fact that

15  occurred in that period between the initial investigation of the

16  case and the decisions.  And so all of those things that now

17  impact her with respect to her injury could have been avoided if

18  this was done in 2003, 2004, 2005, any time before

19  September 23rd, 2006.

20          And so I think her impairment is not of her own

21  doing, but the disability that she suffers is going to be

22  detrimental to her ability to get a fair hearing from 12 members

23  of our community.  And on that basis, I'm asking the Court to

24  find her incompetent.

25          THE COURT:  Thank you, Mr. Chaney.  Mr. Carter, do you

1  want to respond briefly?

2          MR. CARTER:  I definitely do, Your Honor.

3              In terms of the time of the prosecution and the

4  fact that these events occurred five years ago, it more makes the

5  government's point, Dr. Bianchini's and Dr. Thompson's point than

6  takes away from it.  Any physician would have to look back and

7  rely on their records as to what happened five years ago, with

8  over 100 patients five years ago.  Whether she had an average

9  memory, excellent memory, she would still have to look at those

10 records, read those records, understand those records and discuss

11 those records.

12             Dr. Thompson said she can do that.  Dr. Bianchini

13 said she can do that.  It's not clear that Dr. Andrews -- I think

14 Dr. Andrews said she could do that, that she could read those

15 records, she could discuss them with her attorney, she can

16 understand them.  Not only did Dr. Andrews, Dr. Bianchini and

17 Dr. Thompson say that, Dr. Cleggett said that.  She said that to

18 Dr. Andrews, that she could read her records and determine what

19 happened.

20             Now, the motion to the Court stated that there was

21 a significant memory loss, Mr. Chaney's motion, there was a

22 significant memory loss which prevents effectively assisting in

23 her defense.  The evidence here does not support that.  There is

24 no long-term memory problem.  Her long-term memory is not a

25 problem.  Her short-term memory may be a problem.  And on the

issue of confabulation, it may occur with a short-term memory

question, but it won't happen, as Dr. Bianchini said, with

reference to any long-term memory.  It won't happen with

reference to a file that's in front of her.  It won't happen to

her reviewing her files with her attorney with her having a copy

of the file and him having a copy of the file.

So confabulation just isn't an issue in this case.

I doubt that outbursts are.  But if outbursts do become a

problem, the Court can instruct the jury at that time.  It can

give a general instruction prior to the trial, and if during the

trial there is an outburst, the Court can build upon that

instruction, that the defendant has had a severe mental injury

that may cause certain problems.  One of those problems, everyone

agrees, is fatigue.  The Court will have to address that.  That

means a two-week trial may become a four-week trial, but that's

something that courts have dealt with and can deal with and it

does not render Ms. Cleggett incompetent to stand trial.  As Dr.

Thompson, Dr. Bianchini, and I believe even Dr. Andrews agreed,

she knows what's in her best interest.  She knows the roles of

the parties.  She knows that on cross-examination what I'm trying

to do and why, that she has the ability to understand the

question and testify truthfully.  And that's what's at issue

here, Your Honor, and that's why as a matter of fact and law, she

is competent to stand trial and this Court should find her that

way.

1          Thank you.

2          THE COURT:  Thank you.  Mr. Carter.

3          All right.  The Court has heard the testimony of

4  Dr. Susan Andrews as an expert called by the defendant.

5  Dr. Andrews conducted an examination and prepared a report dated

6  May 28, 2008.  In that report, Dr. Andrews -- and I'm

7  highlighting the things that are important to the Court's

8  decision because the reports are in evidence and are

9  all-inclusive of their contents.  Dr. Andrews stated that the

10 speech of the defendant is understandable and the language

11 comprehension is normal for three-step commands and that she can

12 repeat sentences and simple confrontational naming is basically

13 within normal limits.  There is a little question as to the

14 status of what medication the defendant was on.  She did note

15 that the defendant had difficulty remembering appointments and

16 that her prospective memory was damaged.

17          She also stated that Dr. Cleggett understands the

18 nature and seriousness of the charges against her and she

19 demonstrated an understanding of the importance of the evaluation

20 being conducted by Dr. Andrews and what was at stake in her

21 responses.  The defendant fully comprehended the nature of the

22 judicial process and the roles of the various members of the

23 legal teams.  She also understands that she is expected and

24 needed to remember the details of her medical practice and the

25 particular patients involved in the charges.

As she noted here today, Dr. Andrews stated that
the defendant inappropriately stated during the course of the
evaluation that she had been advised to, quote, fake bad, close
quote, on the testing.  She did not have any recognition that
stating that was possibly inappropriate.  And I think she stated
as much again -- Dr. Andrews stated as much again today.

Dr. Andrews further stated that she, in fact, did
believe that the defendant attempted to fake bad on some parts of
the testing, in particular verbal memory testing.

Dr. Andrews, as she has stated here today, also
noted on the occasion of her exam that the defendant, following
the testing, commented with resignation, "Well, I guess I'm going
to trial."  Dr. Andrews also noted that the defendant believed
she had done well on the test and had given a full enough effort.

With regard to the IQ, and there are a couple of
different parameters that were used here, one of the findings by
Dr. Andrews was that at some point in time, the average -- she
was in the top of the average range at 108; however, her current
performance IQ was at a 75, which was in the fifth percentile.
Factoring that in, however, the Full 4 IQ from the WASI was 86 or
in the low average range and in the 18th percentile.  And I'm
referring to Page 4 of her report.  If I've left out a few words
in the course of my order here, it's on Page 4 of her report.

Dr. Andrews also stated that memory and new
learning for visual information was severely impaired; however,

her verbal memory scores looked just as impaired.  It was on the
verbal memory test that the defendant gave the naive impression
of not giving full effort.  And I'm quoting from the report of
Dr. Andrews.  Thus, her scores on these tests are probably not as
low as the visual memory he scores actually are.

Dr. Andrews noted and it's undisputed that the
commonly held period for recovery from brain damage is in the
two-year span following it, and it is noted by the Court and
undisputed that the accident in question in the case occurred on
September 23rd, 2006.

Dr. Andrews concluded that the defendant is showing
very significant deficits in both cognitive and behavioral
emotional function and it is unlikely that rehab in the next four
months to a year would make much of a difference in her ability
to assist in her defense.

Dr. Andrews identified six primary deficits.
First, her ability to tell a logical and concise story of her
behavior in the past or in present was very impaired.  Second,
she is easily distracted by either external stimuli and internal
thoughts and forgets what she was saying or working on.  She does
not remember to return to that track or train of thought.  Third,
she is easily lost in irrelevant and unimportant detail and moves
by association into a completely different topic without
realizing the shift.  Fourth, she has no logical problem solving
or deductive reasoning.  Fifth, her short-term memory for new

information or thoughts is so poor that she loses her train of
thought. Whenever she stops to remember something, she is then
likely to forget what she was doing and change the topic. And
sixth, she has difficulty inhibiting inappropriate responses of
behavior that could easily say or do something that would not be
in her best interest.

Dr. Andrews did note that the defendant was likely
to get some better in the next year or two and some of her
current frontal dysfunction could resolve.

Here today, Dr. Andrews discussed Dr. Bianchini's
use of the term "confabulating" and further commented that she
believed that the defendant was susceptible of confabulating as
that word has been defined, and I don't think there was a
difference in the definition given by Dr. Andrews or Dr.
Bianchini.

Insofar as the witness Lori Borruano is concerned,
she works in social services. She's the social services director
at the Plaquemine facility where the defendant currently resides.
She is familiar with the defendant over the last two years and
interacts with her almost every day.

She stated that she does live in a structured
environment and apparently is successful in living in a
structural environment. She does have complaints at times about
nurses regarding giving medicine and also that she is capable of
writing down and keeping track of her medicines which seems to

1  have resolved that problem.

2          She further stated that the defendant does have

3  anger outbursts periodically was the term she used and regularly.

4  She stated that this depended on what kind of day she was having,

5  and that on those occasions when she did have angry outbursts,

6  she was able to recall those outbursts when they occurred and to

7  discuss those outbursts, the causes of them and the resolution of

8  those outbursts and that she did not -- the witness did not

9  recall an instance wherein the defendant did not recall having

10 such an outburst.  She also stated that the defendant always

11 recognized the witness on a day-to-day basis, and she was able to

12 calm the witness down on the occasions when she did have

13 outbursts.

14          With regard to the expert testimony of

15 Dr. Thompson, the Court finds significant that Dr. Thompson

16 reviewed Dr. Andrews' report.  It's noted that Dr. Andrews did

17 not perform any standard competency assessment instrument on the

18 defendant.  He also stated that she can relate to her attorney

19 with a reasonable degree of rational understanding and has a

20 rational as well as factual understanding of the proceedings

21 against her.  She scored a 90 on the Georgia Court Competency

22 Test about which Dr. Thompson testified today and was subject to

23 cross-examination with regard to that particular test.

24          The defendant has no psychiatric history before the

25 accident in question.  He did note a report that her main problem

1   is little violent outbursts, which is how Dr. Cleggett described

2   her outbursts.  Quote, little violent outbursts, and that's

3   quoted on Page 5 of Dr. Thompson's report.

4           Dr. Thompson stated that with reference to the

5   defendant's capacity to understand the proceedings against her,

6   it is his opinion that she has an awareness of the charges and

7   appreciates the seriousness of the charges.  She was able to

8   describe the various counts against her for inappropriate

9   prescribing of controlled substances and that she understood the

10  sentence that could be involved were she to be found guilty on

11  those counts.  She also understood the roles of the defense

12  counsel, the prosector, the judge, the jury, the witnesses and

13  the defendant in the course of a trial, and she could, in fact,

14  distinguish between pleas of guilty, not guilty, and not guilty

15  by reason of insanity.

16          He further found that she could protect herself and

17  utilize her legal rights, although that's a rather general

18  finding that the Court, itself, must evaluate.  She did

19  understand that she had the right to remain silent and the right

20  to an attorney.  She understood the difference between a trial by

21  judge or a trial by jury and that she had a right to a speedy

22  trial.  She also understood the availability of defenses that she

23  might assert at trial.

24          Her primary contention was that she would prescribe

25  medications appropriately and therefore the charges were not

valid.  She understood the range of possible verdicts and the
consequences of the conviction.  He found that she can recall and
relate facts containing to her actions and whereabouts at certain
times.  Her long-term memory of case-specific information was
excellent.  She seemed to be able to recall very specific facts
-- specific details about her practice, the way she prescribed,
why she prescribed the way she did and can recall specific facts.
She was also given -- she has also given civil depositions in the
course of the civil case in reference to those particular facts,
and we discussed that here on the record, the nature of those
depositions, when they occurred, and what problems were
encountered during the course of those depositions.

He stated that she was able to assist her counsel
in locating and examining witnesses, if necessary.

He further found that she can maintain a consistent
defense and inform her attorney of distortions or misstatements
of others.

He found that she was able to makes decisions in
response to well-explained alternatives and she was able to
testify relevantly and be cross-examined, if necessary, in her
own defense.

He further stated that she can refrain from
irrational and unmanageable behavior at trial and that she had
normal demeanor during the interview and did not behave
inappropriately.  She never lost her temper during the course of

the interview with Dr. Thompson, nor did she become irritable or act inappropriately.  He found that she could tolerate the stress of trial and the stress awaiting trial.

With regard to the mental status examination, he found that on memory testing, he also suggested that she was attempting to fake memory deficits and he suspected poor effort.

He found that she was able to recall multiple details about her practice, the way she practiced medicine and why she felt her medical prescribing was appropriate.

With regard to malingering, I've already referenced his concern that she was malingering regarding memory deficits, and, of course, he found that she was competent to stand trial. He also recommended that a neuropsychological test be performed by Dr. Kevin Bianchini, and we heard from Dr. Bianchini today, as well.

Dr. Thompson also stated with regard to reading deposition testimony that the defendant could read her own deposition testimony and react with a "How could I have said that" type of reaction.  That reaction unfortunately isn't limited to persons in the situation that the defendant is in, and, of course, in the course of a deposition, we often allow people to read and sign, although that may not be a luxury that the defendant has during the course of a trial unless those provisions were made.

With regard to Dr. Bianchini, Dr. Bianchini

conducted several days of testing.  His report is dated
January 21st of 2009.  He indicated that the defendant stated she
thinks she cannot assist the attorneys because of her memory.
She cannot remember things about patients.  All she can do is
look at the written charts.  That was the concern that the
defendant expressed at the time of the interview.

She was evaluated over a period of seven days and
was consistently, during that time, oriented to person,
inconsistently oriented to place and consistently not oriented to
time.

She interacted with the examiner in a friendly and
socially appropriate manner and her affect was flat at times and
her emotions seemed stable and appropriate during the course of
the exam.

He also conducted -- had the defendant perform on
the WAIS III, which indicates that she currently had a verbal IQ
at that time of 96, a performance IQ of 72 and a full-scale IQ of
84, which bears some similarity to the references in Dr. Andrews'
report.  This places her in the average range of verbal
functioning to borderline impaired range of performance
functioning and the low average range of full-scale functioning.

I don't think those findings are disputed by any of
the experts who have testified today, the fact that the defendant
does have some degree of impairment.  The issue for the Court to
decide is the extent of the impairment and whether that

impairment would approach the threshold, which would cause
concern for the defendant's ability to undergo trial.

Dr. Bianchini also noted some exaggeration of
symptoms.  The patient showed a pattern of symptom reporting that
in some claimants -- that is seen in some claimants or litigants
who denied preexisting problems and emphasized accident or
injury-related problems for secondary gain.  He referenced the
Lees-Haley Fake Bad Scale or FBS.  The patient's elevated score
of 29 suggests the presence of this pattern.  The scale has also
been found to identify exaggeration of complaints and mental
stress claims such as is present here.

He also referenced on Page 19 of his report
intentional poor performance on neuropsychological testing during
the course of the evaluation.  He found that the defendant
appreciated the incentive for such poor performance.

He stated that the patient also had elevated levels
of complaints on the MMPI, which he administered that have been
shown to exaggeration of emotional and physical symptoms with a
high degree of specificity in multiple studies, again with
patients with real and significant injuries.  He thus diagnosed
the defendant as malingering in that regard.

He stated that the patient had impaired level
scores in many of the areas that he tested, including impaired
performances or performance IQ subtests and visual perception
instructional tests.  He also found an impaired score test on

higher cognitive functions that involved visual material.
However, he stated the patient had some high scores that
suggested spared areas that relate to the question at hand
regarding her capacity to assist counsel.  He found a verbal IQ
of 96 which is average.  He also demonstrated an average verbal
extract reasoning as measured on more than one verbal test that
Dr. Bianchini administered.  He found that she read at a
post-high school level and the patient had mixed performances on
tests of memory.  Her verbal memory was within normal limits on
one test and markedly impaired on another.

He stated his view that the very impaired scores
likely reflect negative response, bias/intentional poor effort.

Later on Page 20 of his report, he further
describes exaggerated cognitive impairment which he references
both in his examination as well as in Dr. Andrews' report.  He
also stated the opinion, the ultimate opinion that the defendant
demonstrates the capacity to and does understand the nature of
the charges against her and the nature of the criminal
proceedings, including the consequences.

He found that the impairments in cognitive
functions, as outlined above, are present but that she retained
the reasonable capacity to assist counsel in her defense.

My appreciation of the case with regard to the
memoranda that are submitted is that the prosecution is based
largely on the number of patients that were seen on a given day

and thus this case is going to involve the examination of medical

records, most of which, for even a doctor that is unimpaired,

reviewing medical records from several years ago is going to

involve trying to recall information that is recorded and that

would otherwise not be retained as a matter of memory.  The Court

also reviewed and is familiar with the standards set forth in the

case law cited by the parties, in particular, *Dusky v. The*

*United States*, which the defendant has cited regarding the

burden, as well as regarding the factors set forth in

*United States v. Swanson* and *Wilson v. The United States*, both of

which are discussed in detail by the defendant.  The government's

memorandum also discusses the *Swanson* case, in particular, and

*Wilson* with regard to the standard that the Court must apply.

The Court has considered all of the testimony and

evidence, as well as the expert reports that have been submitted,

and the Court finds in this case that the defendant, although she

has apparently dozed off a couple times here in court, that that

would not be a particular concern because there are any number of

reasons why someone would doze off in court, in particular what

time she went to bed, what time she got up.  It's certain that

she got up earlier than usual this morning in order to make the

long journey from Plaquemine here to New Orleans.  The Court also

notes that at no time did counsel attempt to disrupt the

defendant's rest in order to employ her assistance in the hearing

here today.

1    That's not to suggest that that would not happen

2  during the course of the trial.  The Court recognizes that if the

3  defendant were to be placed on trial that several significant

4  accommodations would have to be made, but that those are not

5  without -- those are -- can be done very possibly and maybe would

6  involve some indulgences that the defendant can be accommodated.

7    Given the expert testimony the Court has heard

8  today, the Court finds that the defendant is competent to

9  withstand trial and that the Court is willing to make

10 accommodations to the defendant, including abbreviated trial

11 days, rather significantly abbreviated trial days and other

12 accommodations that must be made in order for the defendant to

13 sit for trial.

14   But I think the defendant is competent to withstand

15 trial under the jurisprudential guidelines set forth in the cases

16 cited by counsel.

17   Is there anything else further, Counsel?

18   MR. CHANEY:  Your Honor, with respect to accommodations,

19 one of the accommodations that I think is appropriate in this

20 case is the accommodation of possibly moving the proceeding from

21 the Eastern District to the Middle District of Baton Rouge.  The

22 issue we presently held is that Plaquemine Caring is on Highway

23 1.  It's probably a 30-minute drive from Baton Rouge.  It's an

24 hour and could be an hour and 15 minutes drive from New Orleans

25 depending on her travel.

1    Given the impediment that she has with respect to

2  travel and accommodations that are necessary, I hope that the

3  Court could accommodate in terms of having us move there because

4  we have fewer mobility issues than the defendant.  There are a

5  couple of other things I would like to be able to propose to the

6  Court in terms of items that we believe that are appropriate and

7  try to provide some support for that.

8    THE COURT:  I would like to discuss all of those

9  options.  In fact, having this hearing today at an alternative

10 location that was closer to where Dr. Cleggett is staying was

11 something that I brought up yesterday.  That was for the purposes

12 of today.  If we are to have abbreviated trial days in this case,

13 I think there are a variety of ways we can go about doing this,

14 that being one of them that bears further investigation.

15    So what I would propose to do is to perhaps discuss

16 with counsel at a status conference in the near future within the

17 next 30 days what problems need to be addressed and what -- I

18 think we've heard today all of the vexations that would arise

19 during the course of the trial and I do have some additional

20 thoughts which I have not stated as part of my ruling that I

21 think would address many of the concerns both logistically and

22 medically that the defendant has, things that need to be provided

23 for.

24    So I would like to go ahead and get you all on a

25 calendar for a status conference.  We don't have to pick at that

right now, but again, between now and the end of April, I think
perhaps you can give some thought to other contingencies, and I'm
certainly all ears on what plans can be made.  And like I said, I
have some thoughts myself that can address some of the concerns,
some of the vexations in bringing this case to trial.

          MR. CHANEY:  Thank you, Your Honor.

          THE COURT:  Thank you all.

          MR. CARTER:  Thank you, Your Honor.

          THE DEPUTY CLERK:  All rise.

          (WHEREUPON, at 1:12 p.m., the proceedings were
concluded.)

                    *    *    *

REPORTER'S CERTIFICATE

     I, Cathy Pepper, Certified Realtime Reporter, Registered
Merit Reporter, Registered Professional Reporter, Certified Court
Reporter, Official Court Reporter for the United States District
Court, Eastern District of Louisiana, do hereby certify that the
foregoing is a true and correct transcript, to the best of my
ability and understanding, from the record of the proceedings in
the above-entitled and numbered matter.


                              _s/Cathy Pepper_____

                              Cathy Pepper, CRR, RMR, CCR

                              Official Court Reporter

                              United States District Court

# #

**#07-28** [1] - 3:8

# '

**'70s** [1] - 9:2
**'Yes** [1] - 39:21
**'You** [1] - 39:20

# 0

**07-28** [1] - 1:4

# 1

**1** [1] - 153:23
**10** [1] - 2:6
**100** [1] - 139:8
**108** [1] - 142:18
**118** [1] - 2:19
**12** [2] - 68:19, 138:22
**13** [1] - 68:23
**134** [3] - 2:23, 2:24, 2:25
**15** [3] - 3:21, 3:23, 153:24
**18** [1] - 37:12
**18th** [1] - 142:21
**19** [1] - 150:12
**1960** [1] - 58:11
**1990** [2] - 46:22, 46:23
**1999** [1] - 34:4
**19th** [1] - 47:3
**1:12** [1] - 155:10

# 2

**20** [6] - 9:5, 11:16, 51:2, 90:23, 115:20, 151:13
**2000** [1] - 34:4
**2001** [1] - 33:7
**2002** [2] - 24:22, 138:11
**2003** [1] - 138:18
**2004** [1] - 138:18
**2005** [1] - 138:18
**2006** [3] - 11:8, 138:19, 143:10
**2008** [6] - 7:18, 8:1, 47:3, 65:16, 129:19, 141:6
**2009** [7] - 1:5, 3:3, 7:20, 7:24, 8:3, 65:16, 149:2

**210** [1] - 1:19
**21st** [2] - 8:3, 149:2
**23rd** [1] - 11:6, 138:19, 143:10
**25** [1] - 5:6
**26** [1] - 2:7
**28** [2] - 7:18, 141:6
**29** [1] - 150:9

# 3

**3** [1] - 29:19
**30** [2] - 7:23, 154:17
**30-minute** [1] - 153:23
**30-something** [1] - 115:7
**30th** [2] - 7:20, 33:7
**318** [1] - 1:16
**32** [1] - 2:8
**36** [2] - 2:9, 2:10
**37** [1] - 51:2, 51:5
**3rd** [1] - 8:1

# 4

**4** [5] - 29:19, 95:11, 142:20, 142:22, 142:23
**42** [1] - 2:11
**46** [2] - 2:12, 2:13

# 5

**5** [6] - 29:19, 31:16, 32:2, 76:5, 93:18, 146:3
**50** [1] - 9:21
**500** [3] - 1:16, 1:19, 1:22
**504** [1] - 1:23
**589-7779** [1] - 1:23

# 6

**6** [2] - 25:24, 28:6
**60** [1] - 66:23
**61** [1] - 2:14
**6:45** [1] - 38:8

# 7

**7** [1] - 95:9
**70** [2] - 54:21, 66:23
**70130** [1] - 1:16, 1:19, 1:23
**704** [1] - 51:2

**72** [1] - 149:17
**75** [1] - 142:19
**7:15** [1] - 38:8

# 8

**8** [4] - 1:5, 2:4, 2:5, 3:3
**80** [1] - 2:15
**84** [1] - 149:18
**86** [3] - 2:16, 2:17, 142:20

# 9

**9** [2] - 5:13, 5:14
**90** [4] - 54:18, 54:22, 54:23, 145:21
**96** [3] - 94:22, 149:17, 151:5
**99** [1] - 2:18
**9:00** [1] - 1:5
**9:33** [1] - 5:14

# A

**A**..................................
................ [1] - 2:23
**A.M** [1] - 1:5
**abbreviated** [3] - 153:10, 153:11, 152:12
**abilities** [10] - 21:14, 87:25, 90:11, 94:13, 94:25, 95:1, 116:9, 117:11, 123:10
**ability** [83] - 12:6, 12:7, 13:15, 13:21, 14:3, 14:21, 18:13, 19:1, 19:15, 20:7, 20:15, 23:6, 24:1, 24:6, 24:8, 25:20, 28:24, 29:7, 29:10, 32:15, 32:22, 33:14, 34:3, 34:15, 35:5, 35:6, 40:4, 42:2, 42:4, 54:15, 54:25, 55:2, 58:17, 66:4, 66:9, 68:18, 68:24, 73:23, 75:18, 77:21, 81:8, 83:12, 83:13, 83:15, 84:15, 94:12, 94:14, 94:15, 95:2, 97:18, 98:5, 98:7, 98:9, 100:12, 103:2, 106:2, 106:10, 106:11, 106:16, 107:4, 107:6, 107:15, 108:17,

109:16, 112:22, 116:13, 120:19, 122:19, 126:16, 126:25, 127:21, 128:4, 128:5, 129:25, 137:7, 138:3, 138:22, 140:21, 143:14, 143:17, 150:2, 156:8
**able** [73] - 13:18, 13:19, 17:20, 18:7, 19:24, 24:12, 24:17, 24:24, 25:9, 25:12, 25:18, 32:3, 33:6, 35:24, 37:4, 40:21, 55:8, 55:19, 58:18, 60:6, 60:7, 60:19, 60:22, 63:24, 66:17, 67:21, 68:8, 68:11, 70:12, 71:17, 73:16, 75:21, 79:25, 81:10, 84:8, 84:19, 84:24, 85:7, 85:11, 88:7, 96:23, 98:15, 99:21, 100:13, 100:14, 100:19, 100:21, 101:24, 101:25, 103:8, 108:23, 124:1, 129:5, 129:8, 130:11, 132:25, 133:1, 136:2, 136:12, 136:14, 136:16, 136:17, 137:1, 137:22, 145:6, 145:11, 146:7, 147:5, 147:13, 147:18, 147:19, 148:7, 154:5
**above-entitled** [1] - 156:9
**absence** [1] - 137:12
**absolute** [4] - 59:1, 93:10, 95:17, 110:18
**absolutely** [6] - 40:3, 66:12, 66:16, 82:8, 82:11
**abuse** [1] - 44:17
**academic** [1] - 9:8
**Academy** [1] - 9:14
**accept** [4] - 10:16, 68:20, 127:1, 131:4
**accepts** [1] - 131:24
**access** [1] - 23:14
**accident** [12] - 11:22, 28:14, 28:15, 43:2, 81:4, 81:5, 122:8, 122:10, 133:14, 143:9, 145:25, 150:6
**accommodate** [2] - 6:3, 154:3

**accommodated** [1] - 153:6
**accommodation** [3] - 40:2, 114:5, 153:20
**accommodations** [9] - 137:2, 137:3, 137:5, 153:4, 153:10, 153:12, 153:18, 153:19, 154:2
**accompany** [1] - 89:20
**according** [4] - 89:2, 89:8, 103:20, 110:15
**account** [1] - 119:7
**accurate** [3] - 91:16, 114:8, 122:7
**accused** [1] - 24:14
**acquired** [1] - 122:12
**act** [1] - 148:2
**acting** [1] - 31:3
**action** [1] - 41:14
**Action** [1] - 3:8
**actions** [2] - 29:11, 147:3
**activities** [1] - 38:9
**actual** [5] - 53:11, 65:2, 82:16, 82:18, 131:25
**acute** [3] - 16:20, 88:24, 89:8
**adaptation** [3] - 40:2, 111:10, 114:5
**adapted** [1] - 136:3
**add** [2] - 54:3, 135:16
**addiction** [1] - 46:19
**adding** [1] - 77:5
**addition** [1] - 115:6
**additional** [2] - 133:15, 154:19
**address** [9] - 42:8, 48:21, 60:7, 66:17, 66:20, 82:13, 140:14, 154:21, 155:4
**addressed** [6] - 21:2, 109:15, 118:25, 119:2, 128:6, 154:17
**addressing** [2] - 124:3, 124:7
**adds** [1] - 133:24
**adjunct** [1] - 77:4
**adjustment** [2] - 89:19, 110:5
**administer** [2] - 114:21, 114:23
**administered** [7] - 22:4, 23:18, 38:12, 87:22, 107:6, 150:17, 151:7

**administering** [3] - 114:16, 114:18, 114:25
**administrator** [1] - 37:11
**admitted** [1] - 134:14
**adolescence** [3] - 82:24, 82:25, 83:1
**advancing** [1] - 68:13
**advise** [4] - 4:7, 112:19, 112:20, 113:13
**advised** [1] - 142:3
**affect** [16] - 17:19, 75:6, 75:7, 75:8, 77:20, 78:9, 97:18, 97:20, 98:5, 98:7, 98:9, 107:1, 107:6, 107:11, 149:12
**affected** [3] - 11:17, 104:21, 136:4
**affirm** [1] - 101:6
**affixed** [1] - 135:5
**aggressive** [1] - 68:4
**agitated** [1] - 109:17
**ago** [9] - 3:23, 67:13, 101:22, 130:24, 139:4, 139:7, 139:8, 152:3
**agree** [6] - 69:12, 90:17, 95:13, 96:21, 116:7
**agreed** [3] - 66:2, 66:3, 140:18
**agreement** [5] - 92:18, 102:18, 105:18, 109:12, 109:14
**agrees** [2] - 90:18, 140:14
**ahead** [14] - 5:10, 5:15, 6:4, 7:1, 8:4, 10:16, 10:19, 11:1, 84:13, 86:1, 135:1, 135:11, 154:24
**alcohol** [2] - 56:1, 96:17
**alert** [4] - 20:15, 57:8, 108:24, 117:13
**all-encompassing** [1] - 111:14
**all-inclusive** [1] - 141:9
**alleged** [1] - 48:2
**allow** [3] - 59:18, 130:12, 148:21
**allowed** [1] - 126:8
**allows** [1] - 54:8
**almost** [6] - 14:24, 29:18, 57:20, 74:20, 130:24, 144:20

**alone** [1] - 24:24
**alteration** [1] - 110:3
**alterations** [1] - 89:17
**altercation** [1] - 44:16
**altercations** [1] - 63:7
**alternative** [1] - 154:9
**alternatives** [1] - 147:19
**ambulate** [1] - 42:2
**AMERICA** [1] - 1:4
**America** [1] - 3:9
**American** [1] - 9:13
**amount** [2] - 52:8, 55:5
**ANDREWS** [1] - 8:11
**Andrews** [68] - 6:24, 7:6, 7:8, 7:18, 8:16, 10:17, 36:7, 47:14, 54:25, 55:21, 64:19, 65:9, 66:7, 68:16, 69:19, 70:17, 72:11, 73:22, 74:7, 74:8, 74:14, 75:11, 81:21, 81:25, 86:16, 87:10, 92:8, 93:18, 93:19, 95:11, 96:21, 102:18, 109:6, 110:8, 114:22, 118:11, 125:18, 129:22, 131:10, 131:12, 132:14, 134:4, 136:23, 139:13, 139:14, 139:16, 139:18, 140:18, 141:4, 141:5, 141:6, 141:9, 141:20, 142:1, 142:6, 142:7, 142:10, 142:13, 142:17, 142:24, 143:4, 143:6, 143:11, 143:16, 144:7, 144:10, 144:14, 145:16
**Andrews'** [20] - 7:15, 47:8, 48:16, 55:4, 57:13, 59:10, 59:12, 59:14, 73:24, 94:19, 95:11, 96:5, 118:19, 119:19, 119:21, 120:15, 134:24, 145:16, 149:18, 151:15
**ANDREWS................. ..................** [1] - 2:4
**anger** [13] - 20:15, 20:24, 40:10, 40:11, 41:1, 68:17, 109:20, 109:24, 112:22, 131:7, 137:24, 145:3

**angry** [9] - 20:25, 43:8, 45:6, 110:24, 111:4, 111:6, 131:16, 138:3, 145:5
**answer** [23] - 17:16, 19:24, 20:11, 30:10, 30:12, 30:25, 43:21, 49:21, 50:13, 52:20, 71:25, 72:25, 80:7, 81:10, 85:6, 85:11, 111:11, 116:18, 123:3, 124:2, 128:5, 136:19
**answered** [2] - 121:16, 121:17
**answers** [3] - 13:23, 51:15, 124:1
**anterior** [7] - 28:12, 28:17, 34:1, 34:2, 34:6, 34:8, 94:5
**antianxiety** [2] - 77:12, 78:23
**antidepressant** [4] - 76:10, 76:11, 77:1, 78:21
**antiseizure** [1] - 20:6
**anxiety** [3] - 75:24, 77:11, 109:21
**anxious** [1] - 78:24
**apart** [1] - 79:16
**apologize** [1] - 5:16
**apparent** [1] - 88:14
**appear** [3] - 120:13, 120:15
**appearances** [1] - 3:10
**APPEARANCES** [1] - 1:12
**appeared** [1] - 47:16
**apply** [2] - 73:10, 152:13
**appointments** [1] - 141:15
**appreciate** [5] - 6:21, 19:4, 20:20, 24:22, 29:1
**appreciated** [1] - 150:15
**appreciates** [1] - 146:7
**appreciation** [1] - 151:23
**approach** [1] - 150:1
**appropriate** [15] - 17:13, 19:25, 41:10, 49:16, 52:10, 52:22, 53:19, 55:9, 59:24, 90:21, 148:9, 149:12, 149:13, 153:19, 154:6

**appropriately** [7] - 52:14, 53:21, 53:22, 53:23, 55:17, 146:25
**approved** [1] - 39:10
**April** [1] - 155:1
**APRIL** [2] - 1:5, 3:3
**arc** [2] - 35:24, 138:9
**area** [28] - 8:19, 11:21, 12:5, 13:13, 14:4, 14:23, 16:12, 16:15, 17:1, 18:25, 25:21, 31:17, 50:11, 64:3, 64:5, 64:20, 68:21, 68:22, 68:25, 69:2, 69:3, 69:7, 69:24, 103:17, 104:10, 110:19, 112:19, 123:10
**areas** [25] - 9:22, 11:17, 11:19, 12:20, 12:24, 13:2, 14:1, 14:2, 14:3, 24:7, 37:22, 54:8, 54:24, 66:2, 68:23, 83:23, 93:4, 93:23, 95:7, 103:21, 104:9, 104:16, 130:8, 150:23, 151:3
**argue** [1] - 130:17
**argued** [1] - 133:21
**argument** [1] - 135:17
**arise** [1] - 154:18
**arm** [4] - 72:1, 72:2, 72:3
**arms** [3] - 42:5, 50:2, 54:9
**arousal** [2] - 106:23, 107:11
**arrangements** [2] - 5:13, 10:25
**arrested** [1] - 48:6
**arrive** [1] - 4:9
**arrived** [2] - 5:2, 5:9
**aside** [1] - 11:1
**asleep** [10] - 79:5, 99:4, 107:15, 107:22, 107:24, 107:25, 108:5, 119:14, 134:16
**aspect** [3] - 67:9, 83:2, 92:20
**aspects** [7] - 49:25, 53:1, 54:3, 63:24, 64:24, 71:12, 86:21
**assert** [3] - 129:6, 130:10, 146:23
**asserted** [1] - 130:9
**assessment** [6] - 48:20, 48:25, 52:23, 63:19, 88:1, 145:17

**assessments** [1] - 109:6
**assist** [22] - 4:22, 4:23, 17:20, 24:1, 24:6, 24:8, 24:12, 24:17, 66:9, 68:18, 92:22, 93:1, 99:22, 107:23, 114:7, 120:20, 129:8, 143:15, 147:13, 149:3, 151:4, 151:22
**assistance** [11] - 4:24, 37:23, 40:5, 40:6, 40:8, 40:9, 42:23, 42:24, 43:9, 45:12, 152:24
**assisted** [1] - 123:23
**assisting** [4] - 107:25, 108:1, 136:9, 139:22
**associated** [1] - 20:8
**association** [1] - 143:23
**Association** [1] - 9:13
**associations** [1] - 9:11
**assume** [2] - 113:4, 116:3
**assuming** [3] - 6:1, 82:8, 117:13
**attach** [1] - 90:9
**attachments** [1] - 7:19
**attempt** [5] - 33:25, 62:25, 112:15, 137:15, 152:23
**attempted** [1] - 142:8
**attempting** [3] - 92:13, 92:14, 148:6
**attempts** [1] - 33:22
**attend** [1] - 106:25
**attending** [3] - 19:19, 103:7, 108:7
**attention** [22] - 12:18, 19:18, 19:22, 20:8, 23:9, 26:4, 87:24, 93:7, 103:18, 105:25, 106:2, 106:4, 106:7, 106:10, 106:14, 106:15, 106:21, 106:22, 106:23, 106:24, 114:6, 129:9
**attorney** [35] - 30:6, 30:9, 48:4, 48:23, 49:4, 49:12, 50:9, 50:15, 50:16, 52:18, 53:17, 54:11, 54:12, 58:18, 59:17, 60:6, 60:22, 64:17, 66:18, 68:9, 83:19, 98:10, 98:11, 98:17, 98:20,

108:3, 120:20, 139:15, 140:5, 145:18, 146:20, 147:16
**attorney's** [1] - 54:15
**ATTORNEY'S** [1] - 1:18
**attorneys** [2] - 50:18, 149:3
**audience** [1] - 50:10
**automatically** [1] - 96:20
**availability** [1] - 146:22
**available** [5] - 33:15, 42:9, 73:10, 116:17, 130:7
**average** [16] - 95:1, 95:4, 103:16, 113:20, 117:10, 123:5, 123:14, 123:15, 139:8, 142:17, 142:18, 142:21, 149:19, 149:21, 151:5
**avoided** [1] - 138:17
**awaiting** [1] - 148:3
**awake** [19] - 57:8, 88:16, 99:21, 99:23, 99:24, 106:16, 106:19, 106:25, 107:4, 107:23, 108:7, 108:23, 117:13, 119:17, 119:20, 120:9, 120:12, 120:20, 137:5
**aware** [5] - 15:5, 18:2, 74:14, 112:8, 117:24
**awareness** [1] - 25:12, 96:22, 146:6
**awhile** [1] - 97:9

## B

**B**...............................
............ [1] - 2:24
**B406** [1] - 1:22
**background** [1] - 46:25
**bad** [13] - 27:6, 29:20, 40:20, 62:3, 62:6, 62:10, 62:16, 63:3, 63:13, 95:18, 102:17, 142:3, 142:8
**Bad** [1] - 150:8
**badly** [5] - 14:16, 17:1, 22:10, 22:11, 22:12
**based** [32] - 6:15,

10:7, 11:18, 33:10, 35:9, 47:13, 50:1, 60:19, 61:14, 61:18, 62:6, 73:12, 73:15, 74:2, 74:5, 75:11, 75:12, 81:7, 84:5, 84:7, 84:23, 92:16, 99:12, 100:15, 102:5, 120:8, 122:21, 125:19, 127:9, 130:25, 138:1, 151:24
**basic** [3] - 26:16, 106:15, 109:4
**basing** [2] - 103:24, 103:25
**basis** [9] - 20:3, 37:24, 40:14, 40:15, 54:14, 70:21, 132:16, 138:23, 145:11
**bathroom** [1] - 23:20
**Baton** [3] - 5:24, 153:21, 153:23
**bear** [7] - 9:23, 68:18, 107:15, 108:24, 126:25, 129:5, 130:6
**bears** [3] - 108:13, 149:18, 154:14
**become** [3] - 140:8, 140:15, 148:1
**becomes** [1] - 20:24
**becoming** [1] - 36:1
**bed** [2] - 121:9, 152:20
**BEFORE** [1] - 1:9
**began** [1] - 22:22
**begin** [4] - 5:10, 5:15, 8:18, 36:2
**beginning** [2] - 21:9, 135:23
**behalf** [5] - 3:13, 3:16, 19:10, 46:2, 135:14
**behave** [5] - 59:17, 59:18, 109:21, 110:20, 147:24
**behaved** [1] - 111:25
**behavior** [14] - 12:7, 12:9, 20:20, 29:3, 35:6, 35:7, 41:10, 109:19, 110:15, 113:16, 121:6, 143:18, 144:5, 147:23
**behavioral** [3] - 86:21, 111:3, 143:12
**behaviors** [1] - 12:8
**behind** [1] - 5:6
**belief** [4] - 61:14, 61:22, 102:20, 106:18
**believes** [2] - 16:1,

134:2
**belong** [1] - 9:11
**below** [2] - 116:23, 116:25
**beneficial** [1] - 78:15
**benefit** [2] - 53:10, 90:6
**benzodiazepine** [1] - 77:15
**best** [15] - 16:12, 20:11, 27:2, 27:3, 27:5, 96:17, 96:18, 102:15, 102:17, 102:19, 104:8, 119:2, 140:19, 144:6, 156:7
**better** [10] - 5:11, 16:16, 20:12, 21:15, 24:17, 65:16, 78:20, 92:13, 102:21, 144:8
**between** [10] - 13:7, 16:18, 18:25, 38:8, 45:3, 70:15, 138:15, 146:14, 146:20, 155:1
**beyond** [1] - 15:20
**BIANCHINI** [1] - 86:7
**Bianchini** [34] - 8:2, 10:15, 15:15, 15:24, 16:19, 31:13, 35:10, 57:22, 58:3, 61:7, 65:12, 66:3, 69:17, 72:13, 81:22, 82:12, 85:21, 86:12, 125:19, 129:22, 132:15, 134:5, 135:8, 139:12, 139:16, 140:2, 140:18, 144:15, 148:14, 148:25, 150:3, 151:7
**Bianchini's** [9] - 15:11, 15:19, 16:14, 21:24, 28:2, 48:15, 135:5, 139:5, 144:10
**BIANCHINI**...............
............ [1] - 2:16
**bias/intentional** [1] - 151:12
**big** [2] - 17:17, 70:15
**biggest** [3] - 19:4, 37:24
**bilaterally** [1] - 11:20
**bit** [3] - 13:5, 38:10, 59:24, 65:16, 72:8
**blank** [1] - 122:7
**blanks** [2] - 96:20, 113:17
**block** [1] - 66:25
**Blow** [1] - 82:9

**blowup** [1] - 41:4
**board** [2] - 22:4, 86:17
**body** [3] - 11:25, 12:2, 104:21
**BOGGS** [1] - 1:15
**bolstering** [1] - 58:1
**borderline** [1] - 149:20
**Borruano** [19] - 36:10, 36:22, 36:23, 36:24, 42:22, 42:23, 45:20, 45:21, 62:12, 62:20, 63:4, 81:24, 99:8, 131:14, 131:15, 132:11, 144:16
**BORRUANO** [1] - 36:16
**BORRUANO**...............
............ [1] - 2:9
**brain** [113] - 11:17, 12:1, 12:5, 12:10, 12:11, 12:12, 12:21, 12:24, 13:2, 13:7, 13:8, 13:10, 13:12, 13:14, 14:20, 14:24, 16:20, 17:1, 17:18, 18:13, 18:23, 18:24, 19:14, 20:14, 20:22, 24:16, 33:11, 47:17, 47:18, 50:8, 59:18, 63:23, 66:22, 69:13, 69:14, 73:22, 75:2, 75:3, 75:13, 76:14, 82:14, 82:19, 86:24, 87:1, 87:2, 87:4, 87:12, 87:14, 88:2, 88:23, 89:1, 89:11, 89:14, 89:18, 89:20, 89:22, 90:4, 90:10, 93:8, 93:13, 93:14, 94:2, 94:6, 95:19, 96:14, 96:15, 96:23, 97:2, 102:3, 102:4, 102:6, 104:3, 104:9, 104:11, 104:16, 104:21, 104:22, 105:1, 105:20, 107:1, 107:3, 109:3, 109:5, 109:16, 109:25, 110:4, 110:12, 110:13, 111:4, 112:14, 112:20, 113:15, 113:23, 114:1, 114:2, 116:22, 122:13, 122:20, 122:22, 136:7, 136:8, 136:23, 137:6, 137:16,

138:8, 138:14, 143:7
**brain's** [1] - 112:15
**break** [6] - 15:1, 23:17, 23:19, 23:23, 85:20, 105:9
**breakfast** [1] - 38:7
**breaks** [9] - 23:20, 69:9, 83:18, 119:10, 119:11, 126:22, 127:15, 131:6, 132:20
**brief** [3] - 4:12, 57:9, 85:23
**briefly** [3] - 86:13, 135:19, 139:1
**briefs** [1] - 6:14
**bright** [1] - 117:2
**bring** [4] - 9:23, 25:19, 56:24, 117:25
**bringing** [2] - 73:5, 155:5
**brings** [1] - 18:3
**broad** [1] - 92:18
**broader** [1] - 121:7
**brought** [7] - 4:22, 64:19, 87:19, 87:20, 126:11, 129:9, 154:11
**build** [1] - 131:20, 140:11
**BUILDING** [1] - 1:15
**bullet** [1] - 95:10
**bunch** [1] - 91:25
**burden** [6] - 6:13, 6:14, 6:19, 6:22, 7:2, 152:9
**business** [1] - 52:8
**BY** [39] - 1:14, 1:15, 1:18, 1:24, 1:25, 2:5, 2:6, 2:7, 2:8, 2:10, 2:11, 2:13, 2:14, 2:15, 2:17, 2:18, 2:19, 8:15, 10:21, 26:13, 30:15, 31:11, 32:21, 36:21, 42:20, 43:24, 46:17, 58:6, 61:3, 63:2, 80:25, 85:5, 86:11, 99:7, 99:20, 111:21, 118:7, 120:7, 121:20

## C

**C**...............................
............ [1] - 2:25
**calculated** [1] - 50:24
**calendar** [1] - 154:25
**CALLED** [1] - 3:4
**calm** [4] - 44:24,

70:13, 109:17, 145:12

**calms** [1] - 41:8

**cameras** [1] - 41:23

**cane** [1] - 4:22

**cannot** [5] - 66:4, 66:5, 128:9, 149:3, 149:4

**capabilities** [1] - 105:14

**capability** [3] - 92:15, 122:24, 123:2

**capable** [7] - 16:23, 49:11, 61:9, 67:22, 69:22, 108:1, 144:24

**capably** [1] - 97:25

**capacities** [2] - 92:21, 93:24

**capacity** [22] - 49:12, 58:10, 71:16, 75:15, 88:16, 88:18, 92:25, 93:1, 93:24, 96:3, 105:14, 106:5, 106:9, 117:11, 117:15, 117:18, 121:8, 133:14, 146:5, 151:4, 151:17, 151:22

**care** [8] - 37:2, 37:3, 37:4, 37:12, 38:4, 39:9, 39:10, 40:4

**Caring** [4] - 36:25, 37:14, 125:11, 153:22

**carry** [1] - 77:22

**Carter** [19] - 3:12, 7:23, 26:11, 35:21, 46:1, 84:18, 85:17, 100:18, 101:1, 123:19, 124:12, 125:15, 127:11, 128:13, 129:19, 130:13, 131:25, 138:25, 141:2

**CARTER** [56] - 1:18, 3:12, 6:9, 7:4, 7:12, 7:14, 10:6, 26:13, 30:15, 31:9, 31:11, 32:18, 42:20, 43:24, 45:17, 46:3, 46:17, 58:2, 58:4, 58:6, 60:24, 62:18, 80:23, 80:25, 84:20, 85:5, 85:15, 85:19, 86:11, 99:7, 99:16, 111:11, 118:5, 118:7, 120:7, 121:20, 123:17, 123:20, 124:8, 124:15, 124:18, 125:16, 127:14,

127:17, 127:20, 127:24, 129:21, 130:15, 130:18, 131:9, 132:3, 134:12, 135:4, 135:14, 139:2, 155:8

**CARTER**.................... [2] - 2:15, 2:19

**CARTER**.................... .. [2] - 2:13, 2:17

**CARTER**.................... ... [2] - 2:7, 2:11

**case** [36] - 12:25, 14:6, 19:3, 22:12, 22:14, 48:5, 56:4, 58:11, 58:21, 60:17, 67:12, 67:22, 70:9, 82:14, 82:21, 84:1, 105:24, 108:25, 127:6, 129:4, 129:5, 136:22, 138:9, 138:16, 140:7, 143:9, 147:4, 147:9, 151:23, 152:1, 152:7, 152:12, 152:16, 153:20, 154:12, 155:5

**case-specific** [1] - 147:4

**cases** [2] - 60:13, 153:15

**cash** [1] - 52:7

**cash-only** [1] - 52:7

**categories** [4] - 89:2, 104:7, 105:17, 105:19

**Cater** [1] - 42:18

**CATHY** [1] - 1:22

**Cathy** [2] - 156:3, 156:13

**caused** [1] - 83:1

**causes** [2] - 109:10, 145:7

**CCR** [2] - 1:22, 156:13

**center** [2] - 47:10, 47:19

**Center** [1] - 8:24

**certain** [16] - 28:23, 49:16, 49:20, 65:15, 73:8, 77:7, 84:3, 84:4, 94:7, 105:20, 106:6, 121:4, 137:7, 140:13, 147:3, 152:20

**certainly** [20] - 4:4, 9:20, 12:25, 22:7, 22:18, 25:14, 27:16, 62:24, 68:7, 73:15, 75:10, 77:8, 97:23, 107:25, 108:24,

116:20, 117:3, 117:5, 129:2, 155:3

**CERTIFICATE** [1] - 156:1

**certified** [1] - 86:18

**Certified** [2] - 156:3, 156:4

**certify** [1] - 156:6

**chain** [1] - 18:17

**challenge** [5] - 62:15, 68:4, 116:2, 116:6

**challenged** [5] - 127:23, 127:24, 130:1, 136:16, 138:1

**challenges** [1] - 131:5

**challenging** [1] - 111:1

**chance** [2] - 115:9, 122:5

**chances** [1] - 115:9

**Chaney** [16] - 3:15, 5:10, 6:6, 7:20, 7:21, 9:20, 10:3, 36:6, 36:9, 45:22, 60:25, 82:7, 108:18, 132:18, 135:16, 138:25

**CHANEY** [75] - 1:14, 3:15, 4:4, 4:10, 4:17, 5:2, 5:7, 5:16, 6:7, 6:25, 7:6, 7:13, 7:25, 8:15, 10:9, 10:13, 10:21, 26:6, 26:10, 30:10, 31:5, 32:21, 36:4, 36:10, 36:21, 42:12, 42:15, 45:19, 45:24, 57:25, 61:1, 61:3, 62:24, 63:2, 80:20, 84:11, 84:14, 99:3, 99:18, 99:20, 111:21, 118:2, 120:1, 121:15, 123:21, 124:12, 124:23, 125:4, 125:9, 126:9, 126:21, 127:5, 127:19, 127:23, 128:12, 128:15, 128:19, 129:2, 130:3, 131:14, 131:21, 132:22, 132:24, 133:3, 133:23, 134:1, 134:8, 134:15, 134:19, 134:23, 135:3, 135:17, 135:19, 153:18, 155:6

**Chaney's** [2] - 125:22, 139:21

**CHANEY**.................... [1] - 2:5

**CHANEY**.................... [1] - 2:8

**CHANEY**.................... .. [2] - 2:6, 2:10

**CHANEY**.................... ... [2] - 2:14, 2:18

**change** [8] - 82:4, 96:10, 99:10, 99:13, 135:9, 135:11, 144:3

**changed** [1] - 136:5

**changes** [1] - 128:3

**characteristically** [1] - 105:11

**characteristics** [1] - 88:24

**charge** [3] - 52:8, 78:13, 119:4

**charged** [3] - 26:16, 48:3, 51:13

**charges** [15] - 26:19, 48:2, 50:22, 50:23, 52:25, 53:18, 67:21, 117:16, 141:18, 141:25, 146:6, 146:7, 146:25, 151:18

**charts** [1] - 149:5

**chase** [1] - 23:21

**check** [3] - 91:12, 91:14, 115:6

**checks** [1] - 115:4

**childhood** [2] - 82:22, 82:23

**choice** [1] - 17:3

**chose** [1] - 138:10

**chronic** [1] - 56:1

**chronological** [1] - 83:4

**CIMINO** [1] - 1:15

**Cimino** [1] - 3:16

**Cindy** [1] - 3:16

**Circuit** [2] - 6:17, 108:2

**circumstances** [1] - 18:12

**circumstantial** [1] - 56:22

**cited** [4] - 6:16, 152:7, 152:8, 153:16

**civil** [6] - 50:19, 52:19, 123:23, 128:15, 147:8, 147:9

**claim** [1] - 6:14

**claimants** [2] - 150:5

**claims** [2] - 125:22, 150:11

**clarify** [2] - 82:12, 83:14

**class** [1] - 77:14

**clear** [6] - 13:1, 50:22, 67:9, 93:5, 117:9, 139:13

**clear-cut** [1] - 93:5

**clearly** [2] - 13:2, 108:7

**CLEGGETT** [1] - 1:6

**Cleggett** [89] - 3:9, 3:16, 3:17, 5:18, 7:16, 9:24, 10:2, 10:23, 13:25, 14:9, 15:22, 20:21, 22:12, 22:14, 23:12, 24:1, 25:8, 30:2, 33:7, 35:8, 37:15, 38:14, 39:5, 39:14, 40:11, 41:15, 41:25, 42:24, 43:1, 47:1, 47:2, 47:21, 49:15, 52:2, 55:2, 56:18, 57:6, 58:23, 60:10, 60:19, 63:7, 66:16, 74:1, 75:13, 75:20, 81:18, 82:8, 82:10, 87:8, 87:12, 87:19, 88:11, 90:2, 90:21, 90:22, 92:6, 93:19, 95:12, 97:4, 97:15, 98:23, 99:4, 102:5, 102:9, 104:1, 104:4, 108:22, 109:23, 114:3, 114:10, 115:18, 116:22, 118:12, 119:20, 120:8, 122:21, 123:22, 134:15, 135:21, 136:7, 136:23, 137:4, 137:25, 139:17, 140:17, 141:17, 146:1, 154:10

**Cleggett's** [14] - 19:3, 19:14, 20:2, 21:7, 25:20, 54:25, 65:10, 73:11, 82:4, 96:10, 109:5, 122:19

**Clerk** [4] - 8:13, 36:18, 46:14, 86:9

**CLERK** [10] - 3:8, 4:11, 4:14, 8:6, 36:11, 46:7, 85:22, 85:25, 86:2, 155:9

**clicks** [1] - 19:19

**client** [2] - 78:16, 106:18

**clients** [1] - 82:11

**Clifford** [1] - 123:23

**clinic** [3] - 52:2, 52:3

**clinical** [7] - 8:20,

8:23, 8:25, 10:5, 86:15, 86:17, 87:5

**clock** [1] - 64:15

**close** [3] - 21:25, 38:5, 142:3

**closer** [2] - 3:24, 154:10

**clothes** [1] - 40:7

**coat** [1] - 108:17

**cognitive** [10] - 87:2, 88:17, 90:8, 92:24, 109:3, 143:12, 151:1, 151:14, 151:20

**cognitively** [1] - 114:4

**coherent** [1] - 68:25

**collateral** [1] - 91:17

**combination** [4] - 51:25, 104:3, 104:6, 110:7

**comfortable** [1] - 79:12

**coming** [5] - 23:20, 52:9, 52:10, 108:16, 119:25

**commands** [1] - 141:11

**comment** [4] - 93:21, 130:13, 132:9, 132:10

**commented** [3] - 120:3, 142:12, 144:11

**commenting** [1] - 94:18

**comments** [2] - 25:24, 81:18

**common** [7] - 43:10, 55:25, 60:12, 82:14, 93:8, 114:1, 116:5

**commonly** [3] - 77:1, 97:24, 143:7

**communicate** [1] - 45:5

**community** [1] - 138:23

**compare** [4] - 16:13, 21:23, 53:11, 57:16

**compared** [3] - 16:10, 62:12, 65:24

**comparison** [1] - 89:9

**compensation** [1] - 96:14

**competence** [1] - 135:20

**competency** [21] - 26:14, 47:25, 48:12, 48:25, 49:12, 58:10, 58:12, 58:14, 63:16, 63:19, 68:23, 75:15,

78:13, 82:5, 84:21, 87:15, 92:4, 92:20, 96:10, 132:16, 145:17

**Competency** [6] - 48:11, 49:17, 51:18, 71:1, 72:16, 145:21

**COMPETENCY** [1] - 1:8

**competent** [9] - 24:13, 49:8, 54:7, 81:19, 125:20, 140:24, 148:12, 153:8, 153:14

**complain** [1] - 54:15

**complaints** [6] - 23:12, 39:19, 54:17, 144:23, 150:10, 150:17

**complete** [4] - 24:20, 95:19, 127:7, 131:24

**completely** [1] - 143:23

**complex** [1] - 72:12

**complicated** [1] - 64:7

**component** [3] - 68:22, 107:13, 108:11

**components** [4] - 50:20, 72:19, 106:13

**comport** [1] - 80:1

**composure** [1] - 80:17

**comprehend** [1] - 106:3

**comprehended** [1] - 141:21

**comprehension** [1] - 141:11

**comprehensive** [1] - 87:25

**COMPUTER** [1] - 1:25

**computerized** [1] - 52:23

**concentrate** [1] - 77:21

**concentrated** [1] - 94:5

**concentrating** [3] - 90:11, 108:15, 108:24

**concentration** [12] - 87:24, 89:16, 93:7, 94:8, 103:18, 105:25, 107:12, 108:9, 108:10, 108:13, 114:7

**concept** [1] - 21:4

**concern** [10] - 29:4, 55:2, 83:13, 83:14, 131:21, 135:24,

148:11, 149:5, 150:2, 152:18

**concerned** [8] - 43:12, 43:13, 52:16, 69:1, 69:24, 69:25, 76:20, 144:16

**concerns** [5] - 21:6, 80:11, 125:12, 154:21, 155:4

**concise** [1] - 143:17

**conclude** [2] - 60:9, 88:22

**concluded** [3] - 93:19, 143:11, 155:11

**conclusion** [3] - 49:2, 59:3, 92:16

**conclusions** [2] - 47:13, 47:15

**conducted** [5] - 87:17, 141:5, 141:20, 149:1, 149:15

**confabulate** [5] - 72:17, 98:19, 112:10, 122:5, 137:8

**confabulated** [3] - 18:4, 19:7, 112:8

**confabulates** [2] - 33:16, 35:16

**confabulating** [9] - 15:25, 17:23, 71:22, 71:24, 72:21, 72:25, 137:9, 144:11, 144:12

**confabulation** [43] - 15:25, 17:8, 17:23, 17:25, 24:19, 24:25, 27:25, 28:1, 28:7, 55:21, 55:25, 56:5, 56:25, 57:1, 57:2, 57:4, 61:5, 61:11, 61:18, 72:5, 72:12, 72:22, 72:23, 72:24, 96:13, 96:14, 96:19, 97:2, 97:11, 97:18, 98:5, 100:5, 100:7, 112:7, 112:25, 113:11, 121:21, 121:23, 121:25, 122:15, 140:1, 140:7

**conference** [2] - 154:16, 154:25

**confidence** [1] - 119:5

**confirm** [1] - 12:24

**confrontational** [1] - 141:12

**confusion** [1] - 137:14

**connect** [1] - 95:2

**connected** [1] - 16:3

**connection** [14] - 9:6, 9:16, 15:13, 20:1,

35:1, 37:6, 37:13, 42:7, 68:1, 70:25, 75:20, 108:10, 129:3, 129:7

**conscious** [5] - 17:25, 18:1, 99:21, 99:24, 120:20

**consciously** [1] - 17:23

**consequences** [6] - 26:16, 83:2, 92:20, 117:17, 147:2, 151:19

**consider** [2] - 126:10, 128:1

**consideration** [6] - 65:8, 71:19, 80:8, 80:19, 132:14, 133:25

**considerations** [1] - 133:16

**considered** [3] - 54:21, 55:10, 152:14

**consistent** [10] - 60:5, 65:17, 83:25, 84:1, 93:18, 93:21, 109:5, 135:6, 135:8, 147:15

**consistently** [4] - 15:7, 15:12, 149:8, 149:9

**constantly** [1] - 25:6

**contact** [3] - 54:14, 54:15, 62:13

**contacted** [2] - 50:17, 54:13

**containing** [1] - 147:3

**contention** [1] - 146:24

**contents** [1] - 141:9

**contest** [1] - 127:11

**context** [4] - 25:18, 106:15, 113:9, 131:2

**contingencies** [1] - 155:2

**continue** [1] - 17:12

**continued** [1] - 132:10

**continues** [1] - 20:22

**contraindications** [3] - 76:2, 76:12, 77:6

**control** [5] - 20:15, 70:22, 71:12, 112:22, 138:3

**controlled** [1] - 146:9

**controlling** [1] - 71:11

**conversation** [4] - 38:20, 49:15, 74:5, 74:24

**conversations** [2] - 55:1, 81:7

**conversing** [1] - 16:24

**conviction** [1] - 147:2

**coordinate** [1] - 5:20

**copies** [4] - 11:4, 133:19, 134:22, 135:4

**coping** [1] - 41:1

**copy** [7] - 27:22, 98:21, 128:25, 134:23, 134:25, 140:5, 140:6

**correct** [54] - 20:3, 26:17, 26:18, 27:15, 27:21, 28:8, 28:10, 29:21, 43:4, 51:7, 63:4, 63:17, 65:1, 66:10, 67:24, 68:9, 68:13, 69:11, 72:18, 73:1, 74:3, 75:14, 75:18, 85:18, 91:22, 95:15, 98:22, 99:13, 100:3, 100:8, 100:10, 100:16, 101:6, 101:9, 101:16, 101:19, 101:22, 102:1, 107:8, 107:14, 108:13, 116:11, 116:16, 119:11, 120:16, 120:18, 120:22, 121:11, 121:14, 121:24, 122:17, 126:20, 156:7

**correctional** [1] - 51:9

**correctly** [4] - 42:23, 45:7, 57:3, 121:22

**correlation** [1] - 108:10

**cortex** [1] - 13:20

**Counsel** [2] - 5:8, 153:17

**counsel** [16] - 3:10, 24:9, 32:16, 92:22, 93:1, 117:24, 122:18, 125:17, 146:12, 147:13, 151:4, 151:22, 152:23, 153:16, 154:16

**counsel's** [1] - 5:9

**count** [1] - 88:7

**counts** [4] - 51:4, 51:5, 146:8, 146:11

**couple** [8] - 15:23, 93:4, 105:7, 110:2, 137:22, 142:15, 152:17, 154:5

**course** [62] - 9:14, 11:14, 12:19, 17:5, 20:18, 21:7, 22:20,

23:11, 23:13, 23:16, 34:19, 38:2, 40:6, 41:13, 62:13, 66:15, 70:19, 70:23, 71:6, 72:18, 74:17, 78:7, 78:10, 80:1, 88:3, 91:11, 101:16, 103:3, 106:19, 106:24, 108:16, 111:1, 111:22, 114:10, 114:24, 117:12, 123:24, 124:13, 125:14, 126:11, 126:13, 127:12, 127:16, 128:21, 130:7, 131:16, 132:21, 138:6, 142:2, 142:23, 146:13, 147:9, 147:12, 147:25, 148:12, 148:21, 148:23, 149:13, 150:14, 153:2, 154:19

**Court** [74] - 5:16, 5:23, 5:25, 8:18, 10:16, 10:22, 14:12, 18:14, 20:16, 21:5, 24:8, 37:22, 39:17, 48:10, 48:21, 48:22, 49:3, 49:5, 49:11, 50:1, 50:3, 58:9, 59:6, 80:18, 83:14, 86:13, 120:2, 124:4, 126:10, 127:8, 130:18, 131:1, 131:20, 131:24, 132:6, 132:13, 132:16, 133:12, 133:19, 134:2, 134:25, 135:13, 135:22, 136:9, 136:24, 138:23, 139:20, 140:9, 140:11, 140:14, 140:24, 141:3, 143:8, 145:15, 145:21, 146:18, 149:24, 152:5, 152:13, 152:14, 152:16, 152:22, 153:2, 153:7, 153:8, 153:9, 154:3, 154:6, 156:4, 156:5, 156:6, 156:14, 156:15

**court** [17] - 9:17, 54:10, 59:15, 59:17, 70:12, 71:9, 72:19, 73:17, 73:18, 74:13, 79:20, 116:4, 124:24, 127:10,

152:17, 152:19

**COURT** [93] - 1:1, 1:22, 3:4, 3:7, 3:10, 3:14, 3:25, 4:6, 4:15, 5:1, 5:4, 5:8, 6:4, 6:11, 7:1, 7:5, 7:8, 7:17, 8:4, 10:3, 10:7, 10:10, 10:16, 26:9, 26:11, 30:11, 31:6, 32:19, 36:6, 36:9, 42:14, 42:18, 43:21, 45:18, 45:21, 46:1, 46:5, 60:25, 62:21, 80:22, 84:13, 84:22, 85:16, 85:20, 86:1, 99:5, 99:17, 111:12, 118:4, 120:5, 121:17, 123:18, 124:9, 124:14, 124:16, 125:3, 125:6, 125:15, 126:18, 127:1, 127:11, 127:15, 128:10, 128:13, 128:17, 128:22, 129:11, 129:14, 129:17, 129:19, 129:25, 130:12, 130:16, 131:4, 131:10, 131:15, 132:18, 132:23, 133:2, 133:7, 133:24, 134:3, 134:11, 134:18, 134:21, 135:1, 135:11, 135:16, 135:18, 138:25, 141:2, 154:8, 155:7

**Court** [1] - 26:11

**CROSS-EXAMINATION** [8] - 2:7, 2:11, 2:14, 2:18, 26:12, 42:19, 61:2, 99:19

**cross-examination** [18] - 19:12, 69:8, 71:2, 71:4, 100:15, 101:8, 115:21, 122:19, 122:23, 123:9, 124:20, 126:12, 126:16, 136:16, 136:20, 137:14, 140:20, 145:23

**cross-examine** [1] - 66:19

**cross-examined** [1] - 147:20

**crossing** [1] - 116:2

**CRR** [2] - 1:22, 156:13

**CT** [1] - 64:4

**cumulative** [2] - 133:8, 134:2

**current** [3] - 43:8, 142:18, 144:9

**customary** [3] - 60:18, 67:2, 67:4

**cut** [1] - 93:5

**CYNTHIA** [1] - 1:15

### D

**daily** [5] - 20:3, 37:24, 40:14, 40:17, 110:21

**damage** [30] - 12:4, 12:23, 12:24, 13:4, 13:8, 13:10, 13:13, 13:20, 14:20, 17:18,

151:18

**critical** [2] - 52:17, 53:15

**CROSS** [8] - 2:7, 2:11, 2:14, 2:18, 26:12, 42:19, 61:2, 99:19

**cross** [26] - 19:12, 66:19, 69:8, 71:2, 71:4, 85:9, 85:13, 99:17, 100:15, 101:8, 101:10, 101:16, 108:19, 115:21, 122:19, 122:23, 123:9, 124:20, 126:12, 126:16, 136:16, 136:20, 137:14, 140:20, 145:23, 147:20

18:25, 25:2, 33:14, 66:22, 75:2, 75:3, 86:24, 89:21, 94:1, 94:3, 94:4, 94:17, 95:7, 96:14, 96:16, 104:11, 107:1, 107:3, 109:15, 143:7

**damage-related** [3] - 89:21, 96:14, 96:16

**damaged** [6] - 11:20, 13:2, 13:13, 17:2, 82:19, 141:16

**data** [3] - 55:19, 55:20, 114:20

**date** [2] - 34:21, 66:14

**dated** [4] - 7:23, 8:1, 141:5, 149:1

**dates** [2] - 81:2, 125:4

**day-to-day** [1] - 145:11

**days** [18] - 22:23, 40:19, 44:11, 62:3, 62:16, 63:6, 63:13, 88:3, 88:6, 88:9, 114:11, 149:1, 149:7, 153:11, 154:12, 154:17

**deal** [7] - 54:16, 67:10, 71:18, 75:23, 86:24, 87:5, 140:16

**dealing** [5] - 39:13, 56:9, 90:12, 95:23, 123:9

**deals** [2] - 39:15, 86:20

**dealt** [1] - 140:16

**deceive** [1] - 17:24

**decide** [1] - 149:25

**decision** [3] - 49:9, 49:12, 141:8

**decisions** [2] - 138:16, 147:18

**decrease** [1] - 82:17

**deductive** [4] - 25:16, 25:22, 95:13, 143:25

**defend** [3] - 17:5, 53:18, 116:10

**defendant** [46] - 5:9, 6:11, 6:20, 140:12, 141:4, 141:10, 141:14, 141:15, 141:21, 142:2, 142:8, 142:11, 142:13, 143:2, 143:11, 144:7, 144:12, 144:18, 144:19, 145:2, 145:9, 145:10, 145:18, 145:24, 146:13, 148:17,

148:20, 148:23, 149:2, 149:6, 149:15, 149:23, 150:14, 150:21, 151:16, 152:8, 152:16, 153:3, 153:6, 153:8, 153:10, 153:12, 153:14, 154:4, 154:22

**DEFENDANT** [1] - 1:18

**defendant's** [6] - 6:19, 6:23, 45:22, 146:5, 150:2, 152:24

**DEFENDER** [1] - 1:14

**defending** [2] - 53:19, 53:25

**defense** [21] - 7:6, 10:13, 17:21, 24:2, 24:6, 24:12, 24:17, 32:16, 45:24, 45:25, 108:25, 122:18, 125:17, 129:5, 136:14, 139:23, 143:15, 146:11, 147:16, 147:21, 151:22

**defenses** [1] - 146:22

**defer** [2] - 65:5, 65:8

**deficits** [10] - 21:13, 28:6, 37:19, 42:8, 54:24, 65:25, 143:12, 143:16, 148:6, 148:11

**defined** [1] - 144:13

**definite** [1] - 38:7

**definitely** [5] - 22:14, 30:3, 62:14, 65:25, 139:2

**definition** [4] - 58:13, 58:15, 97:1, 144:14

**definitively** [1] - 71:24

**degree** [13] - 37:10, 48:23, 49:4, 58:19, 58:25, 59:2, 66:5, 105:6, 105:15, 110:15, 145:19, 149:24, 150:19

**delay** [2] - 4:3, 132:3

**delayed** [1] - 5:11

**delivered** [1] - 3:19

**demeanor** [2] - 128:20, 147:24

**demented** [1] - 36:2

**dementia** [2] - 56:8, 96:17

**demonstrate** [1] - 93:24

**demonstrated** [3] -

14:8, 141:19, 151:5
**demonstrates** [1] -
151:17
**denied** [1] - 150:6
**dense** [1] - 111:14
**denying** [1] - 69:14
**department** [1] - 39:11
**depended** [1] - 145:4
**deponent** [1] - 124:17
**deposition** [17] -
79:23, 80:16,
126:20, 127:12,
127:16, 128:8,
128:10, 128:21,
128:23, 130:24,
131:17, 132:10,
132:21, 133:4,
148:17, 148:18,
148:21
**depositions** [42] -
52:19, 80:2, 80:4,
80:9, 80:10, 80:12,
81:1, 81:8, 81:9,
81:16, 81:17,
111:23, 123:22,
123:24, 123:25,
124:20, 124:21,
125:3, 125:14,
125:17, 126:14,
126:18, 126:19,
126:21, 126:22,
126:23, 128:4,
128:19, 129:3,
129:12, 130:1,
131:6, 131:25,
132:18, 133:10,
133:16, 133:18,
137:20, 147:8,
147:11, 147:12
**depressed** [1] - 40:25
**depression** [3] -
76:15, 76:19, 87:6
**DEPUTY** [10] - 3:8,
4:11, 4:14, 8:6,
36:11, 46:7, 85:22,
85:25, 86:2, 155:9
**deputy** [1] - 4:8
**describe** [14] - 10:22,
13:6, 14:12, 21:5,
37:9, 37:22, 38:2,
39:17, 64:8, 64:10,
64:16, 128:24, 146:8
**described** [14] - 12:4,
52:7, 53:4, 53:14,
69:13, 69:23, 70:14,
71:15, 82:22, 84:5,
94:14, 136:7, 136:8,
146:1
**describes** [1] - 151:14
**describing** [3] - 3:22,

13:18, 83:4
**Description** [1] - 2:22
**description** [1] - 52:25
**designation** [1] -
135:11
**designed** [1] - 88:1
**detail** [7] - 24:7, 29:9,
53:14, 57:10, 60:15,
143:22, 152:11
**detailed** [2] - 53:1,
76:5
**details** [6] - 34:17,
67:11, 67:20,
141:24, 147:6, 148:8
**determination** [2] -
132:6, 132:16
**determinations** [1] -
58:12
**determinative** [1] -
133:25
**determine** [3] - 10:2,
72:17, 139:18
**detrimental** [4] -
73:21, 78:17,
136:25, 138:22
**develop** [1] - 129:9
**developmental** [1] -
8:21
**devices** [1] - 4:23
**diagnosed** [1] -
150:20
**diagnosis** [1] - 48:20
**differ** [2] - 61:11,
86:19
**difference** [12] - 18:8,
75:1, 75:3, 75:9,
75:10, 97:3, 105:24,
109:9, 143:14,
144:14, 146:20
**differences** [3] -
57:13, 105:4, 105:18
**different** [35] - 9:10,
10:25, 17:7, 17:16,
47:14, 49:18, 50:18,
50:20, 54:3, 54:8,
56:15, 59:12, 59:13,
65:12, 70:16, 70:17,
72:19, 77:25, 79:8,
83:6, 89:7, 92:5,
93:4, 100:15, 101:8,
101:10, 102:13,
104:9, 105:5,
106:24, 111:5,
125:24, 126:5,
142:16, 143:23
**differently** [2] - 31:3,
136:8
**difficult** [2] - 71:10,
110:5
**difficulties** [3] - 20:23,

89:19, 95:23
**difficulty** [12] - 25:14,
35:14, 76:17, 91:13,
94:9, 94:11, 96:2,
103:21, 106:19,
120:12, 141:15,
144:4
**diffuse** [1] - 94:3
**diminishing** [1] -
113:23
**DIRE** [2] - 2:5, 8:14
**direct** [14] - 19:10,
19:13, 58:21, 85:9,
85:13, 95:11, 101:1,
101:10, 101:16,
104:19, 123:9,
126:11, 136:18,
136:21
**DIRECT** [8] - 2:6, 2:10,
2:13, 2:17, 10:20,
36:20, 46:16, 86:10
**direction** [2] - 5:24,
117:8
**director** [2] - 37:8,
144:17
**disability** [1] - 138:21
**disaffirm** [1] - 101:6
**disagree** [1] - 73:25
**discrete** [1] - 124:25
**discuss** [11] - 32:15,
55:8, 60:22, 64:12,
98:9, 98:11, 139:10,
139:15, 145:7,
154:8, 154:15
**discussed** [8] - 5:22,
31:17, 50:20, 53:1,
87:24, 144:10,
147:10, 152:11
**discusses** [2] - 50:16,
152:12
**discussing** [5] - 48:1,
52:18, 53:17, 55:5,
71:13
**discussion** [1] - 96:12
**disin** [1] - 14:7
**disinhibited** [4] - 14:5,
14:6, 31:2, 112:21
**disinhibition** [12] -
14:9, 14:14, 14:19,
68:17, 74:10, 74:11,
74:12, 74:15, 110:9,
110:11, 112:25,
113:11
**disinhibitive** [1] -
110:20
**disinhibitively** [1] -
30:5
**display** [1] - 21:1
**displayed** [1] - 96:2
**dispute** [1] - 133:13

**disputed** [3] - 66:1,
84:16, 149:22
**disputing** [1] - 117:5
**disrupt** [1] - 152:23
**disruptive** [1] - 132:9
**dissimilate** [1] - 18:2
**distinction** [1] - 13:6
**distinguish** [1] -
146:14
**distortions** [1] -
147:16
**distract** [1] - 72:8
**distracted** [4] - 25:4,
108:12, 108:15,
143:19
**distractibility** [1] -
106:12
**distraction** [2] -
106:12, 108:9
**District** [5] - 153:21,
156:5, 156:6, 156:15
**DISTRICT** [3] - 1:1,
1:1, 1:9
**DOCKET** [1] - 1:4
**Doctor** [10] - 10:22,
26:10, 27:22, 57:3,
61:14, 85:16, 99:12,
115:21, 118:8,
121:22
**doctor** [14] - 18:18,
20:12, 32:11, 44:19,
44:21, 46:18, 62:3,
62:5, 62:16, 66:21,
66:23, 67:23, 71:21,
152:2
**doctor's** [2] - 44:20,
44:23
**doctors** [14] - 10:11,
10:14, 10:17, 60:14,
90:17, 100:6, 115:5,
124:1, 127:25,
128:1, 128:2, 128:4,
136:8, 137:2
**doctors'** [1] - 84:21
**documented** [1] -
91:19
**documents** [2] - 82:3,
132:4
**done** [29] - 13:3,
16:12, 16:15, 16:16,
21:16, 25:8, 42:7,
52:10, 53:12, 57:20,
69:8, 79:24, 113:7,
113:19, 114:9,
115:16, 116:20,
117:20, 125:21,
128:5, 128:15,
130:23, 137:17,
137:19, 137:23,
138:18, 142:14,

153:5
**door** [1] - 126:6
**dose** [1] - 55:14
**doubt** [6] - 27:11,
32:7, 32:10, 32:11,
53:10, 140:8
**down** [18] - 10:24,
23:2, 23:21, 36:7,
39:24, 39:25, 41:9,
44:25, 45:21, 57:24,
66:2, 67:3, 70:8,
85:16, 105:9,
123:18, 144:25,
145:12
**doze** [1] - 152:19
**dozed** [1] - 152:17
**DR** [6] - 2:4, 2:12,
2:16, 8:11, 46:12,
86:7
**Dr** [257] - 3:16, 3:17,
5:18, 6:24, 7:6, 7:8,
7:15, 7:16, 7:18, 8:1,
8:2, 8:16, 9:24, 10:2,
10:14, 10:15, 10:17,
10:23, 13:25, 14:9,
15:11, 15:14, 15:17,
15:19, 15:22, 15:24,
16:14, 16:19, 19:3,
19:14, 20:2, 20:21,
21:7, 21:24, 22:12,
22:14, 23:12, 24:1,
25:8, 25:20, 28:2,
30:1, 30:21, 30:22,
31:13, 33:7, 35:8,
35:10, 36:7, 37:14,
37:17, 38:14, 39:5,
39:14, 40:11, 41:15,
41:25, 43:1, 46:4,
46:5, 47:1, 47:2,
47:8, 47:14, 47:21,
48:15, 48:16, 49:15,
54:25, 55:4, 55:21,
56:18, 57:6, 57:13,
57:22, 58:3, 59:10,
59:12, 59:14, 61:4,
61:7, 63:7, 64:19,
65:9, 65:10, 65:12,
66:3, 66:7, 66:16,
68:15, 68:16, 69:17,
69:19, 70:17, 72:6,
72:9, 72:10, 72:11,
72:13, 73:11, 73:22,
73:24, 74:1, 74:7,
74:8, 74:14, 75:11,
75:13, 75:20, 81:21,
81:22, 81:25, 82:4,
82:10, 82:12, 85:21,
86:12, 86:16, 86:19,
86:20, 87:8, 87:9,
87:10, 87:12, 87:13,

87:19, 88:11, 90:2, 92:8, 93:18, 93:19, 94:19, 95:11, 95:12, 96:5, 96:16, 96:21, 97:15, 99:4, 102:5, 102:9, 104:1, 108:22, 109:5, 109:6, 109:23, 110:8, 111:16, 113:6, 114:3, 114:10, 114:22, 115:18, 116:22, 118:11, 118:19, 118:20, 119:4, 119:19, 119:20, 119:21, 119:22, 119:23, 120:8, 120:15, 120:17, 122:21, 123:22, 125:18, 125:19, 129:22, 131:10, 131:12, 132:14, 132:15, 134:4, 134:5, 134:15, 134:24, 135:4, 135:5, 135:7, 135:8, 135:9, 135:21, 136:7, 136:23, 137:4, 137:25, 139:5, 139:12, 139:13, 139:14, 139:16, 139:17, 139:18, 140:2, 140:17, 140:18, 141:4, 141:5, 141:6, 141:9, 141:17, 141:20, 142:1, 142:6, 142:7, 142:10, 142:13, 142:17, 142:24, 143:4, 143:6, 143:11, 143:16, 144:7, 144:10, 144:14, 145:15, 145:16, 145:22, 146:1, 146:3, 146:4, 148:1, 148:14, 148:16, 148:25, 149:18, 150:3, 151:7, 151:15, 154:10
**drink** [1] - 56:2
**drive** [2] - 153:23, 153:24
**driver** [1] - 3:21
**drugs** [1] - 77:25
**due** [3] - 39:11, 60:1, 60:3
**duly** [4] - 8:12, 36:17, 46:13, 86:8

**dump** [1] - 22:5
**during** [72] - 4:9, 19:13, 21:10, 23:11, 23:16, 25:16, 41:13, 41:25, 52:5, 55:1, 56:18, 56:20, 59:17, 59:20, 59:21, 66:15, 70:19, 70:22, 71:5, 71:6, 72:15, 72:18, 74:17, 78:7, 78:9, 79:5, 80:1, 81:9, 97:5, 101:16, 106:19, 108:1, 108:16, 111:1, 111:17, 111:22, 112:9, 114:24, 116:14, 119:13, 119:15, 121:21, 121:25, 123:24, 124:12, 125:13, 126:10, 126:12, 126:15, 126:22, 127:12, 127:16, 128:20, 128:22, 130:7, 131:6, 131:11, 131:16, 132:21, 137:14, 138:6, 140:10, 142:2, 147:12, 147:24, 147:25, 148:23, 149:8, 149:13, 150:13, 153:2, 154:19
**Dusky** [9] - 50:2, 54:9, 58:7, 58:8, 58:16, 59:3, 59:5, 66:8, 152:7
**dysfunction** [3] - 63:23, 87:5, 144:9

# E

**earliest** [1] - 89:10
**early** [3] - 24:22, 91:12, 93:25
**ears** [1] - 155:3
**easily** [6] - 25:4, 31:15, 108:12, 143:19, 143:22, 144:5
**EASTERN** [1] - 1:1
**Eastern** [2] - 153:21, 156:6
**easy** [3] - 18:4, 64:6, 72:4
**eat** [1] - 38:6
**edge** [1] - 109:18
**educated** [1] - 16:25
**education** [3] - 37:9, 46:25, 65:23

**effect** [4] - 71:2, 72:24, 76:16, 137:11
**effectively** [7] - 34:15, 68:18, 107:23, 114:6, 129:8, 136:15, 139:22
**effects** [6] - 76:1, 76:12, 76:14, 78:5, 79:1, 89:21
**Effexor** [3] - 76:8, 76:14, 77:5
**efficient** [1] - 5:5
**effort** [16] - 16:9, 18:1, 21:12, 21:22, 22:1, 29:16, 29:18, 29:20, 30:25, 70:4, 94:23, 105:12, 142:14, 143:3, 148:6, 151:12
**efforts** [1] - 42:8
**eight** [1] - 53:4
**either** [9] - 4:23, 12:14, 35:9, 54:15, 101:6, 103:9, 119:23, 133:19, 143:19
**Elavil** [2] - 76:23, 77:5
**element** [1] - 116:3
**elements** [4] - 92:20, 102:4, 108:16, 116:5
**elevated** [2] - 150:8, 150:16
**emotion** [1] - 23:24
**emotional** [16] - 14:3, 20:20, 25:12, 71:10, 71:12, 87:3, 109:19, 110:3, 110:5, 111:17, 113:16, 118:8, 118:9, 118:12, 143:13, 150:18
**emotions** [5] - 70:23, 71:11, 71:17, 109:20, 149:13
**emphasized** [1] - 150:6
**employ** [1] - 152:24
**employed** [1] - 36:24
**en** [1] - 3:17
**encoding** [1] - 103:7
**encompassing** [1] - 111:14
**encountered** [1] - 147:12
**end** [3] - 21:16, 49:1, 155:1
**ended** [2] - 49:19, 126:23
**energy** [1] - 107:1
**engage** [1] - 121:8
**engaged** [2] - 106:10,

106:11
**ENGELHARDT** [1] - 1:9
**ensure** [2] - 114:6, 114:24
**entire** [1] - 84:20
**entitled** [1] - 156:9
**entries** [1] - 32:24
**environment** [3] - 37:25, 144:22, 144:23
**episode** [1] - 33:15
**episodes** [3] - 18:16, 21:20, 41:3
**episodic** [6] - 12:14, 18:14, 18:15, 18:21, 19:1, 34:12
**episodically** [1] - 29:25
**error** [1] - 61:12
**errors** [2] - 114:24, 115:10
**especially** [1] - 66:23
**ESQUIRE** [3] - 1:14, 1:15, 1:18
**essence** [1] - 75:6
**essentially** [3] - 90:8, 114:21, 115:14
**established** [1] - 18:25
**eval** [1] - 115:7
**evaluate** [5] - 47:2, 79:16, 79:18, 120:2, 146:18
**evaluated** [13] - 49:7, 64:10, 75:8, 79:20, 79:21, 79:22, 84:4, 87:1, 87:8, 87:9, 117:22, 125:13, 149:7
**evaluating** [10] - 10:2, 12:23, 25:13, 52:11, 52:24, 64:22, 71:20, 79:4, 112:3, 112:4
**evaluation** [41] - 9:24, 10:23, 11:16, 13:25, 15:22, 20:1, 26:22, 20:24, 47:1, 47:4, 47:24, 48:11, 48:25, 58:23, 59:20, 59:21, 60:5, 60:19, 66:15, 69:25, 71:7, 72:15, 73:20, 74:17, 74:21, 75:20, 79:6, 82:10, 87:11, 87:16, 87:17, 94:21, 97:5, 100:10, 100:20, 105:1, 105:10, 141:19, 142:3, 150:14
**evaluations** [5] - 35:9,

47:12, 52:9, 52:10, 73:7
**evaluators** [3] - 21:3, 58:14, 65:18
**event** [8] - 16:3, 28:17, 34:22, 35:4, 56:14, 66:14, 111:17, 113:15
**events** [16] - 24:22, 24:25, 32:24, 34:10, 53:5, 53:15, 55:18, 66:12, 70:18, 104:23, 120:25, 122:4, 127:11, 127:14, 138:10, 139:4
**evidence** [13] - 7:3, 7:11, 7:22, 8:5, 25:19, 59:19, 61:17, 102:6, 128:18, 134:14, 139:23, 141:8, 152:15
**evolved** [1] - 58:12
**evolving** [1] - 136:1
**exact** [4] - 9:20, 53:15, 81:2, 112:17
**exactly** [10] - 28:18, 29:12, 29:14, 32:3, 33:18, 34:25, 67:3, 104:20, 120:13, 127:3
**exaggerated** [4] - 92:9, 92:11, 92:12, 151:14
**exaggerating** [1] - 92:7
**exaggeration** [3] - 150:3, 150:10, 150:18
**exam** [8] - 19:13, 48:15, 48:16, 48:17, 114:23, 142:11, 149:14
**EXAMINATION** [34] - 2:5, 2:6, 2:7, 2:8, 2:10, 2:11, 2:13, 2:14, 2:15, 2:17, 2:18, 2:19, 8:14, 10:20, 26:12, 30:14, 31:10, 32:20, 36:20, 42:19, 43:23, 46:16, 58:5, 61:2, 63:1, 80:24, 85:4, 86:10, 99:6, 99:19, 111:20, 118:6, 120:6, 121:19
**examination** [39] - 7:15, 19:10, 19:12, 32:11, 48:14, 56:18, 56:20, 57:2, 57:7, 57:12, 60:9, 66:15,

69:8, 71:2, 71:4, 71:5, 84:7, 84:23, 87:14, 100:15, 101:1, 101:8, 115:21, 120:8, 122:19, 122:23, 123:9, 124:20, 126:12, 126:16, 136:16, 136:20, 137:14, 140:20, 141:5, 145:23, 148:4, 151:15, 152:1
**examinations** [3] - 122:21, 125:20, 126:4
**Examinations** [1] - 2:3
**examine** [2] - 66:19, 130:13
**examined** [9] - 8:13, 36:18, 46:14, 86:9, 88:19, 90:2, 125:19, 131:12, 147:20
**examiner** [1] - 149:11
**examining** [1] - 147:14
**example** [47] - 13:18, 14:18, 14:19, 14:25, 15:3, 18:18, 19:9, 20:7, 20:15, 21:11, 22:16, 22:20, 25:9, 25:10, 25:17, 32:24, 33:6, 33:9, 34:3, 34:20, 38:18, 42:1, 42:5, 44:15, 66:13, 72:1, 72:5, 74:4, 74:5, 74:14, 74:15, 74:23, 80:1, 80:13, 89:16, 93:16, 96:17, 97:8, 98:16, 103:12, 104:15, 104:16, 112:2, 116:18, 117:6, 117:14, 121:9
**examples** [2] - 14:14, 72:12
**excellent** [3] - 57:23, 139:9, 147:5
**except** [1] - 16:15
**excess** [1] - 9:21
**executive** [11] - 12:10, 13:7, 68:16, 100:20, 102:3, 102:4, 102:6, 116:9, 122:20, 122:22
**exhibit** [2] - 133:20, 135:6
**Exhibit** [8] - 2:23, 2:24, 2:25, 134:4, 134:5, 135:7, 135:9
**Exhibits** [1] - 134:14
**exists** [1] - 6:18

**expanded** [1] - 48:16
**expect** [6] - 63:13, 89:5, 89:13, 89:22, 90:1, 122:15
**expectation** [1] - 78:18
**expected** [3] - 20:24, 54:23, 141:23
**expecting** [1] - 51:14
**experience** [20] - 8:19, 22:6, 37:9, 55:1, 55:25, 57:3, 59:12, 61:18, 61:22, 64:9, 67:23, 68:3, 78:12, 81:15, 97:15, 100:16, 109:20, 118:15, 121:5, 131:11
**experiences** [2] - 9:23, 39:13
**expert** [13] - 9:17, 10:4, 31:4, 46:23, 84:22, 85:1, 86:23, 119:2, 134:3, 141:4, 145:14, 152:15, 153:7
**expert's** [1] - 31:8
**expertise** [4] - 8:19, 10:11, 86:12, 119:6
**experts** [6] - 10:18, 85:2, 105:19, 125:18, 133:13, 149:23
**explain** [4] - 18:14, 44:21, 67:2, 105:3
**explained** [2] - 71:14, 147:19
**explaining** [3] - 8:18, 116:18, 137:13
**explanation** [1] - 51:16
**explicative** [1] - 130:20
**explicatives** [2] - 111:6, 118:14
**explicitly** [1] - 86:25
**explodes** [1] - 40:25
**expressed** [2] - 21:3, 149:6
**extent** [7] - 12:23, 13:3, 28:23, 70:23, 73:9, 127:21, 149:25
**external** [1] - 143:19
**extract** [1] - 151:6
**extraneous** [1] - 22:24
**extremely** [2] - 65:20, 117:2

# F

**face** [4] - 51:3, 56:9, 71:3, 106:12
**face-saving** [1] - 56:9
**faces** [1] - 18:20
**facility** [22] - 3:20, 37:1, 37:2, 37:4, 37:6, 37:11, 37:17, 37:23, 38:3, 38:5, 39:2, 40:5, 40:12, 41:22, 42:1, 42:9, 79:21, 87:21, 125:10, 125:11, 137:21, 144:18
**fact** [30] - 11:14, 17:3, 21:17, 24:19, 25:7, 28:6, 35:16, 35:25, 50:24, 71:14, 73:12, 78:21, 80:3, 90:2, 113:14, 127:2, 128:24, 130:23, 131:5, 131:12, 133:11, 137:10, 138:14, 139:4, 140:23, 142:7, 146:13, 149:23, 154:9
**factor** [2] - 32:9, 36:3
**factoring** [1] - 142:20
**factors** [1] - 152:9
**facts** [7] - 91:19, 133:12, 136:13, 147:3, 147:5, 147:7, 147:9
**factual** [3] - 58:20, 98:17, 145:20
**factually** [2] - 66:9, 66:17
**faculties** [6] - 68:8, 87:23, 88:1, 90:10, 90:13, 116:9
**faculty** [2] - 94:15, 95:19
**fail** [2] - 29:21, 92:13
**failed** [1] - 30:16
**fair** [7] - 65:6, 73:6, 84:25, 100:22, 112:18, 113:13, 113:24, 116:24, 136:25, 137:1, 138:22
**fairly** [7] - 11:15, 57:11, 63:16, 64:18, 96:4, 103:15, 113:8
**fake** [4] - 27:6, 142:3, 142:8, 148:6
**Fake** [1] - 150:8
**faking** [1] - 29:20

**fall** [1] - 119:13
**falling** [1] - 79:5
**falls** [1] - 115:11
**familiar** [6] - 19:8, 38:14, 55:22, 79:10, 144:19, 152:6
**family** [2] - 48:8, 91:12
**far** [6] - 91:6, 91:9, 91:20, 94:19, 109:14, 117:15
**fast** [1] - 49:1
**fatigue** [15] - 22:20, 22:22, 88:10, 88:14, 113:18, 113:19, 114:1, 118:22, 126:24, 128:5, 133:15, 140:14
**fatigued** [1] - 88:6
**FBS** [1] - 150:8
**FEDERAL** [2] - 1:14, 1:15
**feelings** [2] - 109:19, 109:21
**felt** [13] - 16:12, 21:10, 21:16, 21:21, 24:10, 24:11, 24:15, 49:5, 49:10, 52:9, 59:16, 148:9
**few** [3] - 4:1, 68:24, 142:22
**fewer** [1] - 154:4
**field** [1] - 10:4
**fields** [1] - 10:18
**fifth** [2] - 142:19, 143:25
**Fifth** [2] - 6:17, 108:2
**file** [3] - 64:6, 74:22, 140:4, 140:6
**filed** [1] - 6:12
**files** [1] - 140:5
**fill** [7] - 56:6, 72:10, 96:20, 96:24, 97:3, 113:17, 122:6
**filled** [1] - 96:25
**filling** [4] - 56:13, 56:16, 72:21, 112:16
**fills** [1] - 96:23
**filters** [3] - 110:12, 110:13, 110:14
**final** [1] - 54:4
**finally** [4] - 23:24, 25:24, 83:12, 99:12
**findings** [4] - 64:4, 64:5, 142:16, 149:22
**fine** [5] - 4:1, 58:4, 91:2, 128:8, 135:1
**finish** [1] - 85:21, 111:12
**first** [21] - 6:6, 6:8, 7:2, 8:12, 16:6, 24:11,

36:17, 46:13, 66:20, 86:8, 87:18, 88:14, 90:20, 95:17, 105:10, 124:10, 124:11, 124:19, 128:6, 133:18, 143:17
**fit** [1] - 97:3
**five** [13] - 4:7, 15:1, 67:13, 85:20, 113:21, 113:24, 114:15, 121:16, 125:24, 126:5, 139:4, 139:7, 139:8
**five-minute** [2] - 15:1, 85:20
**five-minutes** [1] - 4:7
**flares** [1] - 20:24
**flat** [2] - 22:9, 149:12
**fly** [2] - 56:4, 69:8
**focus** [10] - 9:12, 10:1, 17:22, 23:10, 24:8, 40:10, 72:17, 90:20, 107:13, 107:16
**focused** [7] - 9:7, 13:22, 107:4, 108:24, 116:17, 122:18, 135:20
**folks** [1] - 96:15
**follow** [4] - 25:18, 48:12, 63:3, 68:19
**follow-up** [1] - 48:12
**followed** [1] - 53:13
**following** [2] - 142:11, 143:8
**follows** [4] - 8:13, 36:18, 46:14, 86:9
**FOR** [2] - 1:14, 1:18
**foregoing** [1] - 156:7
**forensic** [3] - 46:19, 86:22, 86:23
**forget** [1] - 144:3
**forgets** [1] - 143:20
**forming** [1] - 82:20
**forms** [1] - 122:12
**forth** [3] - 152:6, 152:9, 153:15
**forward** [10] - 5:18, 6:21, 18:3, 22:24, 34:8, 46:5, 73:6, 101:15, 108:16, 132:6
**forwarding** [1] - 49:1
**four** [6] - 37:10, 55:13, 77:18, 133:8, 140:15, 143:13
**four-week** [1] - 140:15
**four-year** [1] - 37:10
**fourth** [1] - 143:24
**frame** [1] - 129:14

**frankly** [1] - 46:24
**frequent** [6] - 83:18, 119:10, 119:11, 127:15, 131:6, 132:20
**frequently** [1] - 26:2
**friendly** [1] - 149:11
**front** [7] - 3:18, 17:6, 27:24, 92:1, 98:18, 98:20, 140:4
**frontal** [14] - 11:19, 12:4, 12:5, 12:6, 12:13, 13:8, 13:13, 13:20, 14:5, 18:24, 20:18, 25:2, 144:9
**frontotemporal** [1] - 11:20
**frustrated** [1] - 110:24
**fulfill** [1] - 77:21
**Full** [1] - 142:20
**full** [11] - 21:21, 29:15, 29:18, 29:20, 94:23, 96:22, 116:8, 142:14, 143:3, 149:17, 149:21
**full-scale** [2] - 149:17, 149:21
**fully** [2] - 90:9, 141:21
**function** [23] - 13:7, 50:8, 69:23, 72:16, 81:9, 88:2, 100:20, 102:3, 102:4, 102:7, 104:9, 104:19, 105:1, 105:15, 109:4, 109:5, 109:7, 116:10, 122:22, 136:3, 138:2, 143:13
**functional** [2] - 22:17, 22:18
**functionally** [1] - 13:4
**functioning** [18] - 48:17, 49:6, 59:18, 63:16, 63:18, 63:20, 65:22, 65:24, 68:7, 73:11, 88:18, 89:16, 103:15, 104:22, 122:20, 149:20, 149:21
**functions** [10] - 50:14, 64:8, 68:17, 104:20, 116:23, 132:12, 132:15, 135:23, 151:1, 151:21
**fund** [1] - 137:10
**funny** [1] - 59:23
**furthermore** [1] - 127:21
**future** [2] - 70:18, 154:16
**fuzzy** [1] - 76:16

# G

**gain** [1] - 150:7
**gaps** [2] - 56:6, 112:16
**gathered** [1] - 105:22
**gauge** [1] - 22:19
**general** [8] - 23:8, 24:10, 55:7, 140:10, 146:17
**generalize** [1] - 120:25
**generally** [3] - 16:9, 23:7, 102:18
**genius** [1] - 13:9
**George** [2] - 3:15, 4:15
**GEORGE** [1] - 1:14
**Georgia** [12] - 48:10, 49:17, 49:24, 50:11, 51:18, 53:3, 54:2, 54:5, 54:18, 70:25, 72:16, 145:21
**germane** [2] - 124:25, 126:7
**given** [23] - 19:12, 24:15, 28:12, 38:16, 39:1, 49:6, 63:13, 69:4, 69:13, 83:16, 108:22, 113:7, 121:1, 121:2, 121:3, 132:11, 142:14, 144:14, 147:8, 151:25, 153:7, 154:1
**go-between** [1] - 45:3
**God** [4] - 8:9, 36:14, 46:10, 86:5
**government** [17] - 6:7, 6:18, 6:23, 7:14, 10:12, 46:2, 46:3, 100:12, 123:20, 124:3, 131:5, 133:20, 135:6, 135:14, 135:20, 135:22, 138:11
**Government** [1] - 135:9
**government's** [3] - 7:2, 139:5, 152:11
**grade** [6] - 28:12, 28:18, 34:1, 34:2, 34:6, 34:8
**graduated** [1] - 51:25
**graph** [3] - 95:24, 95:25
**graphically** [1] - 96:2
**great** [2] - 4:9, 57:10
**greater** [4] - 96:2, 111:8, 111:17, 130:19

**greatly** [1] - 21:15
**grounds** [1] - 31:6
**group** [2] - 57:22
**guess** [8] - 21:17, 35:3, 76:5, 97:20, 106:4, 117:23, 133:6, 142:12
**guidelines** [1] - 153:15
**guilty** [4] - 146:10, 146:14
**guys** [1] - 44:2

# H

**hair** [1] - 40:9
**HALE** [1] - 1:15
**Haley** [1] - 150:8
**half** [1] - 15:2
**hand** [6] - 8:7, 36:12, 46:8, 54:6, 86:3, 151:3
**handle** [3] - 67:10, 70:9, 70:12
**handling** [1] - 79:8
**hands** [1] - 42:5
**hard** [2] - 72:11, 120:25
**harmed** [1] - 13:4
**head** [8] - 11:15, 25:5, 43:19, 44:25, 52:17, 63:14, 83:19, 126:17
**headaches** [2] - 76:25, 77:2
**hear** [7] - 54:14, 63:6, 65:14, 85:3, 108:7, 124:10, 127:3
**heard** [24] - 47:14, 61:25, 65:9, 73:21, 73:24, 75:6, 81:24, 82:2, 82:20, 83:6, 87:23, 96:9, 99:8, 99:13, 109:22, 110:8, 110:21, 131:3, 133:8, 133:18, 141:3, 148:14, 153:7, 154:18
**HEARD** [1] - 1:9
**hearing** [8] - 84:21, 124:11, 126:2, 127:2, 128:7, 138:22, 152:24, 154:9
**HEARING** [1] - 1:8
**hearings** [1] - 6:1
**heighten** [1] - 77:6
**held** [2] - 143:7, 153:22

**help** [17] - 8:9, 12:23, 17:5, 23:4, 27:22, 36:14, 37:22, 42:9, 46:10, 77:2, 78:23, 86:5, 92:23, 93:2, 100:2, 108:8, 115:23
**helped** [3] - 22:24, 40:1, 40:2
**helpful** [5] - 68:12, 130:16, 130:18, 130:25, 131:17
**helping** [2] - 20:19, 93:16
**helps** [2] - 76:21, 77:3
**hemiparesis** [3] - 11:21, 11:23, 93:25
**hemisphere** [2] - 94:17, 95:6
**hereby** [1] - 156:6
**herself** [12] - 17:5, 40:5, 53:25, 55:11, 55:20, 67:11, 70:12, 80:1, 80:17, 81:12, 108:25, 146:16
**hesitation** [1] - 131:9
**Hi** [1] - 72:6
**high** [7] - 22:17, 65:22, 89:23, 103:15, 150:19, 151:2, 151:8
**higher** [2] - 55:14, 151:1
**highlighting** [1] - 141:7
**Highway** [1] - 153:22
**hired** [3] - 30:6, 30:8, 52:4
**historical** [2] - 34:12, 50:1
**histories** [1] - 52:12
**history** [22] - 29:3, 29:8, 34:17, 34:18, 35:12, 48:8, 49:6, 63:14, 83:3, 83:16, 87:12, 90:25, 91:3, 91:4, 91:5, 91:7, 91:13, 113:14, 145:24
**hold** [3] - 8:20, 130:12, 137:12
**home** [7] - 10:24, 23:14, 27:16, 38:5, 38:6, 47:5, 47:18
**honest** [3] - 22:1, 30:4, 30:5
**Honor** [64] - 3:12, 3:15, 3:18, 4:5, 5:7, 5:16, 6:7, 6:9, 6:25, 7:7, 7:12, 7:25, 26:6, 26:8, 30:10, 31:9,

32:18, 36:5, 42:13, 42:17, 45:20, 45:24, 46:3, 58:1, 60:24, 61:1, 62:18, 62:24, 80:21, 84:11, 99:3, 118:3, 120:3, 121:15, 123:21, 124:18, 124:23, 125:5, 125:16, 126:9, 127:5, 127:20, 127:23, 128:16, 129:2, 129:18, 130:4, 130:18, 131:22, 134:8, 134:15, 134:23, 135:4, 135:15, 135:19, 135:25, 136:22, 137:16, 138:9, 139:2, 140:23, 153:18, 155:6, 155:8
**HONORABLE** [1] - 1:9
**hope** [4] - 4:8, 78:18, 78:19, 154:2
**Hospital** [1] - 47:9
**hospitalization** [1] - 47:9
**hostility** [1] - 41:2
**hour** [5] - 15:2, 90:23, 115:20, 153:24
**hours** [10] - 23:2, 55:13, 77:18, 113:21, 113:24, 113:25, 137:4, 137:22, 137:23
**house** [1] - 91:17
**housekeeping** [1] - 40:7
**hundred** [1] - 54:19
**hurting** [1] - 25:10
**Hydrocodone** [1] - 77:17
**hypothetical** [1] - 82:7

# I

**idea** [6] - 35:8, 47:10, 48:17, 50:5, 55:19, 59:16
**identified** [4] - 59:25, 64:4, 143:16
**identify** [3] - 50:7, 63:25, 150:10
**Ill** [2] - 1:18, 149:16
**imaging** [1] - 12:25
**imbecile** [1] - 13:10
**immediately** [1] - 71:9
**impact** [38] - 5:19, 11:19, 12:1, 13:10,

13:14, 13:15, 14:4, 14:21, 16:22, 19:14, 19:18, 20:6, 22:19, 23:3, 23:6, 23:25, 25:13, 26:1, 34:2, 34:6, 39:14, 75:17, 76:2, 87:14, 92:24, 97:20, 107:1, 107:3, 107:4, 108:17, 108:21, 109:1, 109:16, 115:11, 121:4, 137:7, 138:17
**impacted** [5] - 11:17, 13:20, 14:24, 19:3, 73:25
**impacting** [1] - 118:1
**impacts** [3] - 69:22, 73:23, 107:10
**impaired** [13] - 94:15, 104:10, 115:12, 142:25, 143:1, 143:18, 149:20, 150:22, 150:23, 150:25, 151:10, 151:11
**impairment** [30] - 13:25, 14:2, 14:3, 25:19, 25:21, 25:22, 69:13, 69:15, 69:17, 69:19, 69:21, 69:22, 73:22, 88:15, 89:18, 92:17, 93:10, 96:15, 105:17, 116:21, 116:22, 117:21, 136:8, 136:23, 137:16, 138:20, 149:24, 149:25, 150:1, 151:14
**impairments** [27] - 5:19, 86:21, 86:22, 89:6, 89:15, 89:17, 89:23, 89:25, 90:4, 90:15, 92:6, 92:7, 92:24, 95:5, 95:6, 96:16, 108:22, 110:17, 110:18, 110:19, 113:7, 113:15, 117:3, 117:5, 151:20
**impairs** [1] - 66:3
**impediment** [2] - 108:3, 154:1
**implication** [1] - 109:11
**implies** [1] - 94:1
**imply** [1] - 90:9
**import** [1] - 130:25
**importance** [4] - 12:5, 14:7, 26:22, 141:19
**important** [13] - 15:24,

25:3, 28:11, 28:21, 28:23, 51:8, 70:7, 82:22, 89:8, 108:16, 108:18, 119:1, 141:7
**impression** [1] - 143:2
**improve** [1] - 42:10
**improved** [4] - 4:20, 16:18, 129:23, 130:22
**improvement** [4] - 42:1, 65:13, 65:19
**improvements** [1] - 42:4
**inability** [7] - 34:9, 60:6, 68:16, 119:17, 119:20, 120:9, 136:25
**inappropriate** [11] - 12:8, 14:18, 20:19, 20:20, 25:15, 55:10, 80:13, 132:20, 142:5, 144:4, 146:8
**inappropriately** [4] - 59:19, 142:2, 147:25, 148:2
**incapable** [2] - 69:7, 82:20
**incentive** [1] - 150:15
**incident** [2] - 41:7, 41:12
**incidents** [4] - 28:14, 43:25, 109:23
**inclined** [1] - 5:25
**include** [2] - 134:8, 137:3
**including** [11] - 20:5, 86:21, 108:22, 114:3, 122:12, 137:8, 150:23, 151:19, 153:10
**inclusive** [1] - 141:9
**incompetent** [13] - 30:17, 83:10, 88:11, 98:25, 125:21, 125:23, 125:25, 126:5, 126:10, 131:3, 132:17, 138:24, 140:17
**inconsistent** [1] - 16:9
**inconsistently** [2] - 35:17, 149:9
**incorporate** [2] - 70:8, 70:10
**incorrect** [1] - 96:24
**incorrectly** [2] - 6:15, 113:17
**increase** [2] - 77:6, 77:25
**indeed** [1] - 128:2
**independent** [2] -

60:16, 67:17
**indicate** [4] - 17:4, 31:6, 81:18, 83:13
**indicated** [4] - 14:14, 32:25, 82:10, 149:2
**indicates** [1] - 149:16
**indication** [1] - 33:5
**indications** [1] - 105:21
**individual** [9] - 18:1, 19:9, 25:17, 34:18, 34:21, 38:10, 58:12, 120:19, 120:21
**individually** [1] - 66:24
**individuals** [3] - 71:8, 78:8, 83:1
**indulgences** [1] - 153:6
**inference** [1] - 123:11
**inform** [2] - 117:23, 147:16
**information** [53] - 18:3, 18:19, 19:6, 19:12, 19:19, 25:2, 25:25, 28:24, 29:2, 33:13, 34:9, 34:21, 55:6, 56:6, 56:16, 56:17, 62:22, 64:22, 68:4, 68:12, 69:10, 70:5, 73:5, 73:8, 73:9, 73:10, 74:7, 83:7, 84:16, 90:12, 91:12, 91:14, 91:19, 94:20, 98:1, 98:2, 98:3, 101:15, 101:18, 103:8, 105:22, 105:23, 112:7, 134:9, 134:10, 136:2, 137:10, 142:25, 144:1, 147:4, 154:4
**inhibit** [3] - 12:7, 14:3, 20:19
**inhibited** [2] - 14:5, 112:21
**inhibiting** [3] - 21:1, 25:15, 144:4
**initial** [1] - 138:15
**initiate** [2] - 12:8, 138:12
**initiated** [2] - 137:25, 138:13
**injuries** [11] - 5:19, 11:5, 20:14, 34:13, 87:1, 88:23, 88:24, 102:5, 112:20, 138:7, 150:20
**injury** [65] - 11:13, 11:15, 11:18, 12:1,

16:20, 18:13, 18:23, 18:24, 19:14, 20:22, 24:16, 28:12, 47:11, 47:17, 47:18, 52:17, 63:14, 66:22, 69:14, 69:17, 69:19, 69:20, 75:13, 82:14, 83:19, 87:2, 87:13, 87:15, 88:25, 89:1, 89:11, 89:12, 89:14, 89:22, 90:5, 93:9, 93:13, 93:14, 94:2, 94:6, 95:19, 104:3, 104:5, 104:8, 105:20, 109:13, 109:25, 110:4, 110:6, 110:12, 110:13, 111:4, 112:14, 113:23, 114:1, 114:2, 122:13, 136:7, 137:6, 137:7, 138:14, 138:17, 140:12, 150:7
**injury-related** [1] - 150:7
**insanity** [1] - 146:15
**inside** [1] - 23:10
**insignificant** [1] - 115:13
**insofar** [1] - 144:16
**instance** [1] - 145:9
**instances** [2] - 23:17, 136:15
**instead** [2] - 53:21, 72:2
**instituted** [1] - 34:5
**instruct** [1] - 140:9
**instruction** [3] - 137:24, 140:10, 140:12
**instructional** [1] - 150:25
**instructions** [1] - 137:6
**instrument** [2] - 52:24, 145:17
**integrating** [1] - 25:25
**intellectually** [1] - 73:13
**intelligence** [12] - 13:5, 13:8, 13:11, 13:14, 13:16, 13:17, 73:14, 73:16, 73:19, 93:14, 94:22, 102:23
**intention** [1] - 6:25
**intentional** [1] - 150:13
**intentionally** [3] - 92:12, 92:13, 92:14
**interact** [2] - 37:14,

93:1
**interacted** [1] - 149:11
**interaction** [8] - 41:14, 62:7, 103:25, 115:18
**interactions** [3] - 14:10, 62:11, 77:24
**interactively** [1] - 115:19
**interacts** [1] - 144:20
**interest** [6] - 27:2, 27:3, 27:5, 92:3, 140:19, 144:6
**interesting** [2] - 16:10, 24:3
**internal** [2] - 51:25, 143:19
**internship** [1] - 8:24
**interpret** [2] - 103:3, 114:20
**interpretation** [3] - 65:7, 105:24, 109:9
**interpreted** [1] - 137:14
**intervals** [2] - 39:2, 39:8
**interview** [4] - 90:20, 147:24, 148:1, 149:6
**interviewed** [1] - 87:20
**investigation** [2] - 138:15, 154:14
**investigator** [2] - 3:18, 4:24
**involve** [4] - 116:25, 152:1, 152:4, 153:6
**involved** [11] - 5:13, 9:4, 9:5, 18:21, 86:25, 90:10, 122:3, 136:17, 141:25, 146:10, 151:1
**involves** [8] - 48:1, 57:4, 73:18, 73:19, 73:20, 87:18, 107:13, 121:23
**involving** [1] - 103:14
**IQ** [10] - 12:11, 22:15, 142:15, 142:19, 142:20, 149:16, 149:17, 150:24, 151:4
**ironically** [1] - 6:13
**irrational** [2] - 70:11, 147:23
**irrelevant** [2] - 125:1, 143:22
**irritability** [1] - 76:19
**irritable** [2] - 76:20, 148:1
**issue** [40] - 6:12, 6:19, 15:20, 17:8, 17:22,

22:2, 23:24, 24:20, 27:20, 35:5, 35:23, 38:25, 63:3, 64:19, 66:17, 67:10, 71:18, 78:5, 78:11, 100:5, 102:9, 102:22, 105:25, 106:15, 107:12, 108:13, 112:7, 116:17, 123:21, 123:22, 124:3, 127:25, 135:20, 135:24, 140:1, 140:7, 140:22, 149:24, 153:22

**issues** [33] - 4:19, 15:3, 24:18, 36:1, 39:14, 40:10, 40:21, 48:1, 48:3, 48:5, 52:6, 52:19, 55:9, 59:16, 59:23, 66:19, 78:1, 95:10, 102:16, 108:23, 109:15, 113:18, 124:4, 126:11, 126:15, 126:24, 127:21, 129:4, 136:13, 137:23, 154:4

**items** [7] - 101:6, 101:21, 102:11, 102:15, 109:10, 154:6

**itself** [4] - 54:5, 82:18, 88:14, 146:18

### J

**Jackie** [2] - 39:24, 45:4
**Jacqueline** [7] - 3:9, 3:16, 9:24, 30:2, 37:15, 43:1, 52:2
**JACQUELINE** [1] - 1:6
**jail** [3] - 48:7, 64:15
**January** [2] - 8:3, 149:2
**job** [8] - 5:11, 21:17, 50:14, 50:16, 50:17, 53:20, 57:23
**Joe** [1] - 82:8
**JOHN** [2] - 2:12, 46:12
**John** [2] - 15:17, 46:4
**joked** [1] - 59:24
**Jones** [1] - 66:14
**JOSEPH** [2] - 2:16, 86:7
**journey** [1] - 152:22
**JR** [2] - 1:14, 46:12
**JR.............................**

[1] - 2:12
**judge** [11] - 49:9, 49:13, 50:4, 50:8, 50:13, 50:14, 64:12, 64:13, 135:23, 146:12, 146:21
**JUDGE** [1] - 1:9
**judge's** [1] - 50:14
**judicial** [3] - 26:16, 127:8, 141:22
**jurisprudence** [3] - 6:13, 6:16, 6:17
**jurisprudential** [1] - 153:15
**jury** [13] - 112:3, 112:13, 112:19, 112:20, 117:22, 117:23, 137:6, 137:12, 137:13, 137:25, 140:9, 146:12, 146:21

### K

**keep** [5] - 34:9, 88:6, 107:22, 116:13, 126:17
**keeping** [3] - 39:24, 116:16, 144:25
**keeps** [1] - 17:15
**kept** [1] - 72:21
**KEVIN** [2] - 2:16, 86:7
**Kevin** [3] - 8:2, 15:14, 148:14
**key** [2] - 24:18, 24:20
**kind** [32] - 21:13, 22:9, 22:24, 24:25, 30:24, 31:2, 33:13, 35:22, 40:17, 44:14, 45:3, 49:22, 64:11, 89:21, 89:23, 94:6, 94:7, 94:17, 94:23, 95:2, 95:3, 96:19, 96:23, 97:2, 102:22, 104:5, 110:16, 112:18, 117:15, 117:17, 145:4
**kinds** [10] - 47:11, 48:5, 48:9, 49:23, 50:10, 50:19, 71:23, 73:16, 78:24
**knee** [2] - 67:12, 67:14
**knowing** [5] - 15:3, 24:13, 26:15, 73:20, 104:3
**knowledge** [13] - 9:23, 33:5, 38:22, 55:6, 55:7, 61:15, 66:18, 75:13, 79:25, 80:15,

104:7, 137:9, 138:13
**knows** [5] - 30:8, 63:17, 140:19, 140:20
**KURT** [1] - 1:9

### L

**LA** [3] - 1:16, 1:19, 1:23
**laboratory** [1] - 123:12
**lack** [4] - 24:20, 25:8, 35:15, 68:17
**Lady** [1] - 47:9
**lady** [1] - 13:1
**Lake** [1] - 47:9
**language** [2] - 80:13, 141:10
**large** [1] - 73:12
**largely** [2] - 104:23, 151:25
**last** [7] - 56:11, 121:9, 129:15, 138:11, 138:12, 144:19
**latest** [2] - 4:16, 4:17
**law** [3] - 6:22, 140:23, 152:7
**lawyer** [9] - 63:17, 69:9, 100:2, 107:24, 108:1, 114:7, 123:23, 136:9
**lawyers** [1] - 99:22
**lead** [2] - 17:24, 60:9
**learn** [3] - 28:24, 29:2, 34:9
**learning** [1] - 142:25
**least** [6] - 53:14, 57:15, 63:22, 91:20, 124:17, 125:23
**leave** [1] - 132:10
**led** [1] - 117:8
**Lees** [1] - 150:8
**Lees-Haley** [1] - 150:8
**left** [10] - 11:21, 11:24, 12:2, 17:1, 63:23, 72:1, 72:2, 72:3, 93:25, 142:22
**legal** [2] - 141:23, 146:17
**lend** [1] - 4:24
**less** [6] - 79:1, 94:17, 94:19, 112:21, 112:22
**letter** [2] - 7:19, 7:23
**level** [19] - 29:8, 40:4, 63:16, 63:18, 65:16, 65:22, 65:23, 66:1, 68:7, 69:21, 73:11, 90:19, 93:12, 93:14,

107:2, 107:11, 116:23, 150:22, 151:8
**levels** [4] - 22:17, 63:20, 115:4, 150:16
**license** [4] - 86:16, 86:17, 138:10
**licensed** [3] - 8:24, 9:1, 37:10
**lie** [2] - 18:1, 137:15
**life** [1] - 91:12
**lighting** [1] - 104:16
**likelihood** [4] - 77:6, 111:8, 114:2, 130:20
**likely** [9] - 19:20, 90:3, 94:15, 103:22, 103:23, 138:5, 144:3, 144:7, 151:12
**limited** [3] - 133:14, 137:22, 148:20
**limits** [2] - 141:13, 151:9
**limp** [1] - 4:21
**line** [1] - 22:9
**lines** [2] - 48:13, 51:11
**link** [2] - 18:25, 23:25
**list** [1] - 28:6
**listed** [3] - 91:25, 95:10, 126:3
**listen** [3] - 106:3, 128:2, 136:18
**listened** [1] - 96:5
**listening** [1] - 106:8
**listing** [1] - 76:5
**litany** [1] - 92:2
**literature** [4] - 89:1, 96:18, 104:3
**litigant** [1] - 130:3
**litigants** [1] - 150:5
**live** [1] - 144:21
**lived** [1] - 87:21
**living** [1] - 144:22
**lobe** [1] - 25:2
**lobes** [9] - 11:19, 12:5, 12:6, 12:13, 13:8, 14:5, 17:6, 18:24, 20:18
**locating** [1] - 147:14
**location** [1] - 154:10
**logic** [1] - 12:12
**logical** [12] - 12:16, 18:17, 25:1, 25:2, 35:15, 51:16, 83:4, 95:12, 95:22, 143:17, 143:24
**logically** [1] - 13:22
**logistically** [1] - 154:21
**long-term** [15] - 37:2, 37:3, 37:12, 38:4,

39:9, 78:7, 82:14, 83:3, 97:11, 97:14, 97:16, 139:24, 140:3, 147:4
**longitudinal** [2] - 78:8, 89:7
**look** [19] - 21:23, 34:11, 34:12, 36:1, 42:16, 54:2, 54:8, 54:9, 64:15, 64:21, 67:14, 80:5, 94:21, 95:25, 102:20, 104:11, 139:6, 139:9, 149:5
**looked** [4] - 6:12, 59:22, 89:9, 143:1
**looking** [12] - 22:3, 34:11, 58:13, 63:16, 63:18, 63:19, 64:1, 79:5, 97:9, 98:11, 106:8
**looks** [5] - 58:9, 88:7, 88:9, 104:12, 115:3
**Looks** [1] - 67:15
**LORI** [2] - 2:9, 36:16
**Lori** [4] - 36:10, 42:22, 131:14, 144:16
**lose** [6] - 26:2, 36:2, 56:2, 71:12, 82:14, 93:9, 93:11, 93:15
**loses** [5] - 31:15, 93:11, 93:19, 108:12, 144:1
**loss** [15] - 28:13, 28:18, 34:2, 34:3, 34:6, 34:8, 43:11, 43:13, 57:4, 82:17, 95:19, 125:22, 139:21, 139:22
**lost** [3] - 80:17, 143:22, 147:25
**loudly** [1] - 132:8
**LOUISIANA** [2] - 1:1, 1:5
**Louisiana** [4] - 8:25, 57:21, 78:14, 156:6
**low** [6] - 63:16, 63:18, 64:1, 142:21, 143:5, 149:21
**low/average** [1] - 94:24
**Lucas** [5] - 9:24, 37:15, 37:17, 92:6, 104:4
**lunch** [1] - 38:8
**luxury** [1] - 148:22
**lying** [1] - 16:1

# M

M.D [1] - 52:2
ma'am [1] - 42:21
main [3] - 19:17, 117:23, 145:25
maintain [2] - 23:5, 147:15
major [1] - 36:3
majority [1] - 78:15
maliciously [1] - 112:15
malinger [6] - 22:5, 29:23, 29:24, 29:25, 30:3, 33:22
malingered [1] - 21:20
malingering [9] - 21:4, 22:2, 22:7, 22:8, 29:23, 30:1, 148:10, 148:11, 150:21
malingers [1] - 22:3
malpractice [1] - 60:13
management [3] - 55:8, 55:9, 55:10
manifestation [1] - 111:15
manipulate [1] - 55:19
manipulated [1] - 33:21
manner [2] - 25:1, 149:12
March [3] - 7:20, 7:23, 33:7
marked [1] - 134:22
markedly [1] - 151:10
marker [1] - 17:17
match [1] - 35:20
material [2] - 95:24, 151:1
matter [13] - 7:16, 35:23, 35:25, 46:24, 68:1, 80:3, 126:13, 128:24, 131:12, 138:4, 140:23, 152:5, 156:9
mattered [1] - 30:7
matters [3] - 50:19, 52:20, 123:24
maximum [3] - 50:25, 51:2, 51:3
meals [2] - 23:19, 40:7
mean [62] - 4:1, 13:1, 13:2, 13:6, 13:10, 14:21, 20:16, 22:6, 22:10, 25:14, 27:9, 27:10, 28:13, 29:8, 32:8, 32:23, 33:10, 34:20, 35:7, 40:14,

40:23, 44:16, 44:17, 49:8, 63:17, 64:12, 64:14, 65:25, 68:21, 69:3, 70:12, 73:9, 74:3, 82:12, 82:15, 83:21, 90:7, 92:11, 93:11, 94:3, 94:11, 94:25, 101:16, 103:2, 103:16, 104:2, 104:8, 110:25, 112:9, 113:18, 113:20, 115:8, 115:23, 116:1, 116:25, 121:1, 123:13, 125:6, 131:22, 132:24, 133:3
meaning [9] - 49:24, 58:17, 89:15, 89:17, 95:3, 103:7, 113:22, 122:6, 123:1
meaningfully [1] - 115:11
means [7] - 93:9, 94:1, 94:4, 95:2, 97:2, 123:10, 140:15
meant [1] - 113:3
measure [10] - 29:5, 29:7, 34:15, 104:15, 104:24, 104:25, 105:2, 123:13
measured [4] - 65:13, 65:19, 65:23, 151:6
measurement [1] - 87:14
measures [8] - 12:22, 34:14, 74:3, 102:10, 104:19, 109:4, 109:6
MECHANICAL [1] - 1:24
mechanism [1] - 41:1
med [1] - 51:25
med-peds [1] - 51:25
Medical [1] - 8:24
medical [39] - 11:5, 11:13, 20:12, 31:19, 41:18, 41:21, 46:18, 47:10, 47:13, 47:15, 47:16, 48:8, 48:19, 53:11, 60:10, 60:12, 60:13, 60:14, 67:5, 67:7, 83:24, 86:20, 88:20, 88:22, 91:4, 97:19, 98:4, 98:5, 100:13, 100:14, 104:4, 119:3, 119:5, 126:14, 134:8, 141:24, 148:9, 152:1, 152:3
medically [1] - 154:22

medication [24] - 38:9, 38:10, 38:11, 39:7, 39:14, 55:15, 55:16, 60:2, 60:3, 75:21, 76:10, 76:11, 76:18, 76:21, 76:25, 77:12, 77:16, 77:18, 78:23, 79:8, 84:5, 121:1, 121:3, 141:14
medications [36] - 20:3, 20:6, 20:7, 20:10, 23:4, 23:15, 23:18, 38:11, 38:15, 38:16, 38:18, 38:25, 39:1, 48:9, 52:7, 52:13, 75:17, 75:23, 76:1, 76:4, 76:5, 78:6, 78:9, 78:12, 78:15, 78:20, 79:2, 79:7, 79:9, 83:9, 98:23, 98:25, 107:6, 146:25
medicine [18] - 39:4, 39:10, 39:21, 39:25, 40:1, 43:12, 44:19, 51:16, 51:24, 52:1, 55:13, 60:1, 77:14, 78:22, 86:14, 121:4, 144:24, 148:8
medicines [3] - 78:22, 78:25, 144:25
meds [2] - 33:8, 39:19
meet [5] - 11:1, 11:2, 58:23, 59:5, 90:22
meeting [11] - 11:4, 14:15, 25:16, 33:7, 47:23, 77:19, 87:18, 90:24, 91:1, 104:3, 119:13
meets [1] - 59:8
Melvin [1] - 66:14
members [3] - 63:7, 138:22, 141:22
memo [2] - 127:22
memoranda [1] - 151:24
memorandum [1] - 152:12
memories [5] - 18:8, 35:7, 35:16, 70:8, 82:20
memory [133] - 12:14, 12:16, 12:17, 12:18, 12:20, 13:19, 16:2, 16:3, 16:4, 16:13, 16:15, 16:21, 16:25, 18:4, 18:14, 18:15, 18:21, 19:1, 21:11, 21:21, 22:16, 23:25, 25:25, 26:5, 28:11,

28:13, 28:21, 28:25, 29:17, 33:13, 33:16, 34:1, 34:2, 34:6, 34:8, 34:12, 34:14, 39:12, 39:14, 41:7, 42:8, 42:10, 43:11, 43:13, 56:2, 56:3, 56:16, 57:4, 57:9, 65:13, 66:12, 69:9, 72:5, 76:2, 76:13, 76:17, 77:25, 82:8, 82:11, 82:15, 82:16, 82:18, 83:3, 84:15, 87:24, 89:16, 94:23, 96:15, 96:16, 96:19, 97:6, 97:12, 97:13, 97:14, 97:16, 97:17, 97:23, 101:21, 102:10, 102:21, 102:22, 103:2, 103:6, 103:14, 116:9, 116:13, 117:7, 117:9, 117:11, 121:23, 122:11, 122:13, 122:16, 123:6, 125:23, 137:11, 137:12, 139:9, 139:21, 139:22, 139:24, 139:25, 140:1, 140:3, 141:16, 142:9, 142:24, 143:1, 143:2, 143:5, 143:25, 147:4, 148:5, 148:6, 148:11, 149:3, 151:9, 152:5
mental [17] - 48:14, 48:16, 57:7, 57:10, 68:8, 86:21, 87:23, 88:1, 88:15, 89:15, 90:10, 90:13, 94:14, 95:19, 140:12, 148:4, 150:10
mention [3] - 9:15, 25:7, 32:2
mentioned [14] - 25:15, 29:23, 30:1, 55:21, 58:7, 59:10, 86:16, 90:1, 92:24, 95:9, 105:18, 109:13, 121:21, 123:5
merely [1] - 133:20
Merit [1] - 156:4
met [4] - 47:20, 48:4, 111:15, 111:16
middle [1] - 57:24
Middle [1] - 153:21

might [31] - 12:9, 16:21, 17:14, 23:3, 25:13, 26:1, 32:25, 33:6, 35:20, 47:12, 48:9, 67:11, 67:13, 71:3, 72:17, 72:21, 74:13, 78:8, 78:9, 80:16, 80:18, 92:22, 93:2, 106:1, 107:18, 113:24, 121:25, 128:5, 133:11, 135:6, 146:23
mild [2] - 89:2, 89:4
Milner [2] - 123:23, 124:2
MILNER [3] - 129:13, 129:16, 129:18
mind [5] - 24:4, 82:4, 106:5, 106:9, 136:19
mine [1] - 119:15
minimum [1] - 137:17
minus [1] - 68:23
minute [3] - 15:1, 72:7, 85:20
minutes [8] - 3:21, 3:23, 4:1, 4:7, 5:6, 90:23, 115:20, 153:24
mislead [3] - 112:15, 117:6, 137:15
missing [1] - 121:6
Mississippi [1] - 8:23
misstatements [1] - 147:16
misstating [1] - 62:19
mix [1] - 77:24
mixed [1] - 151:8
MMPI [1] - 150:17
mobility [3] - 4:19, 5:19, 154:4
mock [1] - 71:2
moderate [2] - 89:3, 89:4
modified [1] - 136:5
modify [1] - 99:14
money [1] - 126:4
monitoring [1] - 130:5
month [1] - 138:12
months [3] - 11:16, 21:24, 143:14
mood [5] - 40:20, 89:17, 89:20, 109:15, 109:16
morning [8] - 3:7, 3:12, 3:14, 3:15, 4:23, 8:16, 8:17, 152:21
most [17] - 4:21, 6:17, 16:10, 22:8, 40:18, 54:18, 55:25, 56:4,

68:25, 82:15, 82:17, 93:8, 103:17, 106:20, 109:4, 134:16, 152:2
**mostly** [1] - 39:12
**motion** [8] - 5:25, 6:9, 6:12, 6:19, 6:23, 125:22, 139:20, 139:21
**motivated** [1] - 131:7
**mouth** [2] - 14:19, 31:2
**move** [6] - 5:24, 22:24, 31:9, 35:24, 121:18, 154:3
**movement** [3] - 4:24, 11:24, 12:2
**moves** [1] - 143:22
**moving** [2] - 126:1, 153:20
**MR** [144] - 2:5, 2:6, 2:7, 2:8, 2:10, 2:11, 2:13, 2:14, 2:15, 2:17, 2:18, 2:19, 3:12, 3:15, 4:4, 4:10, 4:17, 5:2, 5:7, 5:16, 6:7, 6:9, 6:25, 7:4, 7:6, 7:12, 7:13, 7:14, 7:25, 8:15, 10:6, 10:9, 10:13, 10:21, 26:6, 26:10, 26:13, 30:10, 30:15, 31:5, 31:9, 31:11, 32:18, 32:21, 36:4, 36:10, 36:21, 42:12, 42:15, 42:20, 43:24, 45:17, 45:19, 45:24, 46:3, 46:17, 57:25, 58:2, 58:4, 58:6, 60:24, 61:1, 61:3, 62:18, 62:24, 63:2, 80:20, 80:23, 80:25, 84:11, 84:14, 84:20, 85:5, 85:15, 85:19, 86:11, 99:3, 99:7, 99:16, 99:18, 99:20, 111:11, 111:21, 118:2, 118:5, 118:7, 120:1, 120:7, 121:15, 121:20, 123:17, 123:20, 123:21, 124:8, 124:12, 124:15, 124:18, 124:23, 125:4, 125:9, 125:16, 126:9, 126:21, 127:5, 127:14, 127:17, 127:19, 127:20, 127:23, 127:24, 128:12, 128:15, 128:19, 129:2, 129:13, 129:16, 129:18, 129:21, 130:3, 130:15, 130:18, 131:9, 131:14, 131:21, 132:3, 132:22, 132:24, 133:3, 133:23, 134:1, 134:8, 134:12, 134:15, 134:19, 134:23, 135:3, 135:4, 135:14, 135:17, 135:19, 139:2, 153:18, 155:6, 155:8
**multiple** [3] - 115:4, 148:7, 150:19
**muscle** [1] - 78:4
**must** [4] - 66:7, 146:18, 152:13, 153:12

## N

**naive** [3] - 30:2, 33:22, 143:2
**naively** [2] - 22:8, 30:1
**naivete** [2] - 33:19, 33:20
**name** [3] - 42:21, 72:7, 72:8
**names** [2] - 18:20, 63:25
**naming** [1] - 141:12
**National** [1] - 9:14
**natural** [1] - 20:8
**nature** [10] - 24:14, 83:18, 92:19, 102:13, 132:8, 141:18, 141:21, 147:10, 151:17, 151:18
**near** [2] - 58:17, 154:16
**necessarily** [14] - 17:4, 17:18, 19:23, 32:23, 34:7, 56:13, 60:16, 70:11, 72:4, 74:6, 74:16, 74:23, 102:25, 138:13
**necessary** [5] - 114:5, 125:7, 147:14, 147:20, 154:2
**need** [29] - 12:15, 25:17, 33:8, 38:11, 40:5, 58:22, 69:4, 83:17, 92:22, 93:2, 104:20, 108:19, 117:24, 119:8, 125:2, 127:2, 127:10, 128:1, 128:5, 131:6, 132:19, 133:15, 134:6, 135:9, 136:3, 136:4, 154:17, 154:22
**needed** [2] - 133:16, 141:24
**needing** [1] - 43:9
**needs** [6] - 37:22, 39:8, 70:5, 73:17, 100:21, 119:7
**negative** [1] - 151:12
**negatively** [1] - 43:19
**negotiate** [2] - 100:21, 101:24
**neural** [1] - 109:3
**neuro** [1] - 90:9
**neurobehavioral** [3] - 87:3, 89:17, 96:18
**neurocognitive** [9] - 89:15, 89:24, 90:4, 90:7, 90:8, 90:14, 92:6, 92:7, 109:2
**neurological** [3] - 87:4, 88:24, 122:12
**neurons** [1] - 104:21
**neuropsych** [2] - 64:4, 115:7
**neuropsychiatry** [1] - 10:14
**neuropsychological** [16] - 13:3, 57:14, 64:20, 64:25, 65:4, 70:1, 74:1, 74:6, 74:24, 75:12, 87:17, 87:22, 89:6, 94:21, 148:13, 150:13
**neuropsychologist** [5] - 8:20, 9:16, 61:9, 86:15, 86:24
**neuropsychologists** [3] - 57:21, 57:23, 65:6
**neuropsychology** [13] - 8:25, 9:3, 9:5, 9:22, 10:5, 10:15, 15:25, 86:17, 86:18, 87:7, 92:14, 110:9, 114:23
**Neuropsychology** [1] - 9:14
**neurosurgeon** [1] - 74:2
**never** [4] - 31:12, 41:6, 44:9, 147:25
**NEW** [5] - 1:5, 1:14, 1:16, 1:19, 1:23
**new** [9] - 28:24, 29:2, 41:22, 70:8, 82:20, 98:1, 98:2, 142:24, 143:25
**New** [4] - 3:24, 8:24, 152:22, 153:24
**next** [8] - 36:9, 50:11, 93:17, 136:10, 143:13, 144:8, 154:17
**night** [2] - 77:3, 121:10
**NO** [1] - 1:4
**nobody** [3] - 40:19, 69:14, 130:5
**none** [6] - 33:12, 39:3, 64:25, 95:18, 110:18, 117:19
**noon** [1] - 38:8
**normal** [5] - 43:8, 141:11, 141:13, 147:24, 151:9
**normally** [2] - 41:11, 47:25
**note** [8] - 61:23, 67:16, 99:3, 100:9, 120:10, 141:14, 144:7, 145:25
**notebook** [1] - 39:24
**noted** [20] - 15:9, 15:11, 15:20, 15:24, 16:6, 16:8, 16:11, 61:11, 93:25, 100:5, 100:7, 103:17, 120:4, 142:1, 142:11, 142:13, 143:6, 143:8, 145:16, 150:3
**notes** [2] - 42:16, 152:23
**nothing** [14] - 8:8, 24:3, 32:18, 36:4, 36:13, 41:24, 45:17, 46:9, 60:24, 85:15, 86:4, 118:2, 123:17, 133:9
**notice** [2] - 56:18, 127:8
**noticed** [1] - 99:5
**Number** [1] - 95:11
**number** [21] - 9:20, 14:11, 20:2, 20:5, 23:4, 30:23, 49:20, 51:5, 62:11, 75:23, 76:1, 77:25, 88:6, 91:2, 92:5, 106:9, 115:6, 126:6, 151:25, 152:18
**numbered** [1] - 156:9
**numbering** [1] - 135:7
**nurse** [8] - 39:19, 39:20, 39:25, 44:18, 44:19, 44:20, 45:4, 52:4
**nurses** [1] - 144:24
**nurses'** [1] - 55:12
**nursing** [8] - 10:24, 23:14, 23:22, 27:16, 37:11, 47:5, 47:18, 60:1

## O

**o'clock** [2] - 5:13, 5:14
**oath** [6] - 7:9, 8:13, 36:18, 46:6, 46:14, 86:9
**object** [1] - 126:6
**objectifying** [1] - 105:13
**objection** [15] - 30:10, 31:5, 31:8, 57:25, 62:18, 62:21, 84:11, 85:3, 111:11, 120:1, 120:5, 121:15, 124:8, 126:2, 134:12
**objective** [3] - 105:14, 105:22
**observation** [3] - 61:12, 62:6, 62:8
**observations** [1] - 15:10
**observe** [5] - 34:22, 71:6, 111:22, 118:9, 130:11
**observed** [6] - 20:16, 21:6, 123:24, 123:25, 128:20, 129:7
**obvious** [2] - 18:9, 33:24
**obviously** [6] - 16:25, 23:19, 25:14, 48:15, 62:12, 76:15
**occasion** [3] - 37:14, 41:17, 142:11
**occasional** [1] - 56:21
**occasionally** [1] - 113:17
**occasions** [3] - 10:25, 145:5, 145:12
**occur** [5] - 34:10, 70:14, 88:4, 138:6, 140:1
**occurred** [18] - 14:18, 41:12, 43:25, 48:1, 66:14, 67:16, 81:1, 81:3, 82:25, 83:2, 127:12, 129:1,

136:15, 138:15, 139:4, 143:9, 145:6, 147:11

**occurrences** [1] - 90:19

**occurring** [3] - 110:21, 110:22

**occurs** [1] - 55:25

**October** [1] - 8:1

**odd** [1] - 18:9

**OF** [3] - 1:1, 1:4, 1:8

**offer** [1] - 129:25

**offered** [1] - 10:8

**offering** [4] - 10:9, 128:17, 128:19

**office** [4] - 4:17, 41:23, 87:19, 87:20

**OFFICE** [1] - 1:18

**officer** [2] - 124:24, 127:9

**officers** [1] - 116:4

**Official** [2] - 156:5, 156:14

**OFFICIAL** [1] - 1:22

**often** [3] - 15:24, 50:17, 148:21

**oftentimes** [1] - 54:14

**old** [1] - 98:3

**older** [2] - 56:8, 77:1

**once** [5] - 4:8, 46:6, 56:23, 82:19, 113:23

**one** [50] - 5:22, 14:14, 15:24, 19:17, 22:5, 24:18, 30:23, 35:25, 51:4, 51:21, 55:18, 57:21, 59:11, 62:10, 68:25, 69:24, 70:17, 72:20, 76:12, 76:19, 85:17, 90:6, 93:8, 94:8, 94:9, 94:16, 96:18, 97:9, 100:7, 102:17, 103:12, 103:20, 103:21, 104:10, 106:9, 110:14, 119:7, 124:17, 125:20, 130:21, 134:24, 138:9, 140:13, 142:16, 151:6, 151:10, 153:19, 154:14

**ones** [2] - 20:18, 79:8

**open** [2] - 49:19, 130:12

**open-ended** [1] - 49:19

**operating** [1] - 39:6

**operation** [1] - 3:20

**operationalized** [1] - 68:22

**operationalizing** [1] - 50:2

**operative** [1] - 67:15

**opinion** [27] - 24:6, 49:9, 59:8, 70:16, 70:17, 70:18, 73:12, 73:24, 74:2, 75:9, 75:10, 75:11, 82:4, 85:1, 85:11, 88:11, 96:10, 99:10, 107:23, 109:25, 116:5, 119:2, 122:20, 128:3, 146:6, 151:16

**opinions** [3] - 84:21, 105:4, 105:5

**opportunity** [2] - 80:16, 111:22

**opposed** [2] - 28:13, 28:15

**optimum** [1] - 113:22

**options** [1] - 154:9

**order** [9] - 44:20, 44:23, 53:18, 78:23, 129:3, 142:23, 152:21, 152:24, 153:12

**ORDER** [1] - 3:4

**ordered** [1] - 125:9

**organic** [5] - 75:2, 75:13, 104:11, 116:22

**organization** [2] - 12:16, 35:15

**organizations** [1] - 9:11

**organize** [2] - 12:7, 13:23

**organized** [2] - 89:2, 110:15

**organizing** [1] - 13:7

**orient** [2] - 106:5, 106:9

**orientation** [5] - 15:21, 27:20, 28:9, 35:21, 35:23

**oriented** [9] - 15:8, 15:12, 27:14, 27:17, 35:17, 57:8, 149:8, 149:9

**Orleans** [4] - 3:24, 8:24, 152:22, 153:24

**ORLEANS** [5] - 1:5, 1:14, 1:16, 1:19, 1:23

**otherwise** [2] - 4:2, 152:5

**ought** [2] - 24:8, 108:18, 113:7

**outburst** [8] - 25:13,

70:11, 128:22, 129:1, 132:21, 137:25, 140:11, 145:10

**outbursts** [33] - 14:4, 40:11, 70:14, 70:20, 76:21, 80:13, 118:8, 118:9, 118:12, 126:23, 127:16, 127:18, 128:7, 128:8, 131:7, 131:16, 132:7, 132:8, 132:13, 132:17, 132:20, 138:3, 140:8, 145:3, 145:5, 145:6, 145:7, 145:8, 145:13, 146:1, 146:2

**outlined** [1] - 151:21

**outright** [1] - 57:1

**outside** [3] - 4:18, 119:6

**overdue** [1] - 15:5

**overly** [1] - 117:1

**overrule** [3] - 30:11, 85:3, 121:17

**own** [27] - 17:20, 27:2, 27:3, 27:5, 29:3, 29:8, 29:10, 31:19, 32:3, 35:6, 35:11, 37:9, 39:4, 39:9, 40:8, 55:18, 60:10, 60:12, 67:23, 68:3, 80:9, 81:16, 100:16, 138:20, 147:21, 148:17

**Oxycodone** [1] - 38:19

**Oxycontin** [2] - 20:5, 23:4

## P

**p.m** [1] - 155:10

**Page** [14] - 2:3, 2:22, 25:24, 28:6, 31:16, 32:2, 76:5, 93:18, 95:9, 142:22, 142:23, 146:3, 150:12, 151:13

**Pages** [1] - 29:19

**pain** [27] - 23:3, 23:5, 23:9, 23:12, 33:8, 38:18, 40:22, 52:1, 52:6, 52:7, 52:13, 55:8, 55:9, 55:10, 55:13, 55:15, 60:1, 60:2, 75:24, 76:25, 77:4, 77:18, 77:20

**pain-related** [1] - 52:6

**paper** [1] - 65:2

**paralysis** [1] - 72:1

**parameters** [4] - 85:1, 88:18, 89:8, 142:16

**parietal** [1] - 11:21

**parry** [2] - 68:9, 116:10

**part** [31] - 5:17, 12:10, 12:11, 12:12, 14:9, 18:1, 18:21, 21:2, 29:17, 51:20, 53:3, 53:6, 53:7, 54:18, 57:12, 64:7, 70:4, 71:3, 71:19, 73:12, 83:5, 94:5, 101:1, 115:5, 125:12, 126:2, 133:10, 133:21, 154:20

**participate** [1] - 19:15

**participated** [3] - 125:11, 129:4, 137:20

**participating** [1] - 126:14

**particular** [17] - 13:22, 17:19, 21:15, 58:11, 67:10, 69:2, 70:1, 74:23, 78:11, 141:25, 142:9, 145:23, 147:9, 152:7, 152:12, 152:18, 152:19

**particularly** [8] - 12:17, 15:6, 20:25, 22:8, 24:4, 93:13, 95:23, 97:25

**parties** [2] - 140:20, 152:7

**parts** [6] - 51:21, 63:20, 63:22, 76:14, 106:4, 142:8

**party** [1] - 129:2

**passed** [1] - 23:22

**passes** [2] - 23:22, 38:9

**passing** [4] - 14:25, 15:7, 54:21, 94:13

**past** [16] - 6:1, 29:8, 29:11, 34:17, 34:18, 35:11, 48:7, 48:8, 55:18, 82:11, 83:3, 97:23, 113:22, 122:5, 129:17, 143:18

**patient** [13] - 28:19, 33:6, 66:13, 66:24, 67:14, 78:16, 79:17, 150:4, 150:16, 150:22, 151:2, 151:8

**patient's** [1] - 150:8

**patients** [32] - 9:6, 9:7,

9:9, 18:18, 18:19, 41:18, 41:20, 52:4, 52:5, 52:9, 52:24, 56:7, 56:8, 66:13, 66:23, 78:14, 86:23, 87:1, 87:2, 88:5, 93:8, 94:6, 94:16, 95:6, 122:11, 139:8, 141:25, 149:4, 150:20, 151:25

**pattern** [2] - 150:4, 150:9

**pay** [1] - 19:22

**paying** [1] - 106:6

**peck** [1] - 103:10

**pediatrics** [1] - 52:1

**peds** [1] - 51:25

**pencil** [1] - 65:2

**people** [33] - 12:23, 16:24, 17:18, 22:7, 23:8, 25:13, 35:3, 37:3, 38:12, 50:9, 50:12, 54:14, 56:1, 63:25, 64:9, 64:10, 64:11, 64:13, 68:19, 74:18, 74:21, 76:15, 77:2, 78:13, 84:4, 94:2, 96:19, 104:8, 105:4, 120:24, 136:2, 148:22

**people's** [1] - 75:18

**PEPPER** [1] - 1:22

**Pepper** [3] - 156:3, 156:12, 156:13

**peppers** [1] - 103:10

**percent** [1] - 114:15

**percentile** [2] - 142:19, 142:21

**perception** [2] - 21:19, 150:24

**perceptual** [2] - 21:13, 87:25

**perfect** [1] - 58:25

**perform** [6] - 23:6, 29:15, 57:6, 91:24, 145:17, 149:15

**performance** [14] - 21:7, 22:20, 65:10, 65:11, 65:17, 123:22, 124:16, 125:13, 142:19, 149:17, 149:20, 150:13, 150:15, 150:24

**performances** [2] - 150:24, 151:8

**performed** [4] - 32:10, 35:9, 91:23, 148:13

**performing** [6] - 26:22, 49:10, 49:16,

65:15, 65:16, 69:23
**performs** [1] - 70:1
**perhaps** [3] - 107:10, 154:15, 155:2
**period** [7] - 16:18, 20:10, 91:19, 111:18, 138:15, 143:7, 149:7
**periodically** [3] - 40:16, 70:14, 145:3
**permanent** [3] - 89:23, 89:24, 90:3
**perseveration** [3] - 17:10, 17:11, 17:12
**perseverative** [1] - 17:9
**person** [36] - 13:9, 13:12, 16:1, 17:12, 17:15, 17:23, 20:11, 22:3, 22:5, 27:14, 27:17, 33:21, 40:18, 49:21, 53:16, 58:16, 64:22, 65:21, 71:21, 75:1, 75:2, 77:20, 78:12, 78:20, 104:10, 107:15, 107:22, 108:12, 110:12, 113:20, 113:23, 114:17, 114:18, 136:11, 136:12, 149:8
**person's** [9] - 19:1, 34:15, 54:22, 88:2, 88:16, 96:22, 107:1, 107:4, 107:6
**personal** [1] - 66:18
**personally** [1] - 18:7
**persons** [1] - 148:20
**persons'** [1] - 94:13
**PET** [1] - 104:15
**Peter** [1] - 103:10
**Ph.D** [1] - 8:20
**phenomenon** [1] - 97:13
**physical** [4] - 42:24, 44:17, 52:12, 150:18
**physician** [4] - 39:5, 39:6, 41:19, 139:6
**pick** [1] - 154:25
**picked** [1] - 103:10
**pickled** [1] - 103:10
**picky** [1] - 117:1
**picture** [1] - 50:6
**piece** [2] - 52:17, 98:17
**pieces** [3] - 25:19, 105:21, 121:5
**Piper** [1] - 103:10
**place** [9] - 12:3, 16:6, 27:14, 27:18, 35:22,

67:8, 79:10, 94:4, 149:9
**placed** [3] - 108:6, 134:6, 153:3
**places** [1] - 149:19
**PLAINTIFF** [1] - 1:14
**plan** [2] - 12:8, 39:10
**planning** [2] - 53:17, 57:14
**plans** [1] - 155:3
**Plaquemine** [6] - 36:25, 37:13, 125:11, 144:18, 152:22, 153:22
**play** [2] - 12:14, 78:6
**pleas** [1] - 146:14
**pleasant** [3] - 40:18, 59:21, 61:25
**plumb** [1] - 125:2
**plumbed** [1] - 126:12
**plus** [2] - 68:23, 109:3
**point** [25] - 4:12, 4:20, 6:9, 6:24, 21:24, 22:6, 22:7, 24:17, 27:25, 29:2, 38:4, 45:4, 66:4, 72:20, 85:23, 110:18, 112:21, 116:1, 131:18, 131:22, 132:19, 134:13, 139:5, 142:17
**points** [2] - 89:9, 121:4
**poor** [5] - 144:1, 148:6, 150:13, 150:15, 151:12
**portion** [1] - 115:16
**posed** [1] - 85:7
**position** [4] - 20:13, 68:12, 133:23, 134:1
**positions** [2] - 116:10, 130:17
**possibility** [5] - 5:23, 97:21, 117:24, 118:1, 137:8
**possible** [13] - 38:5, 97:22, 109:10, 112:9, 112:12, 113:11, 113:18, 121:21, 121:25, 130:14, 130:15, 147:1
**possibly** [4] - 51:3, 142:5, 153:5, 153:20
**post** [3] - 34:11, 122:8, 151:8
**post-accident** [1] - 122:8
**post-high** [1] - 151:8
**postdoctorate** [1] -

8:22
**posterior** [3] - 12:20, 14:23
**potential** [2] - 117:16
**potentially** [2] - 16:3, 19:17
**powerful** [1] - 55:14
**POYDRAS** [3] - 1:16, 1:19, 1:22
**practical** [1] - 138:4
**practice** [21] - 9:3, 9:4, 9:6, 9:7, 18:18, 34:5, 34:6, 41:18, 41:21, 46:19, 55:7, 67:3, 67:4, 67:18, 67:19, 69:6, 86:14, 86:19, 141:24, 147:6, 148:8
**practiced** [2] - 52:21, 148:8
**practices** [4] - 34:5, 55:8, 60:18, 86:22
**practicing** [5] - 46:21, 51:16, 51:24, 52:1, 114:22
**practitioner** [1] - 52:3
**practitioners** [1] - 52:4
**pre** [1] - 122:10
**pre-accident** [1] - 122:10
**precise** [1] - 104:21
**preclude** [1] - 98:15
**preexisting** [1] - 150:6
**prefer** [2] - 4:2, 6:20
**premorbid** [1] - 93:14
**preparation** [1] - 15:13
**prepared** [9] - 7:15, 7:18, 7:22, 8:2, 21:3, 100:6, 101:5, 141:5
**preparing** [1] - 83:20
**preponderance** [1] - 7:3
**prescribe** [1] - 52:6, 55:13, 55:15, 146:24
**prescribed** [5] - 20:2, 52:13, 78:22, 147:6, 147:7
**prescribing** [3] - 55:17, 146:9, 148:9
**presence** [1] - 150:9
**present** [11] - 58:16, 58:17, 58:18, 83:25, 106:2, 106:3, 107:13, 114:4, 143:18, 150:11, 151:21
**presentation** [2] - 54:22, 112:23
**presented** [1] - 107:20

**presenting** [1] - 68:5
**presently** [2] - 39:6, 153:22
**preservation** [1] - 116:16
**pressure** [6] - 20:8, 40:22, 71:3, 124:5, 126:16
**pressures** [1] - 79:19
**pretty** [8] - 16:14, 40:24, 41:11, 54:20, 73:13, 92:18, 109:5
**prevents** [1] - 139:22
**previous** [2] - 17:13, 83:6
**previously** [5] - 103:5, 112:24, 117:7, 120:4
**primarily** [3] - 14:23, 42:24, 52:5
**primary** [7] - 11:14, 28:6, 36:1, 89:18, 132:22, 143:16, 146:24
**privilege** [2] - 129:6, 130:9
**probative** [2] - 124:6, 136:13
**problem** [45] - 5:17, 12:10, 17:6, 19:4, 19:5, 24:19, 25:1, 26:4, 28:20, 33:16, 37:24, 41:5, 91:20, 93:7, 94:18, 94:19, 95:13, 95:22, 96:4, 97:6, 97:22, 98:21, 103:18, 111:14, 118:22, 119:16, 119:20, 119:24, 120:2, 120:3, 120:9, 120:10, 120:11, 121:13, 122:15, 128:6, 139:24, 139:25, 140:9, 143:24, 145:1, 145:25
**problem-solving** [2] - 12:10, 95:13
**problems** [40] - 17:7, 39:18, 40:12, 45:8, 52:12, 56:1, 64:2, 76:13, 77:7, 86:21, 87:3, 87:4, 87:6, 89:6, 89:20, 91:6, 91:9, 93:5, 93:8, 94:7, 94:8, 96:19, 102:6, 102:21, 103:22, 103:23, 109:12, 111:3, 111:9, 111:18, 112:19, 115:9,

122:12, 140:13, 147:11, 150:6, 150:7, 154:17
**proceed** [3] - 4:2, 6:5, 10:19
**proceeding** [3] - 109:12, 128:15, 153:20
**proceedings** [10] - 4:12, 58:20, 85:23, 92:19, 134:13, 145:20, 146:5, 151:19, 155:10, 156:8
**PROCEEDINGS** [2] - 1:24, 3:1
**process** [28] - 5:18, 6:3, 10:2, 14:21, 16:22, 19:8, 26:16, 47:17, 48:22, 49:3, 49:6, 49:11, 50:3, 54:10, 59:18, 78:16, 100:21, 101:9, 114:25, 115:2, 115:21, 115:24, 116:8, 121:8, 130:5, 132:3, 135:21, 141:22
**processes** [2] - 10:23, 49:14
**produce** [2] - 113:21, 113:22
**PRODUCED** [1] - 1:25
**produced** [2] - 131:25, 132:2
**production** [1] - 113:22
**productive** [1] - 113:21
**professional** [1] - 109:24
**Professional** [1] - 156:4
**progress** [2] - 89:7, 129:23
**progressed** [1] - 129:23
**prominent** [2] - 97:6, 97:21
**pronounced** [1] - 54:7
**proof** [2] - 6:13, 6:14
**proper** [1] - 95:21
**properly** [1] - 103:7
**property** [1] - 88:16
**propose** [2] - 154:5, 154:15
**proprietor** [1] - 52:3
**prosector** [1] - 146:12
**prosecution** [4] - 110:6, 138:12,

139:3, 151:24
prosecution's [1] - 31:4
prospective [1] - 141:16
protect [2] - 129:6, 146:16
protected [1] - 130:9
protocol [1] - 134:9
provide [4] - 29:15, 29:18, 42:24, 154:7
provided [2] - 11:4, 154:22
providing [1] - 29:20
provisions [1] - 148:24
prudent [1] - 6:22
psych [1] - 86:17
psychiatric [4] - 47:9, 48:8, 89:20, 145:24
psychiatrist [1] - 86:20
psychiatry [4] - 46:19, 46:20, 86:22
psychological [9] - 23:6, 57:11, 65:18, 75:2, 87:3, 87:5, 89:19, 110:5
Psychological [1] - 9:13
psychologist [3] - 86:15, 106:18, 117:20
psychology [4] - 8:21, 8:23, 9:12
psychometric [1] - 115:16
psychometrics [1] - 114:17
psychosocial [1] - 91:4
PUBLIC [1] - 1:14
pull [1] - 101:21
purpose [6] - 30:16, 83:22, 87:11, 90:24, 102:19, 124:4
purposes [8] - 112:3, 116:17, 124:3, 124:6, 127:2, 130:4, 132:5, 154:11
pursuits [1] - 9:8
put [13] - 6:22, 16:4, 17:5, 18:8, 24:25, 28:4, 48:19, 71:2, 79:16, 100:15, 112:23, 124:5, 134:4
putting [1] - 35:18

Q

qualified [1] - 9:17
questioned [1] - 54:25
questioning [3] - 35:21, 50:11, 116:14
questions [39] - 26:7, 30:25, 42:12, 45:19, 48:12, 49:19, 49:20, 50:4, 51:11, 52:20, 57:9, 69:1, 71:6, 71:9, 71:25, 80:20, 81:11, 84:8, 84:25, 85:7, 93:10, 96:12, 100:14, 100:18, 100:19, 101:2, 101:5, 105:8, 122:24, 122:25, 123:1, 124:2, 125:1, 126:17, 128:5, 130:5, 136:18, 136:20
quicker [1] - 88:7
quite [6] - 14:6, 53:1, 59:20, 60:12, 100:15, 122:14
quote [4] - 58:21, 142:3, 142:4, 146:2
quoted [1] - 146:3
quoting [1] - 143:3

R

raise [8] - 8:6, 36:11, 46:7, 72:2, 86:2, 124:18, 124:20, 125:18
raised [7] - 6:12, 91:18, 124:3, 124:12, 124:19, 125:12, 126:15
raising [3] - 6:19, 72:3, 124:21
ran [1] - 3:23
range [13] - 54:21, 59:25, 94:24, 95:1, 95:4, 103:16, 115:12, 142:18, 142:21, 147:1, 149:19, 149:20, 149:21
rank [2] - 103:19, 106:1
rare [2] - 122:13, 122:14
rarely [1] - 95:20
rate [1] - 89:23
rather [5] - 31:15, 78:16, 92:2, 146:17,

153:11
rational [9] - 48:24, 49:4, 53:19, 58:19, 59:2, 66:5, 145:19, 145:20
rationally [1] - 66:9
react [1] - 148:18
reaction [4] - 20:20, 37:24, 148:19
reacts [1] - 40:24
read [26] - 31:19, 32:3, 32:22, 33:1, 59:12, 60:10, 60:12, 80:4, 80:9, 81:11, 81:17, 81:21, 96:7, 98:5, 100:13, 100:14, 127:21, 132:25, 133:1, 139:10, 139:14, 139:18, 148:17, 148:22, 151:7
reading [8] - 28:18, 31:23, 32:14, 55:4, 81:15, 98:4, 126:14, 148:16
ready [1] - 78:14
real [6] - 13:14, 16:3, 20:25, 28:25, 118:22, 150:20
realize [1] - 68:21
realizing [2] - 16:5, 143:24
really [40] - 16:5, 16:12, 21:11, 21:14, 21:16, 21:19, 21:20, 24:23, 29:4, 29:8, 33:8, 33:13, 37:25, 40:1, 40:19, 49:9, 49:13, 51:14, 53:1, 53:15, 54:16, 55:13, 56:16, 57:1, 59:6, 59:15, 59:19, 59:20, 60:12, 63:25, 64:14, 64:23, 72:22, 80:6, 83:3, 97:13, 113:21, 116:19
Realtime [1] - 156:3
reason [24] - 24:15, 27:11, 31:7, 33:23, 88:25, 125:13, 125:23, 126:10, 129:7, 131:8, 146:15
reasonable [16] - 48:23, 49:4, 55:20, 58:18, 59:1, 60:8, 62:9, 66:5, 70:2, 70:3, 71:15, 73:16, 84:3, 84:6, 145:19, 151:22
reasoning [12] -

25:16, 25:22, 87:24, 90:12, 94:25, 95:1, 95:9, 95:13, 95:23, 96:4, 143:25, 151:6
reasons [4] - 125:21, 125:24, 126:5, 152:19
reasserting [1] - 23:5
rebuild [1] - 42:10
recalled [1] - 83:7
recalling [1] - 91:7
received [4] - 4:8, 7:23
receives [1] - 40:6
recent [2] - 6:17, 122:8
recently [3] - 27:1, 122:3, 122:4
recess [4] - 4:7, 4:9, 4:13, 85:24
recessed [1] - 80:16
recognition [1] - 142:4
recognize [1] - 14:17
recognized [1] - 145:11
recognizes [1] - 153:2
recollection [3] - 60:17, 67:17, 119:17
recommend [2] - 57:19, 78:21
recommended [3] - 57:17, 57:24, 148:13
recompose [1] - 80:17
reconstruct [7] - 29:3, 35:5, 35:7, 35:11, 42:10, 55:1, 55:3
reconstructed [1] - 83:7
reconstructing [2] - 91:10, 91:21
reconstruction [1] - 59:11
record [30] - 3:11, 5:8, 7:17, 32:24, 33:3, 98:18, 98:20, 98:21, 99:4, 119:13, 124:18, 127:7, 130:12, 131:19, 131:22, 131:23, 132:1, 132:25, 133:2, 133:5, 133:11, 133:22, 134:15, 134:19, 134:21, 135:12, 147:10, 156:8
recorded [1] - 152:4
RECORDED [1] - 1:24
records [59] - 11:5, 11:13, 11:18, 20:2, 20:21, 31:19, 31:23,

32:3, 32:15, 32:22, 38:23, 47:6, 47:7, 47:8, 47:14, 47:15, 47:16, 47:20, 48:20, 53:11, 60:10, 60:12, 60:14, 60:15, 60:16, 60:20, 60:22, 61:23, 66:25, 67:6, 67:7, 67:15, 83:24, 88:20, 88:22, 89:10, 98:4, 98:5, 98:7, 98:9, 98:12, 100:13, 100:14, 104:4, 126:14, 127:22, 133:1, 139:7, 139:10, 139:11, 139:15, 139:18, 152:2, 152:3
recover [1] - 24:16
recovering [1] - 47:18
recovers [1] - 28:19
recovery [2] - 16:20, 143:7
redirect [1] - 32:19, 45:18, 80:22, 118:4, 124:19, 125:2
REDIRECT [6] - 2:8, 2:15, 2:19, 32:20, 80:24, 118:6
redirected [5] - 23:1, 25:6, 31:16, 93:16, 93:22
reduced [4] - 110:16, 113:24, 114:3, 117:18
refer [7] - 50:1, 60:15, 63:23, 65:5, 68:11, 105:23, 117:9
reference [7] - 60:5, 61:4, 126:13, 140:3, 140:4, 146:4, 147:9
referenced [4] - 124:17, 148:10, 150:7, 150:12
references [3] - 131:10, 149:18, 151:14
referral [1] - 61:7
referred [6] - 28:1, 29:19, 43:11, 59:13, 118:12, 118:19
referring [8] - 28:16, 33:20, 93:2, 95:9, 101:15, 101:18, 119:4, 142:22
refers [3] - 27:25, 90:10, 103:6
reflect [7] - 17:15, 91:19, 113:16, 119:13, 124:22,

134:19, 151:12
**refrain** [1] - 147:22
**refresh** [1] - 67:1
**refreshing** [1] - 83:24
**refute** [3] - 33:10, 61:19, 63:12
**regard** [13] - 7:21, 10:11, 123:5, 142:15, 145:14, 145:23, 148:4, 148:10, 148:16, 148:25, 150:21, 151:23, 152:13
**regarding** [26] - 18:19, 19:12, 24:6, 26:14, 27:20, 32:23, 33:5, 34:1, 39:14, 41:4, 62:16, 68:15, 68:16, 73:22, 75:13, 80:15, 84:17, 104:11, 105:1, 109:4, 109:23, 144:24, 148:11, 151:4, 152:8, 152:9
**regardless** [1] - 7:1
**regional** [1] - 47:10
**Registered** [2] - 156:3, 156:4
**regular** [4] - 40:16, 54:14, 109:23, 131:16
**regularly** [2] - 56:20, 145:3
**regulation** [1] - 110:4
**rehab** [1] - 143:13
**rehabilitation** [2] - 42:7, 86:25
**relate** [28] - 13:19, 14:22, 34:3, 48:23, 49:4, 54:11, 58:18, 59:17, 60:6, 62:16, 62:19, 66:4, 66:9, 66:17, 68:11, 79:6, 97:11, 97:15, 113:10, 121:7, 123:8, 136:12, 136:14, 136:21, 138:7, 145:18, 147:3, 151:3
**related** [20] - 52:6, 52:19, 55:8, 55:9, 55:11, 55:18, 71:9, 71:11, 87:4, 89:21, 96:14, 96:16, 106:17, 106:22, 106:24, 110:2, 110:3, 137:15, 138:1, 150:7
**relates** [5] - 26:15, 103:2, 106:10,

106:11, 109:16
**relating** [16] - 5:17, 11:5, 11:13, 15:20, 32:24, 40:21, 49:11, 54:11, 66:12, 102:15, 123:21, 126:15, 126:16, 136:2, 136:22, 138:2
**relation** [1] - 52:20
**relationship** [1] - 64:17
**relative** [2] - 6:13, 117:4
**relatively** [3] - 43:4, 43:6, 116:12
**relaxant** [1] - 78:4
**relayed** [2] - 55:6, 91:3
**relaying** [1] - 91:13
**relevance** [2] - 35:19, 120:1
**relevant** [9] - 7:18, 24:4, 49:25, 124:6, 124:24, 126:7, 128:2, 132:5, 136:13
**relevantly** [2] - 66:6, 147:20
**reliable** [2] - 33:17, 73:5
**reliably** [1] - 19:6
**reliance** [1] - 108:6
**reluctance** [1] - 132:7
**rely** [2] - 116:15, 139:7
**relying** [3] - 73:3, 108:3, 108:4
**remain** [7] - 7:9, 46:6, 70:13, 88:16, 106:10, 106:11, 146:19
**remember** [36] - 19:20, 21:20, 23:13, 26:3, 29:7, 29:10, 32:25, 39:23, 41:8, 41:12, 43:25, 44:16, 44:18, 51:1, 52:16, 56:7, 56:10, 56:12, 56:13, 60:14, 66:24, 67:11, 67:13, 75:18, 83:24, 96:23, 97:23, 117:12, 119:21, 122:6, 127:22, 136:14, 141:24, 143:21, 144:2, 149:4
**remembering** [5] - 82:24, 82:25, 90:11, 123:8, 141:15
**remembers** [1] - 43:15
**remote** [5] - 97:23, 122:5, 122:11, 122:13, 122:16
**render** [7] - 68:20,

83:10, 88:10, 98:25, 131:3, 132:17, 140:17
**rendered** [1] - 24:5
**rendering** [2] - 75:11, 105:13
**repeat** [3] - 103:8, 103:11, 141:12
**rephrase** [1] - 62:22
**reply** [1] - 127:22
**report** [68] - 4:18, 7:15, 7:17, 7:18, 8:2, 10:1, 15:11, 15:14, 15:17, 15:19, 16:8, 16:11, 21:2, 24:5, 26:21, 27:23, 28:1, 28:2, 28:4, 28:7, 29:19, 31:8, 31:16, 47:8, 55:4, 59:10, 59:14, 60:4, 61:4, 79:7, 81:21, 88:5, 89:25, 92:1, 95:10, 95:11, 96:7, 96:9, 99:12, 100:6, 101:4, 101:19, 118:19, 118:20, 119:16, 119:19, 119:21, 119:22, 119:23, 124:14, 124:16, 135:5, 141:5, 141:6, 142:22, 142:23, 143:3, 145:16, 145:25, 146:3, 149:1, 149:19, 150:12, 151:13, 151:15
**reported** [2] - 91:2, 93:18
**REPORTER** [1] - 1:22
**Reporter** [6] - 156:3, 156:4, 156:5, 156:14
**REPORTER'S** [1] - 156:1
**reporting** [1] - 150:4
**reports** [20] - 7:11, 7:21, 7:22, 7:25, 8:3, 16:11, 21:3, 57:13, 59:13, 97:19, 100:7, 118:11, 120:4, 124:17, 134:3, 134:6, 134:21, 141:8, 152:15
**represent** [1] - 125:10
**representation** [2] - 127:17, 131:4
**representations** [4] - 62:15, 84:14, 127:9, 131:24
**representative** [1] - 39:11

**representing** [1] - 128:8
**requesting** [1] - 57:15
**require** [1] - 35:3
**required** [1] - 92:22
**rescheduled** [1] - 126:24
**residents** [3] - 38:5, 39:3, 39:9
**resides** [1] - 144:18
**residing** [1] - 10:25
**residual** [3] - 90:3, 92:6, 92:23
**resignation** [1] - 142:12
**resolution** [2] - 44:4, 145:7
**resolve** [3] - 45:10, 45:14, 144:9
**resolved** [1] - 145:1
**resolving** [1] - 45:12
**respect** [89] - 5:17, 5:23, 9:3, 9:22, 9:23, 12:13, 14:20, 15:3, 15:19, 18:3, 18:13, 18:23, 20:14, 21:6, 21:13, 22:2, 23:24, 24:1, 24:5, 24:8, 25:16, 25:20, 25:24, 25:25, 26:7, 33:2, 33:14, 36:4, 38:14, 38:25, 39:5, 39:13, 40:4, 41:25, 42:12, 45:19, 61:12, 61:14, 61:25, 62:11, 63:3, 65:4, 65:9, 65:15, 66:8, 66:19, 70:25, 72:24, 73:11, 75:17, 77:20, 77:24, 78:6, 80:20, 100:5, 100:10, 100:12, 100:18, 102:5, 102:9, 102:15, 102:22, 103:15, 104:14, 105:25, 108:9, 108:23, 112:2, 113:18, 113:19, 114:9, 114:16, 115:15, 115:18, 116:21, 118:2, 123:25, 124:25, 126:9, 135:19, 135:25, 136:6, 137:11, 137:13, 137:20, 137:24, 138:17, 153:18, 154:1
**respective** [1] - 15:22
**respects** [1] - 65:17
**respond** [9] - 100:14,

102:1, 111:5, 111:6, 122:25, 123:1, 126:17, 139:1
**responded** [1] - 124:21
**response** [10] - 17:13, 43:10, 44:22, 51:23, 71:10, 112:22, 122:6, 124:19, 147:19, 151:12
**response)** [2] - 41:16, 103:12
**responses** [5] - 25:10, 25:15, 26:24, 141:21, 144:4
**responsibilities** [2] - 37:7, 37:13
**responsible** [2] - 12:6, 20:19
**rest** [2] - 133:3, 152:24
**Restoril** [1] - 77:13
**restoring** [2] - 78:13, 119:4
**restricted** [1] - 11:24
**restroom** [1] - 15:1
**rests** [1] - 123:20
**result** [10] - 11:18, 11:22, 49:1, 78:1, 89:13, 89:18, 92:3, 117:21, 123:12, 133:14
**results** [5] - 12:25, 16:11, 65:5, 74:2, 92:5
**retained** [2] - 151:21, 152:5
**return** [1] - 143:21
**returns** [1] - 113:23
**reveal** [2] - 74:19, 74:20
**revealed** [2] - 74:7, 74:8
**review** [15] - 11:10, 11:18, 15:14, 15:17, 38:22, 47:7, 60:13, 80:12, 97:18, 98:23, 119:19, 120:8, 131:1, 132:2, 132:4
**reviewed** [8] - 47:6, 59:10, 67:7, 88:20, 118:11, 131:23, 145:16, 152:6
**reviewing** [5] - 47:20, 82:2, 88:22, 140:5, 152:3
**right-sided** [3] - 50:8, 63:24, 64:2
**rights** [2] - 129:6, 146:17
**rise** [5] - 4:11, 4:14,

85:22, 85:25, 155:9
**risk** [1] - 111:17
**River** [1] - 125:11
**RMR** [2] - 1:22, 156:13
**role** [2] - 12:13, 50:12
**roles** [3] - 140:19, 141:22, 146:11
**ROOM** [3] - 1:16, 1:19, 1:22
**room** [10] - 11:1, 23:21, 43:17, 79:12, 79:13, 79:14, 79:15, 79:17, 132:11
**Rouge** [3] - 5:24, 153:21, 153:23
**roughly** [2] - 41:13, 51:5
**route** [1] - 3:17
**routinely** [1] - 71:5
**rules** [1] - 135:13
**ruling** [2] - 131:20, 154:20
**runs** [1] - 23:2

## S

**s/Cathy** [1] - 156:12
**sadness** [1] - 109:20
**safe** [1] - 39:12
**sat** [3] - 67:3, 126:18, 126:21
**satisfaction** [2] - 45:15, 45:16
**saving** [1] - 56:9
**saw** [19] - 11:12, 14:8, 14:12, 16:18, 16:19, 20:2, 24:11, 52:4, 56:11, 57:13, 61:17, 61:21, 66:24, 75:7, 79:3, 83:5, 102:6
**scale** [3] - 149:17, 149:21, 150:9
**Scale** [1] - 150:8
**scan** [1] - 104:15
**scene** [1] - 34:22
**schedule** [3] - 38:15, 39:15
**scheduled** [2] - 38:9
**school** [2] - 8:22, 151:8
**scientific** [2] - 89:1, 105:23
**score** [9] - 53:4, 53:6, 53:7, 53:9, 54:4, 54:6, 150:8, 150:25
**scored** [2] - 54:18, 115:6, 145:21
**scores** [17] - 16:13, 16:14, 21:23, 21:24,

21:25, 54:3, 54:19, 54:21, 102:17, 109:8, 143:1, 143:4, 143:5, 150:23, 151:2, 151:11
**scoring** [4] - 115:5, 115:6, 115:9, 115:10
**screaming** [1] - 44:18
**screening** [1] - 48:15
**seal** [5] - 134:7, 134:9, 134:10, 134:11, 134:14
**seated** [3] - 3:7, 4:15, 5:9
**second** [6] - 14:15, 21:9, 21:10, 26:6, 42:15, 143:18
**secondary** [1] - 150:7
**security** [1] - 41:22
**sedates** [1] - 77:3
**sedating** [1] - 121:3
**sedation** [3] - 76:18, 79:1, 121:5
**sedative** [2] - 78:5, 78:25
**see** [40] - 9:6, 9:9, 12:23, 13:25, 14:8, 15:9, 22:4, 22:9, 23:7, 25:19, 40:23, 47:5, 56:1, 56:5, 56:20, 57:1, 57:16, 59:19, 61:20, 61:21, 61:23, 64:22, 66:20, 71:8, 72:15, 79:19, 80:12, 82:3, 89:22, 93:8, 96:9, 105:4, 114:15, 118:19, 119:23, 128:3, 128:23, 128:25, 130:11
**seeing** [2] - 52:5, 66:23
**seeking** [1] - 62:23
**seem** [6] - 6:18, 14:17, 91:8, 91:11, 91:13, 117:2
**self** [1] - 25:12
**self-awareness** [1] - 25:12
**sell** [1] - 33:8
**semi** [1] - 49:24
**semi-structured** [1] - 49:24
**sense** [13] - 14:24, 15:7, 22:24, 24:13, 24:20, 25:8, 36:2, 44:9, 81:12, 81:13, 94:13, 95:25, 132:11
**sensitive** [1] - 65:21
**sentence** [2] - 103:4,

146:10
**sentences** [1] - 141:12
**separate** [1] - 79:15
**September** [4] - 11:6, 47:3, 138:19, 143:10
**sequence** [1] - 13:23
**sequential** [2] - 25:1, 25:2
**series** [1] - 101:2
**serious** [5] - 5:19, 35:23, 35:25, 51:8, 136:8
**seriously** [2] - 116:1, 133:12
**seriousness** [3] - 26:19, 141:18, 146:7
**serve** [2] - 40:6, 50:23
**served** [2] - 38:7, 38:8
**serves** [1] - 105:15
**services** [3] - 37:8, 144:17
**sessions** [1] - 119:8
**set** [5] - 11:1, 126:2, 152:6, 152:9, 153:15
**sets** [1] - 17:7
**setting** [1] - 86:24
**seven** [3] - 88:9, 114:11, 149:7
**several** [10] - 11:19, 17:14, 21:24, 22:15, 23:2, 23:19, 24:18, 149:1, 152:3, 153:3
**severe** [11] - 11:15, 17:18, 47:17, 56:4, 89:3, 89:4, 89:10, 89:14, 89:22, 90:4, 105:20, 140:12
**severely** [2] - 89:11, 142:25
**severity** [1] - 52:17
**shakes** [1] - 43:19
**shape** [1] - 78:21
**share** [1] - 116:3
**She..** [1] - 95:12
**shift** [2] - 12:8, 143:24
**shoot** [1] - 57:24
**short** [24] - 15:1, 25:25, 35:22, 43:13, 56:2, 56:3, 57:4, 76:13, 82:15, 97:11, 97:13, 97:16, 97:17, 101:21, 101:22, 102:10, 102:23, 116:13, 121:23, 137:3, 139:25, 140:1, 143:25
**short-term** [20] - 25:25, 43:13, 56:2, 56:3, 57:4, 76:13, 82:15, 97:11, 97:13,

97:16, 97:17, 101:21, 102:10, 102:23, 116:13, 121:23, 139:25, 140:1, 143:25
**shorter** [1] - 119:8
**shortly** [1] - 101:22
**shouting** [1] - 109:24
**show** [8] - 13:3, 50:6, 67:6, 94:9, 104:15, 113:20, 132:19, 133:10
**showed** [1] - 150:4
**showers** [1] - 40:8
**showing** [2] - 125:7, 143:11
**shown** [2] - 132:25, 150:18
**shrinks** [1] - 28:19
**sicker** [1] - 135:6
**side** [13] - 6:16, 11:24, 12:1, 12:2, 17:1, 18:24, 45:23, 76:1, 76:12, 76:16, 94:2
**sided** [3] - 50:8, 63:24, 64:2
**sides** [1] - 6:14
**sidetrack** [1] - 26:3
**sign** [1] - 148:22
**signals** [2] - 110:16
**significance** [4] - 14:7, 14:13, 15:20, 16:21
**significant** [21] - 11:12, 15:21, 23:25, 25:21, 25:22, 33:23, 65:19, 69:14, 69:17, 69:19, 69:20, 100:9, 113:15, 137:13, 138:14, 139:21, 139:22, 143:12, 145:15, 150:20, 153:3
**significantly** [5] - 16:16, 65:12, 116:23, 137:18, 153:11
**silent** [1] - 146:19
**similar** [2] - 81:15, 109:8
**similarity** [1] - 149:18
**simple** [5] - 33:21, 63:21, 63:22, 72:11, 141:12
**simplified** [1] - 64:11
**simplify** [1] - 63:24
**simply** [1] - 73:19
**single** [2] - 51:4, 60:17
**sit** [9] - 50:4, 50:9, 50:10, 68:24, 70:8,

129:12, 129:14, 153:13
**sitting** [6] - 70:2, 127:12, 130:1, 131:17, 136:10
**situation** [16] - 17:2, 18:6, 18:7, 24:21, 24:23, 25:11, 43:9, 51:9, 60:7, 66:21, 76:22, 110:5, 120:25, 123:12, 128:7, 148:20
**situations** [1] - 37:25
**six** [8] - 28:6, 53:8, 88:9, 95:10, 114:10, 125:24, 126:6, 143:16
**sixth** [1] - 144:4
**skill** [1] - 117:25
**sleep** [5] - 77:2, 77:3, 107:10, 107:11
**sleeping** [5] - 77:14, 77:16, 106:20, 108:2, 119:12
**slowly** [1] - 4:21
**smorgasbord** [1] - 125:24
**social** [7] - 37:8, 37:10, 62:1, 109:22, 110:21, 144:17
**socially** [1] - 149:12
**sole** [2] - 52:3
**solemnly** [4] - 8:7, 36:12, 46:8, 86:3
**solution** [2] - 130:14, 130:15
**solutions** [1] - 119:3
**solving** [6] - 12:10, 95:13, 95:22, 96:4, 143:24
**Soma** [2] - 78:3, 78:4
**someone** [25] - 13:4, 17:24, 21:25, 36:1, 47:25, 66:12, 71:24, 72:1, 72:14, 72:25, 82:14, 93:12, 93:13, 95:18, 106:8, 107:25, 111:7, 111:9, 111:18, 114:2, 115:11, 116:21, 117:6, 122:2, 152:19
**sometimes** [19] - 18:8, 40:18, 44:7, 44:8, 44:25, 45:4, 45:14, 45:15, 56:7, 60:14, 64:10, 80:10, 89:3, 96:20, 111:15, 120:24, 121:3, 137:22

**somewhat** [2] - 87:5, 91:4

**somewhere** [1] - 15:9

**sophisticated** [4] - 57:11, 57:14, 64:18, 64:20

**sorry** [6] - 29:6, 36:22, 42:21, 58:3, 120:23, 135:8

**sort** [25] - 5:20, 18:20, 41:4, 49:24, 50:1, 50:8, 54:5, 56:3, 56:8, 58:15, 58:21, 60:6, 66:15, 72:10, 78:24, 88:15, 94:3, 96:20, 104:6, 105:10, 108:5, 111:14, 119:5, 124:5, 137:24

**sorts** [2] - 73:21, 75:24

**sounds** [3] - 105:7, 133:7, 133:17

**Southern** [1] - 8:23

**space** [3] - 24:24, 35:17, 36:3

**spaces** [1] - 70:15

**span** [2] - 19:18, 143:8

**spare** [1] - 93:24

**spared** [3] - 95:7, 97:24, 151:3

**speaking** [2] - 16:9, 90:11

**specialty** [1] - 87:7

**specific** [29] - 13:19, 15:4, 32:23, 32:24, 34:18, 34:21, 38:11, 38:22, 39:1, 40:22, 41:24, 42:8, 49:21, 49:22, 66:14, 67:11, 67:14, 67:17, 72:22, 79:25, 84:18, 97:8, 101:5, 104:16, 126:15, 147:4, 147:5, 147:6, 147:7

**specifically** [3] - 51:7, 59:15, 103:6

**specificity** [1] - 150:19

**specifics** [1] - 136:22

**speculation** [3] - 31:5, 84:12, 84:17

**speech** [1] - 141:10

**speedy** [1] - 146:21

**spend** [7] - 46:24, 51:9, 69:4, 69:6, 74:19, 83:19, 83:21

**spent** [4] - 30:22, 48:7, 115:19, 126:4

**spoken** [1] - 103:9

**spot** [2] - 115:5

**stable** [1] - 149:13

**staff** [4] - 38:12, 40:12, 63:7, 109:24

**stake** [2] - 26:24, 141:20

**stamina** [1] - 88:16

**stand** [25] - 19:9, 25:11, 47:25, 49:8, 58:10, 58:14, 68:24, 70:13, 75:15, 75:16, 81:19, 82:5, 83:10, 83:17, 84:8, 84:24, 88:11, 98:25, 125:8, 131:3, 131:18, 140:17, 140:24, 148:12

**standard** [19] - 47:24, 48:25, 54:9, 56:9, 57:7, 58:7, 58:8, 58:9, 58:15, 59:3, 59:5, 60:18, 67:2, 67:4, 67:19, 87:17, 114:22, 145:17, 152:13

**standardized** [7] - 48:11, 49:17, 52:11, 58:13, 84:4, 84:6, 115:2

**standards** [10] - 58:24, 59:8, 66:8, 135:25, 136:1, 136:3, 136:4, 152:6

**standing** [2] - 7:9, 46:6

**standpoint** [1] - 117:20

**start** [4] - 5:14, 56:12, 56:22, 71:8

**started** [3] - 5:12, 7:1, 39:24

**state** [2] - 47:14, 78:13

**State** [2] - 8:25, 9:1

**statement** [6] - 21:9, 24:10, 27:12, 31:2, 32:11, 95:14

**statements** [3] - 30:21, 31:12, 137:5

**STATES** [3] - 1:1, 1:4, 1:9

**States** [7] - 3:8, 3:13, 152:8, 152:10, 156:5, 156:15

**stating** [1] - 142:5

**station** [3] - 23:22, 55:12, 60:2

**statistically** [1] - 115:13

**status** [8] - 48:14, 48:17, 57:7, 57:10, 141:14, 148:4,

154:16, 154:25

**stay** [10] - 13:21, 13:22, 106:2, 106:16, 107:4, 108:23, 119:17, 119:20, 120:9

**staying** [3] - 106:19, 120:12, 154:10

**stays** [1] - 13:24

**STENOGRAPHY** [1] - 1:24

**step** [5] - 36:7, 45:21, 85:16, 123:18, 141:11

**steps** [1] - 52:22

**Stewart** [3] - 72:9, 72:10

**sticks** [1] - 84:2

**still** [9] - 11:21, 11:24, 16:19, 20:22, 22:16, 22:18, 51:17, 115:10, 139:9

**stimuli** [1] - 143:19

**stimulus** [1] - 106:6

**stipulate** [9] - 7:11, 7:14, 7:22, 8:3, 10:6, 10:13, 128:9, 132:6, 132:25

**stipulated** [2] - 46:23, 86:12

**stipulation** [2] - 10:4, 10:11

**stop** [6] - 38:10, 51:17, 60:1, 92:2, 110:16

**stopped** [2] - 22:23, 88:5

**stopping** [1] - 110:23

**stops** [1] - 144:2

**story** [4] - 51:22, 68:19, 68:25, 143:17

**straight** [1] - 57:24

**strategies** [1] - 119:5

**STREET** [3] - 1:16, 1:19, 1:22

**street** [1] - 33:9

**stress** [7] - 40:22, 104:17, 107:9, 107:10, 148:2, 148:3, 150:11

**stresses** [1] - 78:10

**stressors** [1] - 79:19

**stretch** [1] - 3:24

**strictly** [1] - 13:13

**strike** [1] - 58:4

**stripped** [1] - 35:22

**structural** [1] - 144:23

**structure** [1] - 38:7

**structured** [4] - 38:1, 49:24, 82:19, 144:21

**studied** [2] - 89:8, 94:7

**studies** [4] - 78:8, 103:24, 113:20, 150:19

**study** [1] - 78:11

**stuff** [11] - 5:20, 18:20, 34:12, 59:22, 64:6, 66:16, 74:19, 124:5, 130:9, 135:25, 137:24

**subcategories** [1] - 89:4

**subject** [3] - 19:10, 19:11, 145:22

**subjective** [5] - 104:24, 104:25, 105:1, 105:11, 105:16

**submit** [6] - 131:1, 132:2, 134:25, 135:2, 136:9, 136:24

**submitted** [6] - 132:1, 132:4, 133:19, 134:22, 151:24, 152:15

**substances** [1] - 146:9

**substantial** [1] - 4:3

**subtests** [1] - 150:24

**successful** [1] - 144:22

**sudden** [1] - 54:7

**suffer** [2] - 97:4, 133:15

**suffered** [10] - 11:5, 11:15, 34:13, 75:14, 102:6, 110:1, 116:21, 116:23, 138:8, 138:14

**suffering** [1] - 77:20

**suffers** [3] - 37:19, 137:16, 138:21

**suffice** [1] - 121:12

**sufficient** [1] - 122:22

**sufficiently** [1] - 103:8

**suggest** [2] - 134:4, 153:1

**suggested** [4] - 6:11, 137:2, 148:5, 151:3

**suggesting** [2] - 33:20, 124:4

**suggests** [1] - 150:9

**sum** [1] - 115:19

**summer** [3] - 129:16, 129:17, 129:19

**supervise** [1] - 115:3

**supervision** [1] - 115:3

**supervisor** [1] - 115:3

**supplement** [1] - 69:9

**supply** [1] - 70:4

**support** [4] - 55:2, 133:11, 139:23, 154:7

**supporting** [1] - 68:12

**supposed** [4] - 5:21, 13:24, 52:23, 53:13

**supposition** [2] - 103:24, 104:2

**surely** [1] - 16:23

**surfaced** [1] - 121:12

**surgeon** [1] - 67:12

**surgeries** [1] - 67:13

**surgery** [3] - 67:14

**surprise** [3] - 30:20, 31:1, 31:12

**surprised** [1] - 55:5

**surrender** [1] - 138:10

**survey** [1] - 88:2

**SUSAN** [2] - 2:4, 8:11

**Susan** [2] - 7:6, 141:4

**susceptible** [2] - 117:8, 144:12

**suspected** [1] - 148:6

**sustain** [3] - 31:8, 62:21, 120:5

**Swanson** [2] - 152:10, 152:12

**swear** [5] - 8:7, 36:12, 46:8, 86:1, 86:3

**switched** [1] - 112:24

**sworn** [7] - 8:12, 36:17, 46:13, 86:8, 126:19, 130:6

**symptom** [3] - 89:18, 114:1, 150:4

**symptoms** [4] - 90:25, 91:2, 150:4, 150:18

**system** [3] - 41:22, 50:1, 51:10

**T**

**table** [2] - 5:10, 105:8

**tag** [1] - 108:17

**tangent** [2] - 25:6, 56:22

**tangents** [2] - 19:21, 22:25

**target** [1] - 126:1

**task** [4] - 23:1, 77:21, 77:22, 100:15

**tasks** [1] - 21:16

**team** [1] - 39:10

**teams** [1] - 141:23

**technicians** [1] - 87:21, 114:21, 114:23, 115:1,

118:9, 118:17, 119:16
**temper** [1] - 147:25
**tend** [2] - 94:3, 133:11
**tends** [2] - 23:9, 77:2
**term** [46] - 15:25, 17:8, 25:25, 37:2, 37:3, 37:12, 38:4, 39:9, 43:13, 55:21, 55:22, 55:24, 56:2, 56:3, 57:4, 76:13, 78:7, 82:14, 82:15, 83:3, 90:13, 90:21, 97:11, 97:13, 97:14, 97:16, 97:17, 101:21, 102:10, 102:23, 110:8, 110:9, 116:13, 121:23, 139:24, 139:25, 140:1, 140:3, 143:25, 144:11, 145:3, 147:4
**terms** [27] - 6:15, 37:20, 40:2, 40:11, 43:11, 64:11, 65:17, 84:7, 84:23, 88:24, 89:5, 89:7, 92:4, 95:17, 98:4, 109:6, 109:9, 110:6, 121:6, 127:7, 130:16, 135:17, 137:4, 137:6, 139:3, 154:3, 154:6
**Test** [6] - 48:11, 49:17, 51:18, 71:1, 72:16, 145:22
**test** [42] - 27:6, 28:25, 29:13, 29:21, 30:17, 34:23, 49:22, 49:24, 51:20, 51:21, 54:5, 54:6, 63:20, 63:22, 64:1, 64:23, 65:10, 65:11, 65:22, 70:1, 72:22, 72:23, 75:16, 92:16, 95:3, 96:3, 104:17, 114:16, 114:17, 114:18, 114:20, 114:25, 123:10, 123:12, 123:13, 142:14, 143:2, 145:23, 148:13, 150:25, 151:6, 151:10
**tested** [5] - 16:17, 21:8, 31:25, 95:1, 150:23
**testified** [14] - 8:13, 36:18, 46:14, 60:11, 86:9, 92:8, 117:15, 131:15, 132:14,

133:13, 136:6, 145:22, 149:23
**testify** [13] - 10:18, 19:9, 60:15, 66:6, 67:24, 68:24, 70:13, 83:12, 83:13, 83:15, 131:19, 140:22, 147:20
**testifying** [8] - 19:15, 73:18, 79:22, 82:9, 84:7, 84:24, 86:23, 136:17
**testimony** [57] - 8:7, 10:7, 15:13, 15:14, 36:12, 46:8, 62:1, 62:19, 62:20, 65:14, 68:15, 72:18, 75:6, 81:24, 83:6, 84:3, 84:22, 86:3, 94:19, 94:24, 96:5, 99:8, 99:10, 99:24, 107:18, 109:22, 112:9, 112:10, 118:1, 121:21, 122:1, 122:3, 123:5, 124:1, 124:24, 126:19, 127:8, 127:10, 127:13, 128:1, 128:11, 128:12, 128:20, 128:25, 129:22, 129:25, 130:6, 130:19, 130:22, 130:25, 137:4, 141:3, 145:14, 148:17, 148:18, 152:14, 153:7
**testing** [47] - 13:3, 14:16, 21:11, 22:21, 23:6, 23:11, 23:17, 28:25, 49:18, 57:11, 57:15, 64:21, 64:25, 65:2, 65:3, 65:4, 72:6, 72:14, 73:15, 74:1, 74:2, 74:6, 74:24, 75:12, 75:15, 87:21, 88:5, 92:15, 95:8, 97:7, 97:10, 97:17, 104:5, 114:9, 114:21, 114:25, 115:15, 115:16, 116:25, 142:4, 142:9, 142:12, 148:5, 149:1, 150:13
**tests** [44] - 12:22, 21:21, 22:4, 28:21, 29:4, 29:6, 29:7, 29:15, 30:3, 33:13, 34:14, 34:19, 49:2, 49:17, 49:19, 49:21,

49:23, 57:6, 65:6, 65:7, 65:20, 65:23, 71:24, 74:13, 87:22, 87:23, 88:4, 91:23, 91:25, 92:3, 92:9, 93:23, 104:20, 105:12, 115:8, 120:13, 120:15, 120:17, 143:4, 150:25, 151:9
**THE** [109] - 1:9, 1:14, 1:18, 3:7, 3:8, 3:10, 3:14, 3:25, 4:6, 4:11, 4:14, 4:15, 5:1, 5:4, 5:8, 6:4, 6:11, 7:1, 7:5, 7:8, 7:17, 8:4, 8:6, 8:10, 10:3, 10:7, 10:10, 10:16, 26:9, 26:11, 30:11, 31:6, 32:19, 36:6, 36:8, 36:9, 36:11, 36:15, 42:14, 42:18, 43:21, 43:22, 45:18, 45:21, 46:1, 46:5, 46:7, 46:11, 60:25, 62:21, 80:22, 84:13, 84:22, 85:16, 85:20, 85:22, 85:25, 86:1, 86:2, 86:6, 99:5, 99:17, 111:12, 118:4, 120:5, 121:17, 123:18, 124:9, 124:14, 124:16, 125:3, 125:6, 125:15, 126:18, 127:1, 127:11, 127:15, 128:10, 128:13, 128:17, 128:22, 129:11, 129:14, 129:17, 129:19, 129:25, 130:12, 130:16, 131:4, 131:10, 131:15, 132:18, 132:23, 133:2, 133:7, 133:24, 134:3, 134:11, 134:18, 134:21, 135:1, 135:11, 135:16, 135:18, 138:25, 141:2, 154:8, 155:7, 155:9
**themselves** [6] - 37:4, 39:3, 47:16, 53:18, 67:1, 107:22
**Theodore** [1] - 3:12
**THEODORE** [1] - 1:18
**therefore** [1] - 146:25
**they've** [1] - 48:3
**thinking** [3] - 90:11,

106:7, 117:10
**thinks** [2] - 67:7, 149:3
**third** [1] - 143:21
**THOMPSON** [2] - 2:12, 46:12
**Thompson** [34] - 8:1, 10:14, 15:17, 30:21, 30:22, 46:4, 46:5, 61:4, 72:6, 81:21, 86:20, 87:9, 87:10, 87:13, 96:16, 111:16, 113:6, 118:11, 119:4, 125:18, 129:22, 132:15, 134:4, 135:7, 135:9, 139:12, 139:17, 140:18, 145:15, 145:22, 146:4, 148:1, 148:16
**Thompson's** [8] - 86:19, 118:20, 119:22, 119:23, 120:17, 135:4, 139:5, 146:3
**thoughts** [6] - 13:23, 26:1, 143:20, 144:1, 154:20, 155:4
**thousand** [2] - 49:10, 67:12
**three** [4] - 113:25, 129:13, 134:11, 141:11
**three-step** [1] - 141:11
**threshold** [1] - 150:1
**throughout** [4] - 6:2, 21:7, 22:20, 116:8
**thrust** [2] - 68:8, 116:10
**tied** [1] - 109:25
**timing** [1] - 35:22
**tired** [1] - 72:3
**TO** [1] - 3:4
**today** [45] - 10:18, 15:14, 70:19, 79:21, 81:24, 82:2, 82:20, 85:3, 87:24, 96:5, 96:9, 99:8, 99:13, 116:19, 117:15, 119:25, 120:12, 120:25, 121:2, 121:6, 122:21, 125:23, 126:5, 128:14, 128:18, 130:23, 131:13, 131:20, 133:8, 133:18, 133:21, 135:2, 136:6, 142:1, 142:6, 142:10,

144:10, 145:22, 148:14, 149:23, 152:25, 153:8, 154:9, 154:12, 154:18
**together** [8] - 16:4, 16:5, 18:9, 18:10, 24:25, 25:19, 35:18, 48:19
**tolerate** [1] - 148:2
**took** [9] - 52:11, 65:10, 65:11, 75:21, 75:23, 76:6, 80:7, 88:6
**top** [3] - 53:7, 53:9, 142:18
**topic** [6] - 13:22, 13:24, 56:23, 56:24, 143:23, 144:3
**total** [2] - 115:19, 120:25
**toward** [2] - 35:23, 106:5
**towards** [2] - 3:24, 133:20
**track** [10] - 25:18, 34:10, 40:21, 93:9, 93:11, 93:12, 93:15, 136:19, 143:21, 144:25
**tracked** [1] - 109:25
**traffic** [1] - 3:23
**train** [7] - 26:2, 31:15, 93:19, 108:12, 115:1, 143:21, 144:1
**trained** [2] - 39:6, 120:24
**training** [2] - 75:12, 115:2
**TRANSCRIPT** [2] - 1:8, 1:24
**transcript** [4] - 124:21, 128:23, 128:25, 156:7
**transcripts** [4] - 128:13, 129:11, 129:20, 130:13
**transmitted** [1] - 7:19
**Transplus** [1] - 3:20
**transported** [1] - 3:19
**trash** [1] - 22:5
**trauma** [4] - 28:17, 82:17, 82:18, 83:1
**traumatic** [11] - 82:24, 87:12, 87:14, 89:11, 89:14, 89:22, 90:4, 94:2, 105:20, 122:13
**travel** [4] - 5:12, 137:21, 153:25, 154:2

**treat** [2] - 9:7, 9:9
**treated** [2] - 18:19, 113:8
**treating** [2] - 78:14, 86:23
**treatment** [5] - 41:18, 41:20, 55:9, 55:11, 86:25
**treats** [3] - 76:15, 76:19
**trial** [71] - 14:17, 17:5, 19:8, 19:16, 20:9, 21:18, 24:9, 25:18, 26:17, 30:18, 47:25, 49:8, 58:10, 58:14, 70:19, 70:23, 70:24, 75:15, 75:16, 78:7, 78:10, 78:14, 78:16, 81:19, 82:5, 83:10, 83:20, 88:11, 99:1, 106:15, 106:20, 108:17, 111:1, 112:2, 113:9, 130:7, 131:3, 136:17, 136:25, 137:1, 138:6, 140:10, 140:11, 140:15, 140:17, 140:24, 142:13, 146:13, 146:20, 146:21, 146:22, 146:23, 147:23, 148:3, 148:12, 148:23, 150:2, 153:2, 153:3, 153:9, 153:10, 153:11, 153:13, 153:15, 154:12, 154:19, 155:5
**tried** [3] - 5:20, 116:15, 129:9
**trier** [1] - 113:14
**trouble** [1] - 20:21
**true** [11] - 29:17, 30:13, 32:1, 32:6, 32:9, 32:10, 32:12, 73:8, 102:2, 120:21, 156:7
**trust** [2] - 19:6, 35:18
**truth** [18] - 8:8, 8:9, 16:2, 36:13, 36:14, 46:9, 46:10, 86:4, 86:5, 100:2, 104:13, 108:5, 112:4, 116:4
**truthfully** [3] - 85:11, 123:3, 140:22
**truthfulness** [1] - 138:2
**try** [9] - 3:25, 4:4, 12:23, 23:5, 42:9, 73:10, 100:24,

132:1, 154:7
**trying** [10] - 17:24, 44:21, 72:17, 78:24, 115:23, 116:3, 117:6, 140:20, 152:4
**Tulane** [2] - 8:1, 8:21
**twice** [3] - 11:3, 55:14, 56:23
**two** [26] - 9:15, 10:11, 10:17, 10:25, 16:4, 16:5, 16:11, 17:6, 18:8, 18:10, 21:3, 30:23, 37:18, 41:14, 50:2, 53:4, 54:9, 62:13, 105:4, 106:19, 113:25, 125:20, 140:15, 143:8, 144:8, 144:19
**two-week** [1] - 106:19, 140:15
**two-year** [1] - 143:8
**type** [16] - 23:3, 28:12, 32:24, 40:22, 44:4, 46:18, 47:11, 49:20, 58:1, 77:15, 79:23, 86:13, 89:10, 104:15, 123:12, 148:19
**types** [7] - 12:14, 21:16, 47:12, 49:18, 65:2, 77:7, 103:13
**typical** [1] - 95:6
**typically** [3] - 89:2, 97:14, 103:9

## U

**U.S** [1] - 1:18
**ultimate** [2] - 49:12, 151:16
**ultimately** [1] - 6:21
**unable** [4] - 45:10, 79:6, 107:22, 136:24
**uncommon** [1] - 66:21
**under** [16] - 6:16, 7:23, 37:19, 40:22, 59:3, 71:3, 79:19, 90:13, 104:17, 124:5, 126:16, 134:7, 134:9, 134:10, 134:14, 153:15
**undergo** [1] - 150:2
**understandable** [1] - 141:10
**understood** [15] - 17:21, 26:21, 27:2, 27:5, 27:9, 27:10, 53:14, 94:7, 113:6, 146:9, 146:11,

146:20, 146:22, 147:1
**undisputed** [3] - 136:7, 143:6, 143:9
**unfairly** [1] - 117:22
**unfortunately** [1] - 148:19
**unimpaired** [1] - 152:2
**unimportant** [1] - 143:22
**UNITED** [3] - 1:1, 1:4, 1:9
**United** [7] - 3:8, 3:13, 152:8, 152:10, 156:5, 156:15
**University** [3] - 8:1, 8:21, 8:23
**unless** [3] - 18:11, 84:17, 148:23
**Unless** [1] - 31:6
**unlikely** [2] - 122:11, 143:13
**unmanageable** [1] - 147:23
**unusual** [3] - 95:18, 114:13, 114:14
**up** [26] - 7:8, 7:11, 38:6, 40:11, 48:12, 49:13, 54:3, 56:3, 56:4, 56:6, 64:19, 70:2, 97:2, 97:25, 98:14, 98:16, 104:16, 112:14, 123:21, 126:11, 128:24, 134:22, 137:9, 152:20, 152:21, 154:11
**update** [1] - 3:25
**upset** [5] - 21:14, 40:24, 44:24, 59:22, 71:18
**upsetting** [1] - 59:22
**uses** [2] - 15:25, 16:24
**usual** [1] - 152:21
**utilize** [2] - 117:25, 146:17
**utterly** [1] - 105:16

## V

**VA** [1] - 8:24
**vague** [1] - 41:24
**valid** [1] - 147:1
**varies** [1] - 69:21
**variety** [3] - 9:9, 89:6, 154:13
**various** [12] - 48:9, 49:19, 49:25, 52:6, 53:1, 76:14, 87:23,

90:13, 106:13, 110:7, 141:22, 146:8
**verbal** [41] - 12:17, 16:13, 16:15, 16:21, 16:25, 21:11, 21:21, 22:15, 22:16, 28:11, 29:17, 44:17, 63:7, 63:23, 63:24, 65:13, 84:15, 94:20, 94:22, 94:25, 102:11, 102:16, 102:21, 102:22, 103:2, 103:6, 103:8, 103:14, 117:11, 123:5, 142:9, 143:1, 143:2, 149:16, 149:19, 151:4, 151:5, 151:6, 151:9
**verbally** [1] - 43:21
**verdict** [1] - 68:20
**verdicts** [1] - 147:1
**verification** [1] - 34:23
**version** [6] - 48:16, 51:22, 53:14, 53:15, 53:16, 84:2
**versus** [3] - 3:9, 14:5, 56:15
**vexations** [2] - 154:18, 155:5
**vibrant** [1] - 43:6
**view** [2] - 90:3, 151:11
**violent** [2] - 146:1, 146:2
**visit** [3] - 21:9, 21:10, 62:5
**visited** [1] - 62:8
**visual** [9] - 12:19, 87:25, 90:12, 95:24, 102:21, 142:25, 143:5, 150:24, 151:1
**visually** [1] - 96:1
**visuospatial** [1] - 21:13
**visuospatially** [2] - 50:7, 64:1
**vocabulary** [2] - 16:24, 17:4
**vocational** [1] - 89:6
**VOIR** [2] - 2:5, 8:14
**vulnerable** [2] - 82:16, 82:17

## W

**WAIS** [1] - 149:16
**wait** [2] - 5:4, 124:9
**waited** [1] - 138:11
**waiting** [2] - 3:19, 44:22

**walk** [5] - 4:19, 4:20, 43:17, 49:14, 126:6
**walks** [1] - 4:20
**wants** [1] - 131:25
**warned** [1] - 112:13
**warning** [1] - 112:17
**wash** [1] - 40:7
**WASI** [1] - 142:20
**ways** [1] - 154:13
**wear** [1] - 79:1
**weather** [1] - 109:17
**week** [6] - 44:13, 66:23, 106:19, 138:11, 140:15
**weekly** [4] - 40:15, 40:17, 54:13, 110:22
**well-educated** [1] - 16:25
**well-explained** [1] - 147:19
**well-placed** [1] - 108:6
**West** [1] - 125:11
**wheelchair** [1] - 4:22
**wheeling** [1] - 59:25
**whereabouts** [1] - 147:3
**wherein** [1] - 145:9
**WHEREUPON** [4] - 4:12, 85:23, 134:13, 155:10
**whether's** [1] - 48:2
**whole** [8] - 8:8, 36:13, 38:4, 46:9, 59:16, 86:4, 91:25, 121:8
**willing** [3] - 131:4, 132:1, 153:9
**Wilson** [2] - 152:10, 152:13
**window** [1] - 16:20
**wipe** [1] - 13:9
**withering** [1] - 122:19
**withstand** [6] - 19:15, 20:7, 122:19, 122:22, 123:9, 153:9, 153:14
**Witness** [1] - 43:19
**witness** [44] - 6:6, 6:8, 8:12, 10:4, 26:7, 31:7, 36:5, 36:9, 36:17, 42:13, 46:1, 46:13, 70:13, 73:4, 73:5, 80:21, 84:8, 84:24, 85:2, 85:17, 86:1, 86:8, 100:16, 108:19, 111:11, 112:13, 118:3, 127:3, 127:5, 127:6, 128:20, 129:10, 131:13, 131:18, 132:12, 132:14,

132:19, 133:17, 136:15, 144:16, 145:8, 145:11, 145:12

**WITNESS** [6] - 8:10, 36:8, 36:15, 43:22, 46:11, 86:6

**witness's** [1] - 127:10

**witnessed** [1] - 130:21

**witnesses** [9] - 45:22, 45:24, 45:25, 124:10, 126:3, 126:12, 133:9, 146:12, 147:14

**woken** [1] - 119:12

**woman** [2] - 43:4, 43:6

**word** [9] - 4:8, 17:3, 90:9, 96:13, 103:3, 103:4, 144:13

**words** [6] - 95:2, 95:3, 96:3, 96:4, 122:25, 142:22

**worker** [3] - 62:1, 109:22, 110:21

**works** [1] - 144:17

**worse** [1] - 92:14

**worst** [1] - 103:20

**worth** [1] - 94:18

**writes** [2] - 39:24, 39:25

**writing** [1] - 144:25

**written** [3] - 33:1, 103:9, 149:5

**wrote** [1] - 27:6

# X

**Xanax** [3] - 20:5, 77:9, 77:15

# Y

**year** [7] - 37:10, 129:15, 130:24, 138:12, 143:8, 143:14, 144:8

**years** [15] - 8:22, 9:5, 37:12, 37:18, 41:14, 51:2, 51:6, 62:13, 67:13, 87:1, 139:4, 139:7, 139:8, 144:19, 152:3

**yell** [1] - 111:6

**yelled** [1] - 132:8

**yelling** [3] - 44:18, 118:14, 130:20

**yellow** [1] - 134:24

**yesterday** [1] - 154:11

**young** [1] - 43:4

**yourself** [3] - 18:12, 53:20, 106:7